# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

[1] KEVIN W. HOOG; and
[2] VIVIAN REBECCA HOOG,

           Plaintiffs,

v.

[1] DOMETIC CORPORATION, a Delaware
corporation,

           Defendant.

Case No. __CIV-20-272-JD_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Kevin W. Hoog and Vivian Rebecca Hoog (hereinafter collectively referred to as "Plaintiffs"), sues Defendant DOMETIC CORPORATION, and states as follows:

## I.    INTRODUCTION

1.    For more than 20 years, Defendant Dometic Corporation – along with its parent and affiliate companies – have foisted dangerously defective gas absorption refrigerators onto the American public.  Dometic and its corporate fellow travelers were at all times aware that Dometic-branded gas absorption refrigerators constituted a serious fire hazard, and put lives and property at risk.   Yet Dometic never took steps to investigate – much less eliminate - the dangerous defects inherent in its product, nor did it disclose the defects and risks to federal regulators or consumers.   Instead, year after year, it continued to pump tens of thousands of defective gas absorption refrigerators into the American RV and boat market, all the

while representing that the refrigerators were safe and free of defects.   As a result, millions of Americans have purchased RVs and boats containing Dometic's defective refrigerators, unknowingly exposing themselves and their families to a serious risk of injury or death, while thousands have actually experienced firsthand the fear, loss and ruinous financial consequences of a Dometic gas absorption refrigerator fire in the close confines of an RV or boat.

2.    Dometic's conduct – and that of its affiliate and parent companies – was not the result of a good faith business decision that just didn't work out.   Rather, it was an intentional, knowing and willful attempt to use every device, stratagem and scheme to conceal and minimize the dangerous defects inherent in its refrigerators, so that it could continue to sell the defective products into the American market, rather than spend the pennies it would take to make its refrigerators safe to use.   By doing so, Dometic elevated corporate profits over the rights and safety of the American public, all the while gaming the federal regulatory scheme established by the National Highway Traffic and Safety Act (NHTSA) intended to ensure safety on the highways.

3.    This case is but another example of the continuing consequences of Dometic's wrongful conduct.[1]   Plaintiffs seek to recover damages suffered as a

---

[1]    Dometic concedes that it has received at least 1,466 fire claims involving their gas absorption refrigerators between 2000 and 2016.

result of a fire on March 30, 2018, caused by a defective Dometic NDA 1402 gas absorption refrigerator, which was installed as original equipment in Plaintiffs' 2007 Newmar Dutch Star 4320 Class A motorhome, (hereinafter referred to as the "Fire" and "RV" respectively).

4.     The Dometic-branded NDA 1402 gas absorption refrigerator at issue in this case  (the "Refrigerator") was designed, manufactured, and placed into the stream of commerce by Defendant Dometic Corporation and its parent and affiliate companies.   The Refrigerator was identical in design, function and operation to the other 3 million Dometic-branded gas absorption refrigerators sold into the American market by Dometic since 1997, and contained the same design defects.   All of these products were dangerously defective in design when first put on the market and remained dangerously defective at all times thereafter.

Plaintiffs will seek damages at trial according to proof, including punitive damages, based on the averments set forth below.

## II.    PARTIES

5.     Plaintiffs is, and at all times relevant hereto was, a citizen of Oklahoma, residing in Arcadia, Oklahoma.

6.     Defendant Dometic Corporation ("Defendant" or "Dometic") is a Delaware corporation with its headquarters and principal place of business at 13551 Triton Park Blvd., Suite 1000, Louisville, Kentucky 4022. Dometic Corporation is one of a network of affiliated companies involved in the design, manufacture, assembly, purchase, importation,

marketing, sales, distribution, servicing, recall and retrofit of Dometic-branded gas absorption refrigerators placed into the stream of commerce throughout the United States, specifically including the state of Oklahoma. Dometic Corporation and its affiliate companies are ultimately organized, controlled and owned by Dometic Group AB, a publicly traded company listed on the Swedish NASDAQ exchange (DOM:STO).

7.     At all times relevant hereto, Dometic Corporation has maintained a close and continuing business relationship with its affiliate and parent companies, and has worked closely with them in all aspects of the design, manufacture, sale, distribution, recall and retrofit of Dometic-branded gas absorption refrigerators. Dometic Corporation has at all times had the ability to influence and affect the design of Dometic-branded gas absorption refrigerators, and has actively participated in, controlled and directed the investigation of defects in Dometic-branded gas absorption refrigerators, both in the United States and Sweden, where Dometic's parent - Dometic Group AB – is headquartered. Dometic Corporation has, at all times relevant hereto, access to all information regarding the design and manufacture of Dometic-branded gas absorption refrigerators in the possession of its affiliate and parent companies, and has regularly collaborated with its affiliates and parent in the design and manufacture of said products, including in the design and manufacture of product recall retrofit devices.

8.     Plaintiffs are informed and believe that Dometic-branded gas absorption refrigerators have been sold and distributed in the United States since 1965 by White Consolidated Industries, Inc., dba The Dometic Corporation, a wholly owned subsidiary of Electrolux, AB, a Swedish corporation. Electrolux AB/White Consolidated Industries, Inc.

sold its Dometic gas absorption refrigerator business in 2001 to a predecessor of Defendant Dometic Corporation, and through a series of corporate transfers and reorganizations, all assets and liabilities relating to the gas absorption refrigerator and cooling unit business were ultimately transferred to, and assumed by, Defendant. Specifically, Defendant assumed liability for defects in pre-June 2001 manufactured Dometic-branded gas absorption refrigerator units.

9.      Defendant's Dometic-branded products, including the Refrigerator at issue in this case, were and are sold and distributed throughout the United States by Defendant, and through Defendant's network of distributors/retail outlets, including in the State of Oklahoma.

10.      As with other vehicle or appliance sales, while Dometic-branded gas absorption refrigerators were initially sold to RV manufacturers, Original Equipment Manufacturers ("OEM's") and distributed through retail RV dealerships, the intended end-users of the refrigerators were always consumers, not those intermediaries. When Dometic initiated recall campaigns regarding its gas absorption refrigerators, Defendant Dometic was the party responsible for notifying NHTSA as well as all consumers, and remedying the defect.

11.      Defendant Dometic was and is authorized to transact business and conduct business in Oklahoma, and throughout the United States.

### III.    JURISDICTION AND VENUE

12.      This Court has jurisdiction over Defendant Dometic Corporation because, to the best of Plaintiffs' knowledge and belief, Defendant is a foreign corporation authorized

to conduct business in Oklahoma, and because a substantial portion of the wrongdoing alleged by Plaintiffs occurred in this Circuit. Defendant does significant business in Oklahoma, and thus has sufficient minimum contacts with Oklahoma, or otherwise intentionally avail itself of the Oklahoma consumer market through the promotion, marketing, sale, and service of gas absorption refrigerators and other RV-related products in Oklahoma. This purposeful availment renders the exercise of jurisdiction by this Court over Defendant and/or related entities permissible under traditional notions of fair play and substantial justice. Plaintiffs' damages exceed the $75,000.00 minimum necessary to sustain subject matter jurisdiction in a diversity of citizenship case.

13.    Venue is proper in this district in that a substantial amount of the events, acts and omissions giving rise to these claims occurred within said district.

14.    All conditions precedent to the maintenance of this action have occurred, been satisfied or performed, or have otherwise been waived.

### IV. FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

15.    Since at least 1997, Dometic – including its predecessors, affiliates and parents - has designed, manufactured, sold distributed and otherwise placed into the stream of commerce millions of refrigerators specially designed for use in RVs and in boats, including the Refrigerator at issue in this case. These RV refrigerators all share a common design and common gas absorption technology.

### A.    How Gas Absorption Refrigerators Work

16.    Unlike a regular household refrigerator that uses a motorized compressor, a gas absorption refrigerator has no moving parts. Instead, gas absorption technology

involves a process whereby a solution of ammonia, water, and sodium chromate is pressurized by hydrogen gas inside a sealed loop of low carbon steel tubing, and then heated by electricity or propane until the solution boils – at approximately 400 degrees Fahrenheit – and releases ammonia gas. The ammonia gas circulates through the steel tubing at very high pressure – approximately 450 psi. As the ammonia gas is first condensed to a liquid, and then evaporated through interaction with the hydrogen gas, heat is removed from the refrigerator box, causing the temperature in the box to decrease and providing the refrigeration effect. The series of tubes housing the solution and its heating element is referred to as a "cooling unit," and it is a separately replaceable part bolted to the back of the refrigerator box. While the refrigerator is normally installed in a wooden refrigerator cabinet in an RV or boat, it is a self-contained unit separate and apart from the RV or boat itself. The refrigerator is designed to plug into a normal duplex electrical outlet, and will operate normally outside of any RV or boat if plugged into a 120 VAC outlet.

17.    A Dometic gas absorption refrigerator cooling unit includes the heat sources (propane and electric), as well as a condenser, evaporator, absorber, and solution tank. The cooling unit is a sealed no-maintenance boiler system. At rest, *i.e.*, when not operating on electric power or propane, the cooling unit's internal pressure is approximately 350 psi, depending on ambient temperature. Sodium chromate – a known Level 1 carcinogen – is included in the solution to offset the corrosive effect of the ammonia/water combination on the low carbon steel tubing. The following diagram explains how the ammonia absorption process works, and the key components of a typical gas absorption refrigerator, including the Refrigerator installed as original equipment in plaintiffs' RV:



**B**.    **Dometic's Defective Gas Absorption Refrigerators Contain Common Design Defects That Have Caused and/or Contributed to Thousands of Fires**

18.    Since at least 1997, Dometic designed, manufactured, assembled, sold, and otherwise placed into the stream of commerce Dometic-branded gas absorption refrigerators in a number of different models and sizes, ranging from six cubic feet up to 14 cubic feet. The plaintiffs' Refrigerator was a 13.2 cubic foot model. The cooling units used on all these gas absorption refrigerators was identical in design, function and operation, differing only in size. The cooling units also shared common design defects that created an unreasonable risk of fire and explosion when the refrigerators were used in a foreseeable manner and for their intended purpose.

8

19.    One design defect involves the cooling unit boiler tube assembly. The boiler tube is that part of the cooling unit where heat is applied to the cooling solution through electric heaters contained in pockets welded to the side of the boiler tube. The boiler tube configuration common to all Dometic gas absorption refrigerators, including plaintiffs' Refrigerator, is illustrated below:



20.    In this boiler tube design, heat from the electric heating elements is transferred first through the wall of the heating element pockets and then through the single line of weld connecting the heating pockets to the boiler tube. The surface area of the single welds along the boiler tube is small, leading to a concentration of heat on the inner surface of the boiler tube wall adjacent to the weld. This configuration is referred to herein as the "Single Weld Design".

21.     When operating, Dometic gas absorption refrigerators are designed to cycle through heating and cooling periods 15 to 20 times per day. The heating and cooling cycles are managed through electronic controllers designed by Dometic and/or manufactured to its specifications. During the heating and cooling cycles, the metals of each component of the boiler tube assembly – the heater pockets, welds, and boiler tubing – expand and contract at different rates, introducing cyclic stress into the assembly. The stress is particularly acute when the system shifts from a cooling to a heating cycle, because Dometic designed the electronic controllers with a very steep temperature gradient, *i.e.*, during a heating cycle, the heat is applied very rapidly and all at once.

22.     The concentration of heat on the inside surface of the boiler tube wall caused by Dometic's use of the Single Weld Design, combined with the above cyclic stress, causes a breakdown of any protective layer on the inside of the boiler tubing that may have been established through pre-production treatment of the boiler tubing, or through the sodium chromate component of the cooling solution. Once the protective layer is compromised, the highly corrosive cooling solution begins to eat away at the boiler tube wall, creating excessive corrosion along the line of the heater pocket welds, and microscopic corrosion pits and cracks. When the wall of the boiler tube becomes too thin to withstand the internal pressures inherent in the cooling unit (350 psi when turned off and 450 psi under normal operation), the boiler tubing wall cracks and leaks flammable ammonia and hydrogen gas – along with cancer-causing sodium chromate – at high pressure into the refrigerator compartment, creating a serious health and fire hazard.

23.     The photograph below shows an actual boiler tube from a Dometic-branded gas absorption refrigerator that cracked and caused a fire. The gap in the tube wall is readily apparent, and is illustrative of thousands of similar failures in Dometic-branded gas absorption refrigerators since 1997.



24.     The development of excessive corrosion on the inside of the boiler tube along the line of the heater pocket welds under normal use is caused by the use of the Single Weld Design of the cooling unit boiler tube assembly common to all Dometic gas absorption refrigerators, and is what makes that design defective. The damage begins the first time the refrigerator is turned on, and once the protective layer inside the boiler tube is compromised, the corrosion will continue to eat away at the boiler tube wall until the boiler tube cracks and leaks. Dometic has at all times relevant hereto known about the dangers of corrosion in the cooling units used in its gas absorption refrigerators, as

evidenced by the fact that the cooling units all contain sodium chromate as a corrosion inhibitor. However, Dometic has never done any study or testing that would enable it to predict exactly which cooling units will fail, when they will fail, or under what circumstances. As a result, the entire population of Dometic-branded gas absorption refrigerators placed into the stream of commerce since 1997 is suspect for catastrophic failure, a fact Dometic has at all times concealed, thereby passing the risk of property damage, serious injury and death onto unsuspecting consumers, including Plaintiffs.

25.    The defective design of the boiler tube assembly can cause a catastrophic fire to be ignited, including, but not limited to, through the following processes:

     a.  The uncontrolled, high-pressure release of hydrogen gas due to a breach in the boiler tube wall is sufficient to cause the gas to self-ignite regardless of whether the refrigerator is operating or not;

     b.  Dometic gas absorption refrigerators are designed to be installed in wooden cabinets that are not gas tight. The gases escaping from a leaking cooling unit will therefore not be contained inside the refrigerator cabinet, but will flow outside the cabinet into the living space of the RV/boat, and out of the refrigerator cabinet vents to the area immediately around the RV/boat. The escaping gases – particularly hydrogen gas – requires very little energy to ignite and has a very broad flammability range. Any momentary spark emanating from a source inside or around the RV or boat – from static electricity, a loose electrical connection, turning on a switch – is sufficient to cause ignition;

c. A leaking cooling unit that is as little as 20% low on cooling solution has a propensity to develop dry spots on the inside of the boiler tube walls that can lead to a "run-away heating event" that causes the steel tubing to reach temperatures in excess of 1000 degrees Fahrenheit, resulting in fires, either by ignition of the escaping flammable gases, or by ignition of the combustible unprotected wood inside the refrigerator compartment;[2]

d. The refrigerators' electric heaters, propane burner, and propane igniter are all in the immediate vicinity of the boiler tube assembly. Each is a competent ignition source for gases escaping from a leaking boiler tube assembly;

e. The excessive corrosion caused by the defective boiler tube assembly design can "sluff off" the boiler tube wall during normal operation and circulate through the system, plugging the internal percolator tube and stopping flow of the cooling solution, leading to a run-away heating event, as described above, or the buildup of excessive internal pressure leading to a rupture of the cooling unit due to the defective safety fuse plug design (described below), and the uncontrolled release and detonation of hydrogen gas.

---

[2] The "dry boiler" phenomenon occurs when there is not sufficient flow of the cooling solution to wet the inside of the boiler tube wall, and is akin to a pot of water left on the stove. So long as there is water in the pot to absorb the heat, the pot will be fine no matter the temperature. Once the water is gone, however, the same amount of heat will destroy the pot.

26.     In addition to the defective boiler tube assembly, Dometic gas absorption refrigerators contain additional common design defects, including, but not limited to, a so-called "safety fuse," which actually decreases the safety of the cooling unit with respect to fire risk. The safety fuse is a plug inserted into the end of the cooling unit solution tank. The photo below is illustrative of the safety fuse design common to all Dometic-branded gas absorption refrigerators, including plaintiffs' Refrigerator:



27.     The safety fuse is designed to melt and "blow out" at relatively low temperatures (less than 300 degrees Fahrenheit), thereby depressurizing the cooling unit in the event of a fire or other malfunction before internal pressures reach the point where the cooling unit explodes and causes a safety hazard due to flying shrapnel. However, because the safety fuse operates on temperature and not on pressure, it is wholly ineffective as a

pressure relief system, *i.e.*, it does *not* prevent the cooling unit from rupturing due to high pressure.

28.    Further, when the safety fuse "blows out" because it is exposed to heat – as in a fire – it releases the cooling solution into the enclosed space of the refrigerator compartment at over 400 psi, creating a cloud of highly flammable ammonia and hydrogen gas, which is then ignited by any available ignition source, including the sudden uncontrolled release of the hydrogen gas itself. The effect of this "safety" device – when operating as designed – is either to initiate a fire where none existed through a rupture of the cooling unit and the uncontrolled release of hydrogen gas, or turn a small fire into a hydrogen-fueled inferno.

29.    The public safety risks created by the defects inherent in the design of Dometic-branded gas absorption refrigerators are not theoretical, but actual. Dometic's gas absorption refrigerators have caused thousands of fires since 1997, and continue to cause *new* fires at an alarming rate.

30.    Further, the public safety risks caused by Dometic's defective gas absorption refrigerators is not limited to owners or users of Dometic's refrigerators. The boiler tube cracks and leaks caused by Dometic's use of the Single Weld Design, and the resulting uncontrolled release of highly flammable and explosive gases - most notably hydrogen gas – results in fires that burn with an intense heat, capable of shooting flames both upwards and many feet to the side of the refrigerator, thereby putting the lives and property of anyone near the refrigerator at risk.



Figure 1 – Example of what a Dometic RV Refrigerator Fire looks like. This fire – caused by a leaking Dometic RM 2852 gas absorption refrigerator – occurred in Olympia, Washington on March 27, 2016, completely destroying the RV and contents, and causing substantial damage to the structures nearby.



**Figure 2 - Before (top) and after (bottom) photos of fire damage caused by leaking Dometic RM 2852 gas absorption refrigerator - Ohio, August 16, 2015.**



**C.     Defendant Continued to Produce, Market, and Sell Its Gas Absorption Refrigerators Despite Actual Knowledge of the Defects and Their Propensity to Cause Fires.**

31.     Dometic acknowledges, understands and concedes that leaks in its gas absorption refrigerator cooling units carry the risk of fire and consequent "injury or death" to individuals using its products as designed and intended, and for a reasonably foreseeable purpose. Dometic's cooling units were therefore designed not to leak – ever. Yet, for at least 20 years, Dometic has had actual knowledge that its gas absorption refrigerators were leaking and igniting fires when operated under real world conditions, thereby posing serious safety risks to owners and the general public. Dometic's actual knowledge was and is based on a variety of data, including:

> ➢ Since at least 1999, Dometic has maintained detailed databases tracking the real-world performance of its gas absorption refrigerators in the field, including fire claims and warranty and return claims. The data was provided to Dometic from a variety of sources adverse to Dometic, including attorneys and insurance companies representing owners of RVs and boats destroyed in fires caused by leaking Dometic gas absorption refrigerators. For example, Chris Jackson, Dometic's former claims administrator and the person responsible for maintaining the fire claim databases, confirmed, under oath, that Dometic received 1,466 fire claims – not including warranty and returns - involving its gas absorption refrigerators between 2000 and 2016.

➢ Dometic has been engaged in constant litigation in state and federal courts across the country arising from fires caused by its defective gas absorption refrigerators, and through that litigation have had access to expert reports from independent fire investigators and engineers documenting the defects described herein.

➢ Over the years, Dometic has retained its own outside experts and consultants to examine and test its gas absorption refrigerators. These outside studies documented the defects in boiler tube design described above, particularly the inadequacy of the boiler tube and its failure due to internal corrosion. One such expert was Dr. Elizabeth Buc, who Dometic's outside litigation counsel retained in 2005 – 2006. Initially, Dr. Buc was tasked with conducting a series of controlled release tests of Dometic gas absorption refrigerator cooling units to prove that boiler tube leaks did not cause fires, thereby creating a litigation defense to the many fire claims Dometic was receiving. Dr. Buc's testing proved just the opposite – confirming that boiler tube leaks would indeed cause fires. Dr. Buc was again retained by Dometic in 2006 – 2007 to develop the Secondary Burner Housing (SBH) retrofit device. While represented by Dometic to be a "fix" for any "potential" defects in its gas absorption refrigerators, Dr. Buc has since conceded that the SBH 1). does not eliminate the use of the Single Weld Design; 2). does not prevent the Single Weld Design from causing corrosion on the inside of the boiler tube along the line of the exterior weld between the boiler tube and electric heater

pockets; 3). does not prevent that corrosion from eating through the wall of the boiler tube; 4). does not prevent the high pressure release of the cooling unit contents, and 5). does not prevent the high pressure release from causing a fire. Through these outside studies and consultations, Dometic obtained scientific and engineering confirmation of both the existence and nature of dangerous defects inherent in the design of its gas absorption refrigerators, as well as recommendations for reducing or eliminating the defects through modifications in design, and/or the use of boiler tubing of different specification.

32.    Notwithstanding Dometic's actual knowledge of the dismal real world performance of its product, Dometic never stopped selling and placing its dangerously defective refrigerators into the stream of commerce, nor has it ever paused production and sales so that the refrigerators could be modified to operate safely. As a result, between 1997 and 2017, Dometic sold over 3 million defective gas absorption refrigerators into the U.S. market.

**D.    Dometic Has Twice Recalled *Some* of Its Defective Refrigerators, but the Recalls Have Done Nothing to Alleviate the Serious Safety Defects**

33.    Dometic has instituted two product safety recalls involving select models of its gas absorption refrigerators through the National Highway Traffic Safety Administration ("NHTSA") – one in 2006 (NHTSA No. 06E-076, "the 2006 Recall") and one in 2008 (NHTSA No. 08E-032, "the 2008 Recall"). Both recalls were self-initiated by Dometic, including its affiliate and parent companies; the recalls were not the result of any

agency action by NHTSA. The timing, nature, scope, and remedy involved in both recalls were controlled completely by Dometic, in concert with its affiliate and parent companies. Dometic did not initiate the recalls to fix its inherently dangerous and defective refrigerators, nor did any of its retrofit devices render its refrigerators safe to use. Rather, the initiation of the recalls were part of an overall plan and scheme to conceal and minimize the risks the defects posed on the one hand, and to create a litigation defense to further fire claims on the other hand, by blaming owners for not participating in the recall program.

34.    Notwithstanding the common defects inherent in all Dometic-branded gas absorption refrigerators, Dometic's 2006 Recall was limited to Dometic 2-door refrigerator Models NDR1062, RM2652, RM2662, RM 2663, RM2852, RM2862, RM3662, RM3663, RM3862, and RM3863 manufactured between April 1997 and May 2003. A total of 926,877 refrigerators were recalled. The 2006 Recall blamed the problem – described as fatigue failure at the toe of the weld between the heater pocket and boiler tube – on the use of a higher wattage heater element (354 watts vs. 325 watts) between 1997 and 2003. But this was misinformation. While the higher wattage heating element may have sped up the corrosion of the boiler tube walls, the problem was then, and is now, Dometic's use of the Single Weld Design, which required all of the heat necessary to run the cooling unit to pass through a single line of weld, thereby initiating the corrosion process leading to boiler tube failure in the first place.

35.    The 2008 Recall involved all the same models, manufactured between June 1, 2003 and September 30, 2006, except Model RM3863. A total of 745,574 refrigerators were recalled. The 2008 Recall blamed the same problem – fatigue failure – on an

"inconsistent weld process" that was supposedly remedied by adopting welding procedures in 2006 and 2007 that used robotic – rather than manual – welds to attach the electric heater pockets to the cooling unit boiler tube.[3] But this was again misinformation and inherently deceptive. While robotic welding provided a more consistent weld, it did nothing to eliminate the inherent design defect of *using only one weld* to carry all the heat generated by the electric heaters. Dometic's insistence on using the Single Weld Design meant that the defects and processes at play were unchanged, and that Dometic-branded gas absorption refrigerators were just as dangerously defective, regardless of the welding process used. By such misdirection, Dometic purposefully hid this fact from NHTSA – and by extension from owners and the general public, even though third party engineering firms had begun to investigate the problem on their own, and had published articles by then plainly documenting the corrosion failure that was becoming common in Dometic-branded gas absorption refrigerators.

36.    Dometic has not expanded the recalls to include any refrigerators manufactured after September 30, 2006, notwithstanding that Dometic has at all times continued to manufacture, sell, and otherwise place these same model refrigerators into the stream of commerce. The post-September 2006 refrigerators continue to use the Single Weld Design, and therefore contain the same design defects as those manufactured before September 2006. Dometic knew and has hidden that the gas absorption refrigerators

---

[3] Dometic had *no established welding procedures or protocols at all* prior to 2006 – 2007.

manufactured after September 2006 continue to fail and cause fires because of the same defects that affected the pre-2006 refrigerators.

37.    Dometic has *never* recalled any of its Dometic Model RM2351, RM2354, RM2451, RM2454, RM2551, RM2554, RM3762, DMR/DMC 7-Series, RM2820, RM3962, RM1350 refrigerators – nor the Model NDA1402 refrigerator installed in plaintiffs' RV - notwithstanding that Dometic continues to manufacture some or all of those refrigerator models; those refrigerators share the common design defects described above; and, Dometic has actual knowledge that these model refrigerators continue to fail and cause fires because of the defects described above.

38.    The 2006 and 2008 Recalls called for identical retrofit campaigns. The retrofit involved installing a "Thermo Disc" and "Thermal Fuse" on the metal shielding surrounding the cooling unit boiler tube, and installing a "Secondary Burner Housing Assembly" – essentially three thin metal plates – behind, below and in front of the cooling unit boiler tube. Upon information and belief, the Thermo Disc, Thermal Fuse, and metal shielding were designed and manufactured by Dometic, or at its direction. Dometic also began to install the Thermo Disc and Thermal Fuse on new production cooling units manufactured after June 2006. Plaintiffs are informed and believes that the Refrigerator had a Thermo Disc and Thermal Fuse installed at the factory. The intended purpose of the Thermo Disc and Thermal Fuse was to sense temperature at the boiler tube, and to interrupt electric power to the refrigerator controls in the event the boiler tube exceeded a set temperature, thereby preventing ignition of a fire caused from an overheated cooling unit. The metal shielding was intended to protect consumables inside the refrigerator cabinet

(*i.e.*, bare wooden framing, insulation, wooden paneling, etc.) from flames and/or radiant heat caused by a failed boiler tube.

39.    While the retrofit remedy chosen by Dometic was cheap to manufacture and quick to install, it was also wholly inadequate for its intended purpose in that it did not address, much less eliminate, the root cause of the boiler tube failures in Dometic-branded gas absorption refrigerators, namely internal corrosion of the boiler tube caused by the use of the Single Weld Design, leading to thinning of the boiler tube walls, cracks, and leaks of flammable hydrogen and ammonia gases at high pressure.

40.    As of the filing of this Complaint, fires are still occurring as a result of the defects in Dometic-branded gas absorption refrigerators, regardless of whether the refrigerators have been recalled and retrofitted to Dometic's specifications, or which have had the retrofit "failsafe" devices installed during refrigerator manufacture.

41.    Dometic has at all times had actual knowledge that its retrofit campaigns have been both fundamentally fraudulent and inadequate in that it continued to receive fire claims involving its gas absorption refrigerators that had already been retrofitted with the above devices, or which had the devices installed during production.

**E.    Dometic Concealed and Suppressed Material Facts About the Defects and Ongoing Fire Danger Inherent in Its Gas Absorption Refrigerators Despite an Ongoing Duty to Disclose.**

42.    Dometic – including its affiliates and parent companies - at all times relevant hereto, had a duty to manufacture defect-free products and an ongoing duty to disclose details about known defects, hazards and unreasonable safety risks (such as the fire risks

here), regardless of any warranty period, both truthfully and completely. Due to the serious dangers involved, Dometic's duty to disclose known defects was, at all times relevant hereto, ongoing. Dometic also had a duty to conduct any recall and retrofit campaigns regarding its gas absorption refrigerators in a timely and reasonable manner so that the recall/retrofit campaigns resulted in gas absorption refrigerators that could be used safely, and to provide adequate warnings and instructions on continuing hazards and risks inherent in its gas absorption refrigerators of which users would not be aware.

43.    Rather than fix or eliminate the serious safety-related defects inherent in its gas absorption refrigerators, Dometic – in cooperation with its affiliates and parent companies – actively concealed and minimized the dangers and risks inherent in its defective products from consumers, the general public, and federal regulators at NHTSA responsible for ensuring safety on the highways, through a consistent pattern and practice of deception, misrepresentation, fraudulent concealment, and omission of material fact, including, but not limited to:

   a.    Failing to disclose, suppressing, and minimizing the *nature and number* of defects inherent in the design of Dometic-branded gas absorption refrigerators by limiting the description of the defect leading to the 2006 Recall to "… a fatigue crack that may develop in the boiler tube in the area of the weld between the boiler tube and heater pocket."[4] This description was deceptive and misleading in that the fatigue cracking of the boiler tube was

---

[4] Dometic NHTSA Notification of Defect (August 28, 2006), *available at* https://static.nhtsa.gov/odi/rcl/2006/RCDNN-06E076-8395.pdf, (last accessed March 20, 2020).

a symptom and manifestation of the underlying defect – corrosion pitting and cracking of the inside of the boiler tube caused by the use of the Single Weld Design – rather than the defect itself. This omission of material fact was designed to convey the impression that the defect was limited to cooling units that exhibited fatigue cracking, when in fact the defective boiler tube assembly was common to all of Dometic's cooling units; the defective design would cause excessive corrosion to the inside of the boiler tube along the line of the weld in all cooling units; and that all cooling units would therefore eventually fail and leak, with a substantial number causing catastrophic fires;

b.  Failing to disclose, suppressing, and minimizing the *scope* of the defects inherent in the design of Dometic-branded gas absorption refrigerators. Notwithstanding Dometic's actual knowledge of the extensive fire claim and warranty history of its gas absorption refrigerators, Dometic consistently refused to acknowledge the existence of a problem, referring instead in the 2006 Recall notification to "…Dometic products which *may* contain *potential* defects…" (emphasis added). Further, Dometic consistently claimed and represented that the scope of the defective refrigerator population was limited to "…a fractional percentage of the potentially affected refrigerators…" In the 2006 Recall (NHTSA 06E-076), Dometic estimated a "potential maximum incident rate" of boiler tube failures at .01% of 926,877 refrigerators included in the recall – a total of 92 refrigerators. In the 2008 Recall (NHTSA 08E-032), Dometic estimated the potential

maximum incident rate for the additional 745,574 refrigerators included in that recall population to be .005% – or a total of 37 refrigerators. These statements were knowingly false when made. Dometic's own internal tracking of warranty claims and fires showed that by 2008, Dometic had been put on notice of at least 835 fire claims involving its gas absorption refrigerators – many of which Dometic had investigated and paid out substantial sums to settle - in addition to hundreds more failed refrigerators returned from the field because of cooling unit leaks. In truth and fact, there have been thousands of fires in RVs and boats caused by Dometic's gas absorption refrigerators, a fact that Dometic never disclosed to the federal regulators at NHTSA, notwithstanding its statutory duty to do so;

c.    Dometic intended for consumers and federal regulators to accept these "estimates" as representations of fact based on the superior knowledge of Dometic as the manufacturer of the product. Given Dometic's actual knowledge of the thousands of fires and failures of its gas absorption refrigerators reported to it between 1997 and 2008 – information never disclosed to consumers or federal regulators – these representations were grossly deceptive and misleading, in that they created the false impression that there were no safety problems associated with Dometic's gas absorption refrigerators, or that any problems were *de minimis* in nature;

d.    Failing to disclose, suppressing, and minimizing the circumstances in which a failed boiler tube could ignite a fire. For example, Dometic consistently

maintained that certain specific conditions must exist in order for a failed boiler tube to cause a fire, including that the refrigerator "…must be on and normally operating…,"[5] when in fact, the high-pressure release of hydrogen gas from a leaking boiler tube is sufficient to cause self-ignition of the gas regardless of whether the refrigerator is on or off;

e.   Dometic further failed to disclose and suppressed the fact that these "conditions" were not based on any sound, independent scientific inquiry, but were instead the result of tests manufactured and controlled since the 2005 – 2006 timeframe by Dometic itself, using engineers and other professionals – such as Dr. Buc (identified above), R. Craig Jerner, Ph.D./P.E., Jaime Petty-Galis, P.E.[6], Amy Gray, Ph.D./P.E., and Richard P. Baron, Ph.D./P.E. - routinely hired by Dometic as experts in litigation arising from fires caused by its defective gas absorption refrigerators. Dr. Jerner, for example, was so biased from his years of compensation from Dometic that as recently as 2014 he testified under oath that he never examined a Dometic-brand gas absorption refrigerator that he determined to have been the cause of an RV fire, notwithstanding that Dometic has paid millions of dollars to individuals in private settlements for injuries and property damage from RV

---

[5] Both the 2006 Recall and 2008 Recall summaries state this to be the case. While the 2006 Recall summary says that the propane gas system has to be on to ignite a fire, the 2008 Recall summary drops this condition.

[6] Ms. Petty-Galis is a metallurgist Dometic hired to attend the materials exam of the Hoog Refrigerator in December, 2018.

refrigerator fires. The purpose and intent of these omissions and suppressions were to convey to both consumers and federal regulators that the defects inherent in Dometic-branded gas absorption refrigerators either didn't exist, were unlikely to occur, or did not pose a safety risk, and that the refrigerators were therefore safer to use than they really were;

f.    Concealing the dangerously defective safety fuse plug design;

g.   Suppressing and concealing the fact that Dometic never adequately tested its gas absorption refrigerators prior to placing the products into the stream of commerce to determine if they were safe to operate under real-world conditions. Dometic instead made the business decision to use its customers as unknowing guinea pigs, and to shift the risk of any design or manufacturing defects onto it. Even after Dometic began to receive a flood of fire claims and warranty claims that should have alerted it to the fact that serious defects existed in its products when used under real-world conditions, Dometic continued to conceal, suppress, and minimize the defects and safety risks from consumers and federal regulators, and continued to insert dangerously defective products into the stream of commerce. Indeed, Dometic – to this day – denies that any safety-related design defect exists in its refrigerators;

h.   Deploying "independent" fire investigators to investigate fires involving Dometic-branded gas absorption refrigerators who are actually nothing more than paid retainers of Dometic. These fire investigators include, Walter

Oliveaux[7], SOS Investigations, Inc. (St. Francisville, Louisiana); Chris Bloom, CJB Fire Consultant (White City, Oregon); Gary Coggins, Independent Fire Consulting (Chelsea, Alabama); and Kim May, Tri-Fire Consultants (Fort Wayne, Indiana). Between them, these individuals have been retained by Dometic in over 1,000 fire investigations involving Dometic-branded gas absorption refrigerators. As part of Dometic's risk management program, these individuals are deployed whenever the Dometic receive a significant fire claim involving its gas absorption refrigerators. While holding themselves out as independent investigators conducting a full examination pursuant to commonly accepted objective standards and guidelines such as NFPA 921, by agreement and understanding with Dometic, its only task is to find an alternate explanation for a fire that does not involve a Dometic gas absorption refrigerator. The close and continuous business relationship between Dometic and this cadre of fire investigators is concealed from other fire investigators, regulatory bodies, litigants, and owners of Dometic gas absorption refrigerators for the purpose of creating a misleading image of impartiality, and to suppress and conceal the true nature of the defects and risks inherent in Dometic's products, and the causal connection of those defects to individual fires;

---

[7] Walter Oliveaux was the fire investigator who Dometic dispatched to investigate the fire in this case.

i.  Establishing a fraudulent and useless field testing protocol whereby Dometic-branded gas absorption refrigerators are pressure tested in the field after a fire to determine if they leak due to a failure in the boiler tubing. The testing protocol arbitrarily sets the maximum pressure of the leak test to 100 psi, notwithstanding that Dometic's refrigerators normally operate at up to 450 psi. Dometic's testing protocol is intentionally designed: (a) not to find the kind of microscopic leaks described by Dometic in its product safety recalls; and (b) not to find leaks in any other part of the refrigerator cooling unit, notwithstanding Dometic's knowledge that such leaks regularly occur. The testing protocol has no objective standards, no known error rate, and is easily and routinely manipulated by Dometic's retained fire investigators to conceal a leaking boiler tube from individuals unfamiliar with Dometic's product. The testing protocol is misleading and deceptive in that it does not replicate the actual operation of a Dometic gas absorption refrigerator, and cannot scientifically be used to determine whether a cooling unit has a leak at the boiler tube. Dometic routinely uses this testing protocol as part of its risk management practices to reduce its claims exposure, and to mislead consumers and federal regulators into believing that Dometic gas absorption refrigerators are not defective, or that a particular gas absorption refrigerator should be excluded as the origin and cause of a fire;

j.  Employing a consistent litigation strategy of "delay-deny-defend" wherein documents and evidence produced in discovery relevant to Dometic's

defective gas absorption refrigerators in one case, is denied, suppressed and concealed in the next case through questionable – if not downright bogus – assertions that the material is covered by the attorney-client privilege, is non-discoverable work product, is subject to confidentiality/protective orders, has been clawed back, or is otherwise proprietary, a trade secret, etc. A prime example is the work Elizabeth Buc did for Dometic in 2005 – 2007 investigating whether leaking cooling units caused fires, and in the development of the Secondary Burner Housing (SBH) recall device Dometic began to deploy as part of its 2008 Recall. While Dometic used select portions of Ms. Buc's work as the basis for its public filings with NHTSA regarding the 2006 and 2008 recalls, it has at the same time refused to produce any Buc-related material in discovery, claiming that all documents regarding Ms. Buc's work – including emails *between non-attorneys regarding Ms. Buc's testing* of Dometic gas absorption refrigerators – are absolutely privileged as attorney-client communications. Indeed, Dometic has gone so far as to threaten sanctions – including disqualification – against any attorney who even mentions Ms. Buc's publicly available testing results. Dometic's litigation strategy is part of its overall plan and scheme to conceal facts that would otherwise expose the dangerous defects inherent in its gas absorption refrigerators to the public and to federal regulators;

k. Limiting the scope of its product safety recalls to only certain 2-door models manufactured between 1997 and 2006, and excluding some models of

refrigerator – like the Model 1402 Refrigerator installed in plaintiffs' RV - from any product safety recall at all, notwithstanding the fact that all models of Dometic's gas absorption refrigerators at issue and described herein are designed the same way; use the same gas absorption technology; share the same defective Single Weld boiler tube assembly and safety fuse plug designs; have the same propensity to fail for the same reasons; and present the same safety risk to consumers of fire;

l.   Conducting repeated manufacturer-initiated and controlled retrofit campaigns to install Thermo Discs and Thermal Fuses onto the cooling units of Dometic-branded gas absorption refrigerators, or installing those devices onto refrigerator cooling units at the factory, that were represented to "fix" the defects, while concealing the material fact that the retrofits were ineffective to render the refrigerators safe to use for their intended purpose. In truth the retrofit devices did not and do not address, much less eliminate, the root cause of boiler tube failure – *i.e.*, internal corrosion of the boiler tube wall caused by the use of the Single Weld Design – but only seek to counter the propensity of the underlying defect to cause fires by shutting off electricity to the refrigerator controls. The retrofit devices did not and do not work to prevent Dometic's products from causing and/or enhancing fires, because the devices do not stop Dometic gas absorption refrigerator cooling units from corroding and leaking in the first place;

m.  Concealing and suppressing the fact that, at all times relevant hereto, and at least since 1997, Dometic knew or should have known that feasible alternative designs were readily available to eliminate or substantially reduce the propensity of its gas absorption refrigerators to corrode, leak and ignite fires, including, but not limited to, changing the specifications of the boiler tubing to use material that was thicker and made of corrosion-resistant material (*e.g.*, stainless steel); changing the design of the boiler tube assembly by eliminating the Single Weld Design and using two welds to eliminate or reduce the concentration of heat and the resulting breakdown of the protective layer on the inside of the boiler tubing; reconfiguring the electronic controls to moderate the temperature gradient of the AC heaters; changing the design of the safety fuse plug so that it actually operated on pressure and not temperature, and vented outside and away from the refrigerator cabinet, thereby preventing cooling unit ruptures and the uncontrolled release of hydrogen gas into an enclosed space; and replacing dangerously explosive hydrogen gas with inert helium to eliminate or decrease the risk of fire in the event of a boiler tube or safety fuse plug failure. For example:

A.     Beginning in and about 2001, Atwood Mobile Products LLC ("Atwood") began marketing and selling gas absorption refrigerators for RVs that utilized a helium-based cooling system ("Atwood Helium Refrigerators"). Helium-based refrigerators

use a mixture of two isotopes of helium: helium-3 and helium-4. Helium is an inert gas that is not flammable. As a result, the Atwood Helium Refrigerators did not carry the innate risk of explosive fire that is inherent with hydrogen systems, e.g., the Hindenburg. Atwood Helium Refrigerators were marketed as "providing superior durability and performance." Dometic was at all times aware of Atwood's development of helium-based gas absorption refrigerators, and the fact that they performed on a par with its own hydrogen-based gas absorption refrigerators.[8] However, Dometic never developed this readily available, safer alternative technology. On the contrary, Dometic's parent company – Dometic Group AB – purchased Atwood in 2014 and quickly discontinued the Atwood helium-based gas absorption refrigerator line.

B.    At all times relevant hereto, but at least since 1997, RV refrigerator repair businesses have been actively engaged in diagnosing, repairing, and reconditioning failed Dometic gas absorption refrigerator cooling units, including cooling units that failed due to leaks in the boiler tube caused by the defective

---

[8] In 2012, Ford's RV Training and Service – a founding member of the RV refrigerator reconditioning business - conducted a side-be-side evaluation of Atwood's helium-based refrigerators with hydrogen-based refrigerators from Dometic. The evaluation found the performance of the helium and hydrogen systems to be virtually identical.

boiler tube assembly design described herein. Those entities included, but are not limited to, NuCold Refrigeration, Inc. of Morrilton, Arkansas, and Ford RV Training Center in Benton, Kentucky. Those entities have routinely reconditioned Dometic-branded gas absorption refrigerator cooling units by replacing the original corroded and leaking boiler tube with new, thicker boiler tubing, which has proven to substantially reduce, if not completely eliminate, future boiler tube failures, while having no negative effects on the functional operation or performance of the refrigerator itself. Dometic has at all times been aware of this simple, straightforward alternative, which was based on readily available materials, would have cost pennies per unit to implement, and could have easily been incorporated into the design of all of its Dometic-branded gas absorption refrigerators manufactured since 1997.

C.     Dometic's only competitor in the U.S. RV and boat market is Norcold, Inc. In 2012, Norcold abandoned the use of the Single Weld Design for its 1200 Series gas absorption refrigerator cooling units, in favor of a boiler tube assembly that incorporated larger and thicker boiler tubes, the use of double welds to attach the electric heater pockets to the boiler tube, and increasing the spacing of the electric heaters to lessen the concentration of heat

on the inside of the boiler tube. According to Dave Roberts - Norcold's Vice-President of Finance and the person responsible for tracking fire claims involving Norcold gas absorption refrigerators – Norcold has not received a single verified fire claim involving a Norcold-branded 1200 Series gas absorption refrigerator equipped with the 2012 redesign. Plaintiffs are informed and believes that Dometic at all times knew about the redesign of Norcold-branded 1200 Series refrigerators, but refused to adopt similar design changes to render its products safe to use for their intended purpose.

44.    Dometic concealed and suppressed the above facts in furtherance of its business decision and plan – in conjunction with and pursuant to a common plan and scheme with and between its affiliate and parent companies - to continue to manufacture defectively designed products rather than invest the time and money to develop products that were actually safe to use, and which conformed to its sales representations and warranties. In doing so, Dometic also made the decision that, notwithstanding its actual knowledge of the serious public safety risks its gas absorption refrigerators posed to the general public, it was cheaper to deal with warranty and fire claims arising from leaks and fires caused by its defective product rather than fix the millions of defective refrigerators already in the marketplace.

45.    The design defects inherent in Dometic's gas absorption refrigerators, including plaintiffs' Refrigerator; Dometic's wrongful denial and concealment of those

defects; and its inadequate and fraudulent product safety recall/retrofit campaigns, created serious and unreasonable safety risks to consumers and users of Dometic's products, *i.e.*, the risk of property damage, injury, and death by fire. Dometic's conduct, as alleged hereinabove, was motivated by financial gain, and exhibited a vile, despicable and conscious disregard for both the rights and safety of the public, including the rights and safety of plaintiffs.

### F.    The Fire Giving Rise to This Matter.

46.    On or about October 26, 2011, Plaintiffs purchased the RV from a private party – Kenny Green, of Tulsa, Oklahoma. The RV was equipped with a Dometic Model NDA 1402 gas absorption refrigerator. Plaintiffs are informed and believe that the Refrigerator was manufactured during 2006 – 2007, and was installed in the RV as original equipment.

47.    Between October 26, 2011 and March 30, 2018, plaintiffs owned and used the RV without problem. Plaintiffs did not have any failures of any system on the RV, or any appliance in the RV, including the Refrigerator. Plaintiffs did not alter the RV or any system of the RV during the time they owned it. Plaintiffs did not alter the Refrigerator in any manner, and are informed and believe that the Refrigerator was at all times in the same condition as when it left the Dometic factory, with the exception of normal wear and tear.

48.    Plaintiffs kept the RV – along with their other vehicles – in a custom built 5,000 sq. ft. shop on their property in Arcadia, Oklahoma. The shop took two years to

construct, and included a fully equipped apartment that contained plaintiff Kevin W.

Hoog's personal collection of hand-signed NASCAR memorabilia, and the plaintiffs' gun

collection. The shop was finished November, 2017. All work on the shop was done by

professional contractors, pursuant to building permits obtained from and signed off by



**Figure 3 – Top and bottom - wide-angle view of interior of shop upon completion, Nov. - De4c. 2017. The RV is parked in its usual location. Arrow indicates side vent and location of Dometic refrigerator.**



county building inspectors.



Figure 4 - Inside of shop apartment - Nov. - Dec. 2017. Plaintiffs' Nascar collection is displayed on left. Plaintiffs' gun collection was stored in gun safe on right.

49.    On March 30, 2018, the day started normally. Plaintiff Kevin W. Hoog was away during the day for work. He returned home about 6:00 P.M., and parked his car in the shop. The RV was also parked in the shop, and was plugged into shore power, with the Refrigerator turned on. Plaintiff Vivian Hoog had already parked her car in the shop. Plaintiff Kevin W. Hoog did not see or hear anything unusual inside the shop, or around the shop. He did not smell any unusual odors. He backed out of the shop with his golf cart, locked the doors, and went to his house about 400 feet away. Around 8:00 P.M., plaintiffs left their property to meet friends for dinner. They did not notice anything unusual when they left. At around 10:30 P.M., plaintiffs' cell phones started ringing with alarms from the fire department and neighbors that the shop was on fire. Plaintiffs immediately left for home, and when they arrived saw the shop on fire, with the fire department attempting to contain the fire, and keep it from spreading to adjoining buildings and property. The fire was finally extinguished by the Edmond Fire Department at approximately 2:30 A.M. on March 31, 2018.



Figure 5 - Plaintiffs' shop on fire - March 30, 2017.

50.     The fire completely destroyed the shop, the plaintiffs' vehicles, the RV, and the contents of the shop – including the contents of the apartment. The fire burned so hot that it caused the newly laid concrete floor inside the shop to explode into popcorn-like chunks, requiring that the foundation be dug up and disposed of, along with the remains of the structure and vehicles. Plaintiffs have begun the process of reconstruction of the shop, which is not yet complete as of the date of this Complaint.

51.     As a direct, proximate and legal cause of the Fire, Plaintiffs sustained damages, including wage loss and substantial property damage.



Figure 6 - inside of shop, as seen during joint fire scene inspection, July 23 – 24, 2018. Arrow indicates remains of RV, from the rear. The remains of plaintiffs' vehicles are on the right.



Figure 7 - interior of shop apartment, as seen during joint fire scene inspection, July 23 - 24, 2018. Display case and gun safe are in background.



Figure 8 - Remains of Dometic NDA 1402 gas absorption refrigerator. Arrow indicates refrigerator cooling unit.



Figure 9 – Above: Post-fire condition of shop - July 24- 25, 2018. Below: Plaintiffs' shop – post demolition and clean up – April 12, 2019.



53.    Mike Fitzgerald – Chief of Prevention for the City of Edmond Fire Department – was present during fire suppression activities, and remained on the property until about 1:00 P.M. on the day after the fire. Plaintiffs are informed and believe that Mr. Fitzgerald did an initial scene inspection after the Fire was extinguished; that Mr. Fitzgerald ruled the Fire accidental in nature, as opposed to intentionally set; and that he placed the origin of the fire at the RV.

54.    The Fire happened suddenly and without warning. Plaintiffs had not had any problem with their RV, or any appliance inside the RV - including the Refrigerator - prior to the Fire. The Refrigerator operated without problem until the day of the Fire. The Plaintiffs had no notice of any safety risk in continuing to use the Refrigerator. Plaintiffs did not alter the Refrigerator in any way. Plaintiffs never received any notice from Dometic or any other person or entity that there was any risk in continuing to use their Dometic-branded gas absorption refrigerator for its normally intended purpose.

55.    The fire scene, including the remains of the RV and other vehicles, were examined during a joint inspection on July 23 – 24, 2018, and again on June 15, 2018. The inspection was attended by Walter Oliveaux, a fire investigator retained by Dometic, and by Keith Yamaguchi, an attorney retained by Dometic. During the inspections, the damage to the shop and its contents – including the RV and other vehicles - was documented, and evidence collected, including the remains of the Refrigerator. The fire damage was entirely consistent with the fire originating within the RV at the area of the Refrigerator. The

Refrigerator was transported to Applications Engineering Group, Inc. (AEGI) for a further materials exam.

56.    On December 3 – 6, 2018, the Refrigerator was examined and tested during a joint materials exam at AEGI. Mr. Oliveaux attended the examination on behalf of Dometic, along with Ms. Petty-Galis, a metallurgist retained by Dometic. The Refrigerator cooling unit was pressure tested, revealing a leak at the boiler tube. The boiler tube was then sectioned (cut open), revealing substantial corrosion on the inside of the boiler tube, adjacent to the exterior weld between the boiler tube and the electric heater pockets. The leak site was further examined, revealing a through wall crack in the boiler tube wall, from the inside out, caused by internal corrosion. These findings were consistent with the Refrigerator being the origin of the Fire, caused by the Single Weld Design and other defects described herein.



**Figure 10 - Stereo Electron Microscopy (SEM) study of inside of Hoog refrigerator boiler tube, demonstrating internal corrosion along the line of the exterior weld between the boiler tube and electric heater pocket, from materials exam at AEGI, December 3 – 6, 2018.**



**Figure 11 - Pressure test of Hoog refrigerator cooling unit boiler tube assembly - December 3, 2018. Arrow indicates bubbles from leak in boiler tube.**



Figure 12 - CT Scan of interior of Hoog refrigerator cooling unit boiler tube. Bottom right arrow - location along boiler tube where scan was taken. Upper left arrow - detail of interior of boiler tube, showing corrosion pitting and through wall crack.

## V.    ACCRUAL OF CLAIMS AND EQUITABLE TOLLING

57.    Plaintiffs' claims for relief accrued on March 30, 2018 when the Refrigerator failed and started the Fire, causing the damages described herein. This action is timely, in that it was filed within two (2) years of the date of the Fire, pursuant to 12 O.S. 2017 § 95.

58.    Plaintiffs are informed and believe that the Refrigerator was manufactured during 2006 – 2007, and was thereafter installed as original equipment in the RV, which was then delivered to its first purchaser in or around 2007.

59.    At all times relevant hereto, but at least since 2000, Dometic – including its affiliates and parent companies - had actual knowledge that its gas absorption refrigerators

contained dangerous design defects that presented a substantial and unreasonable risk of fire, property damage, injury and death to users of the products, and to members of the general public nearby. At all relevant times, but at least since 2000, Dometic - including its affiliates and parent companies - also had actual knowledge, through its internal fire claim and warranty/return databases, that its gas absorption refrigerators were in fact causing fires in recreational vehicles and boats, and that the design defects and safety hazards could be substantially decreased, if not totally eliminated, by the adoption of alternate designs readily available in the market.

60.    Notwithstanding its actual knowledge of the dangerous defects inherent in its products, including the Refrigerator, Dometic – including its affiliates and parent companies - took affirmative steps to conceal, deny, and otherwise minimize the defects, and the safety risks involved in the use of the Dometic-branded gas absorption refrigerators, as set forth herein. Dometic's pattern and practice of concealment and deception has continued from at least 2000 through the date of this Complaint.

61.    Based on the above conduct and the allegations herein, Dometic is equitably estopped from relying on any statute of limitations, statute of repose or other time-related defense in this action.

## COUNT I
### Strict Liability/Design Defect

62.    Plaintiffs re-allege and incorporate herein paragraphs 1 through 61 as if fully set forth herein.

63.     The Refrigerator was designed, manufactured, sold, distributed, constructed and/or assembled and put into the stream of commerce by Dometic and its affiliate and parent companies, and each of them.

64.     The Refrigerator contained design defects when it left Dometic's possession that created a product that was 1) unreasonably dangerous in that it did not perform as safely as an ordinary consumer would have expected; and 2) used a design whose risks outweighed its benefits.

65.     The Refrigerator had potential risks, including but not limited to a propensity to fail and cause a fire, that were known Dometic at the time the Refrigerator was designed, manufactured, distributed and/or sold or otherwise placed into the stream of commerce, or which were knowable by said defendant by the use of then available scientific knowledge. The Refrigerator's potential risks presented a substantial and foreseeable danger to plaintiffs, users, bystanders, and the public. The potential risks of using the Refrigerator would not have been recognized by an ordinary consumer, and were not recognized by plaintiffs. Plaintiffs are informed and believe that said risks were not recognized by any prior owner of the Refrigerator.

66.     Notwithstanding its actual knowledge of the potential risks of using the Refrigerator, and its actual knowledge of the fire claim history of its gas absorption refrigerators, Dometic failed to adequately warn or instruct the owners of the Refrigerator – including the plaintiffs - regarding the potential risks of use of the Refrigerator.

67.     As a direct, legal and proximate result of Dometic's actions in designing, manufacturing, constructing, assembling, selling, distributing and otherwise placing the

defective Refrigerator into the stream of commerce, and failing to warn or instruct regarding the risks and dangers inherent in said Refrigerator's use, plaintiffs suffered damages in an exact amount of which will be established at trial according to proof.

**WHEREFORE**, Plaintiffs demands judgment for damages, including punitive damages, pre-judgment interest, interest and costs against Dometic.

## COUNT II
## Strict Liability/Failure to Warn

68.     Plaintiffs re-allege and incorporate herein paragraphs 1 through 61 as if fully set forth herein.

69.     Dometic knew that the Refrigerator, and its component parts, would be purchased and used without inspection for defects in design.

70.     The Refrigerator was defective when it left Dometic's control.

71.     At the time of the Refrigerator's design, manufacture, and sale, and continuing up to the time of the fire caused by the Refrigerator's defects which resulted in plaintiffs' damages, Dometic knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the Refrigerator, whose defective design, manufacturing, and lack of sufficient warnings caused it to have an unreasonably dangerous propensity to fail, leak flammable gases, and ignite fires.

72.     Dometic knew that these substantial dangers were not readily recognizable to an ordinary consumer and that consumers would purchase and use Dometic-branded gas absorption refrigerators, including the Refrigerator, without inspection.

73.    At all times relevant hereto, Dometic failed to provide adequate warnings, instructions, guidelines or admonitions to owners and users of its gas absorption refrigerators and members of the consuming public, of the defects, and of the risks and dangers inherent in the use of the products, which Dometic knew, or in the exercise of reasonable care should have known, to have existed in its gas absorption refrigerators, including the Refrigerator.

74.    At all times relevant hereto, the Refrigerator was being used in the manner intended by Dometic, and in a manner that was reasonably foreseeable by Dometic.

75.    Plaintiffs' damages, as set forth herein, were the direct, legal and proximate result of Dometic's failure to provide adequate warnings or instructions. The exact amount of plaintiffs' damages will be established at trial according to proof.

**WHEREFORE**, plaintiffs demand judgment for damages, including punitive damages, pre-judgment interest, interest and costs against Dometic.

### COUNT III
### Negligence

76.    Plaintiffs re-allege and incorporate herein paragraphs 1 through 61 as if fully set forth herein.

77.    Dometic had a duty to use the amount of care a reasonably careful designer, manufacturer, supplier, distributor, seller and/or installer would use in the design, manufacture, supply, distribution, sale and installation of gas absorption refrigerators, including the Refrigerator, to avoid exposing plaintiffs, users, bystanders, and the public to a foreseeable risk of harm. Dometic also had a duty to use reasonable care to warn

plaintiffs, users, bystanders, and the public about risks or dangers regarding the use of the Refrigerator, or facts that made the Refrigerator likely to be dangerous, and of which Dometic knew, or reasonably should have known, the plaintiffs, users, bystanders, and the public were unaware.

78.    Dometic breached its duty by failing to use reasonable care in the design, manufacture, supply, distribution, sale, installation, recall and retrofit of the Refrigerator.

79.    Dometic knew or should have known that the consumers, owners and users of its gas absorption refrigerators, including the Refrigerator, were unaware of the risks and dangers of the use of the Refrigerator, and the facts that made the Refrigerator likely to be dangerous, but breached its duty by failing to use reasonable care to adequately instruct or warn consumers, owners and users of its gas absorption refrigerators, including the Refrigerator, thereof.

80.    Plaintiffs' damages, as set forth herein, were the direct, legal and proximate result of the Defendants' breach of duty to exercise due care. The exact amount of Plaintiffs' damages will be established at trial according to proof.

**WHEREFORE**, Plaintiffs demand judgment for damages, including punitive damages, pre-judgment interest, interest and costs against Dometic.

**COUNT IV**
**Negligence/Post-Sale Duty to Warn**

81.    Plaintiffs re-allege and incorporate herein paragraphs 1 through 61 as if fully set forth herein.

82.    Dometic had a duty to warn consumers and users of its gas absorption refrigerators, including the Refrigerator, of dangerous propensities in said products that it became aware of after the product was placed into the stream of commerce. This duty was owed not only for the benefit of direct users of the product, but for the benefit of third parties whose lives and property could foreseeably be at risk as a result of the product's dangerous propensities.

83.    Dometic knew or should have known that its gas absorption refrigerators, including the Refrigerator, had a propensity to fail and ignite dangerous fires after placed into the stream of commerce, and used in a reasonably foreseeable manner.

84.    Dometic breached its duty to plaintiffs and affected third parties by failing to warn of the dangerous propensities of the Refrigerator prior to November 28, 2017.

85.    Plaintiffs' damages, as set forth herein, were the direct, legal and proximate result of Dometic's breach of duty to provide post-sale warnings. The exact amount of Plaintiffs' damages will be established at trial according to proof.

**WHEREFORE**, Plaintiffs demand judgment for damages, including punitive damages, pre-judgment interest, interest and costs against Dometic.

## COUNT V
## Negligence Per Se

86.    Plaintiffs re-allege and incorporate herein paragraphs 1 through 61 as if fully set forth herein.

87.    Dometic's gas absorption refrigerators, including the Refrigerator, are motor vehicle "equipment" subject to the jurisdiction of the National Highway and Traffic Safety

Administration (NHTSA). Pursuant to USC § 30118(c) and 49 C.F.R. §§ 573.3(e)(f), 573.6(a), Dometic had a statutory duty to report potential safety related defects in its gas absorption refrigerators to NHTSA within five (5) days of a good faith determination of their existence, and to initiate a comprehensive and effective recall/retrofit campaign to eliminate said safety related defects. Pursuant to 49 U.S.C. §§ 30166(c) and 30166(e), Dometic also had a statutory duty to provide timely, accurate, and complete information to NHTSA regarding said product safety recalls, and/or in response to requests in connection with the investigation of potential risks to safety.

88.    The purpose of the above-described statutory scheme is to impose a duty upon equipment manufacturers to monitor, identify and eliminate potential risks to safety created by their products through manufacturer-initiated recall and retrofit campaigns, and to thereby protect the lives and property of owners of defective products affecting motor vehicle safety, and the general public.

89.    Dometic knew or should have known that its gas absorption refrigerators, including the Refrigerator, were so defectively designed, manufactured, supplied and/or installed as to be dangerous, or likely to be dangerous, when used in a reasonably foreseeable manner, but violated the above-described statutory scheme by failing and refusing to conduct a timely, comprehensive and effective recall and retrofit campaign to eliminate the safety risks to owners and the general public inherent in its gas absorption refrigerators, including the Refrigerator, as set forth herein.

90.    Plaintiffs are members of the class of persons the above-described statutory scheme was designed to protect.

91.     Plaintiffs' damages, as set forth herein, were the direct, legal and proximate result of Dometic's violation of the above-described statutory scheme requiring Dometic to initiate and prosecute a timely, comprehensive and effective recall and retrofit campaign. The exact amount of Plaintiffs' damages will be established at trial according to proof.

**WHEREFORE**, Plaintiffs demand judgment for damages, including punitive damages, pre-judgment interest, interest and costs against Dometic.

## COUNT VI
### Negligence/Post-Sale Duty to Conduct Adequate Recall/Retrofit

92.     Plaintiffs re-allege and incorporate herein paragraphs 1 through 61 as if fully set forth herein.

93.     Dometic had a duty to conduct any recall and/or retrofit campaign involving its gas absorption refrigerators, including the Refrigerator, with the degree of care a reasonably careful manufacturer would use under like circumstances. This duty was owed not only for the benefit of direct users of the product, but for the benefit of third parties whose lives and property could foreseeably be at risk as a result of the product's dangerous propensities.

94.     Dometic knew or should have known that its gas absorption refrigerators, including the Refrigerator, were so defectively designed, manufactured, supplied and/or installed as to be dangerous, or likely to be dangerous, when used in a reasonably foreseeable manner, but breached its duty to plaintiffs and affected third parties by failing to use reasonable care in initiating and prosecuting recall and/or retrofit campaigns which

neither eliminated the safety defects inherent in said products, nor rendered them safe to use for their reasonably foreseeable purpose.

95.    Plaintiffs' damages, as set forth herein, were the direct, legal and proximate result of Dometic's breach of duty to use reasonable care in the initiation and prosecution of product safety recalls of its gas absorption refrigerators, including the Refrigerator. The exact amount of Plaintiffs' damages will be established at trial according to proof.

96.    **WHEREFORE**, Plaintiffs demand judgment for damages, including punitive damages, pre-judgment interest, interest and costs against Dometic.

## COUNT VII
## Fraud by Concealment

97.    Plaintiffs re-allege and incorporate herein paragraphs 1 through 61 as if fully set forth herein.

98.     As alleged above, Dometic intentionally and deceptively concealed and suppressed material facts concerning the quality of its gas absorption refrigerators, including the Refrigerator, in tortious violation of law as alleged in this Complaint. Dometic also made material statements about the safety, reliability, functionality, and quality of its hydrogen-based gas absorption refrigerators, including the Refrigerator, that were substantially incomplete, and either false or misleading.

99.    Plaintiffs reasonably relied upon Dometic's omissions. They had no way of knowing that Dometic's incomplete representations were false and gravely misleading. As alleged herein, Dometic employed sophisticated and complicated methods of deception,

including ineffective recalls and retrofit kits. Plaintiffs did not, and could not, unravel Dometic's deception on their own.

100.    Dometic owed Plaintiffs a duty to disclose the true safety, reliability, functionality, and quality of the Refrigerator. Dometic:

n.    Possessed exclusive knowledge of the exact nature and scope of the defects in the Refrigerator, the fire claim history of Dometic-branded gas absorption refrigerators, and the fact that its recall and retrofit campaigns did not address or eliminate the defects;

o.    Intentionally concealed the foregoing from Plaintiffs; and/or

p.    Made incomplete representations about the true safety, reliability, functionality, and quality of Dometic-branded gas absorption refrigerators, including the Refrigerator, as well as the true defects, safety risks, and recall/retrofit inadequacies related thereto, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

101.    Dometic actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and continue to sell more defective refrigerators, and it did so at the expense of Plaintiffs. On information and belief, Dometic has still not made full and adequate disclosure and continues to conceal material information regarding defects that exist in its Dometic-branded gas absorption refrigerators.

102.    Dometic's fraudulent omissions and its concealment of the true characteristics and safety risks of its Dometic-branded gas absorption refrigerators, including the Refrigerator, were material to Plaintiffs. Had Dometic disclosed the true nature and scope of the safety risks inherent in the use of its products in either the sales and

marketing material provided with the Refrigerator; with post-sale warnings; or, through timely and effective post-sale recall and retrofit campaigns, Plaintiffs would have been aware said safety risks would have acted differently to protect themselves from the risk by either stopping use of the Refrigerator, replacing the Refrigerator with a non-defective product, or not purchasing an RV equipped with a defective Dometic-branded gas absorption refrigerator in the first instance.

103.    As a direct and proximate result of Dometic's misrepresentations and fraudulent concealment of material, safety-related information regarding its defective Dometic-branded gas absorption refrigerators, including the Refrigerator, Plaintiffs have sustained damages and injuries that will be established at trial according to proof.

**WHEREFORE**, Plaintiffs demand judgment for damages, including punitive damages, pre-judgment interest, interest and costs against Dometic.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

s/ Travis P. Brown
Travis P. Brown, OBA #20636
Zachary J. Foster, OBA #30554
MAHAFFEY & GORE, P.C.
300 N.E. 1st Street
Oklahoma City, OK 73104
Telephone: 405-236-0478
Facsimile: 405-236-1840
*tbrown@mahaffeygore.com*
*zfoster@mahaffeygore.com*

and

Terrence A. Beard
(To request admission Pro Hac Vice)
Law Offices of Terrence A. Beard
P.O. Box 1599
Sutter Creek, CA 95685
Telephone: (925) 778-1060
*TBeard1053@aol.com*

ATTORNEYS FOR PLAINTIFFS

ATTORNEY LIEN CLAIMED