**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

KEVIN W. HOOG and REBECCA
HOOG,

      Plaintiffs,

v.

DOMETIC CORPORATION,
a Delaware corporation,

      Defendant.

Case No: 5:20-cv-00272-JD

**DEFENDANT DOMETIC CORPORATION'S OPPOSITION TO PLAINTIFFS'**
**MOTION TO EXCLUDE THE OPINIONS OF WALTER OLIVEAUX**

i

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.    Mr. Oliveaux Is Qualified to Testify About the Cause and Origin of the Fire .... 2

    A. Mr. Oliveaux Has Extensive Education, Training and Experience in Fire
       Investigations ................................................................................. 2

    B. Mr. Oliveaux Has Experience with Gas Absorption Refrigerators and May
       Also Rely on the Expertise of Others to Inform His Opinions ...................... 4

II.    Mr. Oliveaux Employed a Reliable Methodology in Forming His Opinion on the
    Origin of the Fire ............................................................................... 7

    A. Mr. Oliveaux Utilized Scientific Methodology to Determine the Most
       Likely Origin of The Fire .............................................................. 8

    B. Mr. Oliveaux's Inability to Further Test the Lumber Pile Does Not Render
       His Origin Opinion Unreliable ...................................................... 12

III.    Mr. Oliveaux's Other Opinions Are Also Reliable and Admissible ................. 15

CONCLUSION ................................................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Fid. Assurance Co. v. Bank of New York Mellon*,
  2018 WL 11425260, at *4 (W.D. Okla. Feb. 28, 2018) ............................................... 4, 5

*Beavers v. Victorian,*
  2014 WL 1338120, at *3 (W.D. Okla. Apr. 2, 2014) ...................................................... 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. at 590 ................................................................................... 2, 8, 9, 12, 13

*Farm Bureau Prop. & Cas. Ins. Co. v. CNH Indus. Am. LLC*,
  2018 WL 2077727, at *11 (N.D. Iowa Feb. 5, 2018) ................................................... 15

*Goebel v. Denver and Rio Grande Western R. Co.*,
  346 F.3d 987, 994 (10th Cir. 2003) ................................................................................ 8

*Gopalratnam v. Hewlett-Packard Co.*,
  877 F.3d 771, 789 (7th Cir. 2017) ................................................................................. 6

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137, 152 (1999) ..................................................................................... 13, 9

*Lesser ex rel. Lesser v. Camp Wildwood*,
  282 F. Supp. 2d 139, 144 (S.D.N.Y. 2003) .......................................................... 13, 15

*Lopez v. Farmers Ins. Co.*,
  2011 WL 2020699, at *3 (W.D. Okla. May 24, 2011) ................................................... 5

*Nance v. Innovasis, Inc.*,
  2013 WL 7205100, at *2 (W.D. Okla. Mar. 20, 2013) ................................................... 5

*Smithwich v. BNSF Railway Co.*,
  447 F. Supp. 3d 1239, 1244 (W.D. Okla. 2020) ............................................................ 8

*State Farm Fire & Cas. Co. v. Bell*,
  30 F. Supp. 3d 1085, 1125 (D. Kan. 2014) ................................................................. 16

*Stephenson v. Honeywell Int'l, Inc.*,
  703 F. Supp. 2d 1250, 1255 (D. Kan. 2010) .................................................................. 6

*U.S. v. Gardner*,
   211 F.3d 1049, 1054 (7th Cir. 2000)...............................................................6

*U.S. v. Gomez*,
   67 F.3d 1515, 1525 (10th Cir. 1995)..............................................................4

*Vox Mktg. Grp., LLC v. Prodigy Promos L.C.*,
   521 F. Supp. 3d 1135, 1144–45 (D. Utah 2021)...........................................6

*Westfield Ins. Co. v. Harris*,
   134 F.3d 608, 611–13 (4th Cir. 1998).............................................................6

**Rules**

Federal Rule of Evidence 702 ......................................................................4, 8

Defendant Dometic Corporation ("Dometic"), by and through its undersigned counsel, respectfully submits this opposition to Plaintiffs' Motion to Exclude the Opinions of Water Oliveaux [ECF No. 102] (the "Motion" or "Mot.").

## INTRODUCTION

Dometic timely designated Walter Oliveaux to testify as an expert witness regarding the cause and origin of the fire that Plaintiffs allege was caused by their Dometic-branded gas absorption refrigerator (the "Refrigerator").[1] Mr. Oliveaux has been performing cause and origin investigations for decades, and he is particularly experienced in performing investigations that involve gas absorption refrigerators installed in recreational vehicles. Plaintiffs, however, seek to exclude Mr. Oliveaux's opinions because, *inter alia*, he is purportedly not qualified to provide opinions on the precise issues in which he specializes. In so doing, Plaintiffs fail to acknowledge Mr. Oliveaux's extensive education, training and experience in fire cause and origin investigations—including over **one thousand** investigations involving gas absorption refrigerators. Plaintiffs also fail to acknowledge that where an investigation involves a specialized piece of equipment such as a gas absorption refrigerator, cause and origin experts like Mr. Oliveaux are permitted to and often do rely on individuals with expertise in the relevant industry to inform their investigation. Because that is precisely what Mr. Oliveaux did here in forming his opinion that the fire could not have originated at the Refrigerator, Plaintiffs have no basis to exclude that opinion—much less his other opinions as to where the fire actually originated and why.

---

[1] Mr. Oliveaux's expert report (the "Report") is attached hereto as Ex. 1.

Plaintiffs also seek to exclude Mr. Oliveaux's opinions on the grounds that they are speculative and unreliable. But Plaintiffs do not identify any of the methodological failings that warrant exclusion under *Daubert*. Nor could they, because Mr. Oliveaux appropriately followed and applied the scientific method in this case in accordance with accepted scientific principles. Instead, Plaintiffs rely on their own unilateral and wholly unsupported assertions as to analyses they say Mr. Oliveaux should have performed before reaching his opinion on the origin of the fire. Plaintiffs also ignore that Mr. Oliveaux's inability to perform these additional analyses was due to their own spoilation of the fire scene and that, as a result, Mr. Oliveaux expressly disclaimed any ability to determine the cause of the subject fire. Thus, rather than establish any methodological failings, Plaintiffs' Motion only underscores why Mr. Oliveaux's opinions are reliable and admissible. Accordingly, and for the reasons discussed in more detail below, Plaintiffs' Motion should be denied.

## ARGUMENT

### I.   Mr. Oliveaux Is Qualified to Testify About the Cause and Origin of the Fire

#### A.   Mr. Oliveaux Has Extensive Education, Training and Experience in Fire Investigations

In his Report, Mr. Oliveaux submits several opinions regarding the cause and origin of the fire at issue in this case (the "Fire"). Plaintiffs argue that Mr. Oliveaux is not qualified to render these opinions, although they do not specify precisely which opinions or paragraphs they are challenging in this regard. Regardless, Plaintiffs have no basis for challenging any of Mr. Oliveaux's opinions on the grounds of his qualifications.

First, as to his education, Mr. Oliveaux received a degree in fire science in 1999 from Louisiana State University and has completed over 200 hours of training at the Louisiana State University Fire & Emergency training Institute—including 36 hours dedicated solely to fire investigation. *See* CV of Walter Oliveaux (attached hereto as Exhibit 2) at 3. In addition, he has completed 80 Tested Hours as a Fire/Arson Investigator through the National Fire Academy. *Id*.

Second, as to training, Mr. Oliveaux has completed hundreds of tested hours of training in fire investigations under the Public Agency Training Council and the International Association of Arson Investigators—including tested training in (a) the Practical Aspects of Electrical Fire Investigations, (b) Advanced Fire Investigation and Expert Witness, (c) Practical Fire/Arson Scene Search & Evidence Recovery, (d) the Practical Aspects of Arson/Fire Origin Investigation and Arson Case Management, (e) Electrical Appliance Related Fires, and (f) Fire Death/Vehicle Fire Investigations. *Id*. at 4. Further, Mr. Oliveaux is certified as a Fire and Explosion Investigator through both the National Association of Fire Investigator and the LSU Fire & Emergency Training Institute. *Id*. at 5.

Third, as to his experience, Mr. Oliveaux has spent the last 29 years as the Chief Investigator for SOS Investigations, Inc. In that role, he has examined thousands of different fire scenes to determine the cause and origin of the fire—including ***over 1,000*** fire scenes involving recreational vehicles that contain gas absorption refrigerators. *See* Report at 15. Likewise, he has conducted hundreds of investigations specifically involving Dometic-branded gas absorption refrigerators. *See* Sept. 16, 2022 Dep. of Walter Oliveaux

3

("Oliveaux Dep.") (attached hereto as Exhibit 3**)** at 39:5-40:21. Mr. Oliveaux also has significant experience investigating fires as a firefighter and instructor, including as the District Chief with the West Feliciana Fire Protection District #1 and as the lead investigator for the Fire Prevention Bureau. *See* Report at 2.

Mr. Oliveaux's extensive education and training in fire investigations—along with his decades of experience examining and investigating thousands of fire scenes—is more than sufficient to render him qualified to offer his cause and origin opinions in this case. Indeed, any one of these qualifications would be sufficient. *Am. Fid. Assurance Co. v. Bank of New York Mellon*, 2018 WL 11425260, at *4 (W.D. Okla. Feb. 28, 2018) (quoting Fed. R. Evid. 702). Collectively, they establish that Mr. Oliveaux readily meets the "liberal standard under [Rule] 702 regarding expert qualifications." *U.S. v. Gomez*, 67 F.3d 1515, 1525 (10th Cir. 1995).

### B.   Mr. Oliveaux Has Experience with Gas Absorption Refrigerators and May Also Rely on the Expertise of Others to Inform His Opinions

Rather than acknowledging Mr. Oliveaux qualifications—much less the applicable legal standards—Plaintiffs seek to exclude Mr. Oliveaux's opinions because he is purportedly not qualified to "opine on the design, operation and failure of gas absorption refrigerators." Mot. at 5. Plaintiffs' argument fails for multiple reasons.

First, Mr. Oliveaux's Report contains numerous opinions that are not based on any knowledge of gas absorption refrigerators. For instance, Mr. Oliveaux opines as to the fire patterns, electrical activity and other physical evidence observed at the fire scene. He also opines that the Fire could not have originated near Plaintiffs' Refrigerator and instead

originated at a lumber pile outside of the building in which Plaintiffs' RV was housed. These opinions are based on Mr. Oliveaux's own extensive education, training and experience in cause and origin investigation and are not predicated on any specialized knowledge of gas absorption refrigerators. Report at 14. Thus, even if Mr. Oliveaux is not qualified to discuss gas absorption mechanics (he is), that certainly does not warrant exclusion of any of his other opinions. *See, e.g., Beavers v. Victorian,* 2014 WL 1338120, at *3 (W.D. Okla. Apr. 2, 2014) ("The qualifications of a proposed expert must be assessed with regard to the specific subject matter because 'the expert's qualifications must be…specific to the matters he proposed to address as an expert.") (citation omitted); *Nance v. Innovasis, Inc.*, 2013 WL 7205100, at *2 (W.D. Okla. Mar. 20, 2013) ("The issue with regard to expert testimony is … whether those qualifications provide a foundation for a witness to answer a specific question.").

Second, as to his cause and origin opinions that do involve gas absorption mechanics, Mr. Oliveaux is highly experienced in conducting cause and origin investigations that involve gas absorption refrigerators. Indeed, he has himself conducted **over 1000** of these examinations. Report at 15. That experience, by itself, is sufficient to qualify him in cause and origin issues pertaining to gas absorption refrigerators. *Am. Fid. Assurance Co.*, 2018 WL 11425260, at *4. As the court in *Lopez v. Farmers Ins. Co., Inc*. aptly explained, "[a] lack of formal training does not preclude an expert's testimony where, by reason of his experience, he has acquired the necessary expertise." *Lopez v. Farmers Ins. Co*., 2011 WL 2020699, at *3 (W.D. Okla. May 24, 2011).

Finally, Plaintiffs fail to acknowledge that the opinions contained in the section of Mr. Oliveaux's Report titled the "Overpressure Conditions & Ignition Sequence"—the only section that Plaintiffs specifically identify in challenging his qualifications—are appropriately informed by the expertise of others. Specifically, Mr. Oliveaux relied on other experts who do have highly specialized experience with the operation and failure of gas absorption refrigerators—namely, Drs. Richard Baron and Jamie Petty Galis—to explain what must happen for an overpressure rupture or ignition to occur in a gas absorption refrigerator. *Id*. at 249:15-251:4, 254:6-12.[2] That is directly relevant to his cause and origin opinion, as it is necessary to understand these mechanics to determine whether the Refrigerator was a valid ignition source for the Fire. *Id.* at 29:21-30:21.

An "expert may rely upon another expert's opinion if 'the facts or data relied upon [are of] the kind that experts in the particular field would reasonably rely on ... in forming an opinion on the subject.'" *Vox Mktg. Grp., LLC v. Prodigy Promos L.C.*, 521 F. Supp. 3d 1135, 1144–45 (D. Utah 2021) (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017)); *see also Stephenson v. Honeywell Int'l, Inc.*, 703 F. Supp. 2d 1250, 1255 (D. Kan. 2010). In the field of fire cause and origin investigations, it is well established that reliance on the expertise of others is standard industry practice.[3] Indeed,

---

[2] Of note, Dr. Baron also submitted an expert report in this case regarding the operation and failure modes of the Refrigerator, and Plaintiffs do not challenge either his qualifications or the reliability of his opinions.

[3] *See, e.g., U.S. v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000) ("[The fire cause and origin expert's] reliance on reports, photographs, and third-party observations … served as a reliable basis for his testimony because these materials are facts or data 'of a type reasonably relied upon by experts' in the field of fire cause and origin."); *Westfield Ins. Co. v. Harris*, 134 F.3d 608, 611–13 (4th Cir. 1998) (fire cause and origin expert was

the National Fire Protection Association Standard 921, Guide for Fire and Explosion Investigations (2017) ("NFPA 921") specifically recognizes that fire cause and origin experts may need to rely on industry specialists in cases (such as this) where "the investigation involves a specialized industry, piece of equipment, or processing system." NFPA 921 § 15.5.7 (attached as Ex. 4).[4] NFPA 921 further notes that "an expert in that [specialized] field may be needed to fully understand the processes involved" and that experience with "the standards or regulations associated with the industry and its equipment and processes can provide valuable information to the investigator." *Id.*

As noted, Mr. Oliveaux did just what NFPA 921 recommends: he relied on industry experts to inform his understanding of the operation and failure mechanics of gas absorption refrigerators so that he could appropriately determine whether the Refrigerator was a valid ignition source for the Fire. Because that is not only permissible but advisable under industry standards, Plaintiffs have no basis to challenge the opinions contained in this section of his Report.

## II.   Mr. Oliveaux Employed a Reliable Methodology in Forming His Opinion on the Origin of the Fire

In addition to several other opinions bearing on the cause and origin of the Fire, Mr. Oliveaux opines that the Fire originated outside the building in which the Plaintiffs' RV

---

permitted to rely on the report of another expert because such reports are ordinarily relied upon by experts in the field).

[4] NFPA 921 sets forth the relevant standards, practices and methodologies applicable to fire and explosion investigations. *See* Dep. of Mark Howell (attached as Exhibit 5) at 45:2-22).

was housed (the "Shop"). Specifically, he opines that the Fire originated in a lumber pile located immediately outside the Shop. Report at 36. Plaintiffs argue that this opinion is speculative and unreliable, but Mr. Oliveaux's testimony readily belies that contention.

### A.   Mr. Oliveaux Utilized Scientific Methodology to Determine the Most Likely Origin of The Fire

Mr. Oliveaux's opinion on the origin of the Fire is reliable under *Daubert* so long as he properly utilized the scientific method to reach his conclusion. *See Daubert*, 509 U.S. at 590; NFPA 921 § 4.3 ("The scientific method is a principle of inquiry that forms a basis for legitimate…fire incident investigation"). Any criticism as to the accuracy of his origin conclusion goes to the weight of the evidence and is not a basis for exclusion. *See Daubert*, 509 U.S. at 594-595 (*Daubert* inquiry must focus "solely on principles and methodology, not on the conclusions that they generate"); *see also Goebel v. Denver and Rio Grande Western R. Co.*, 346 F.3d 987, 994 (10th Cir. 2003) (the district court is not in a position to assess whether "admissible expert testimony is, in fact, correct"); *Smithwich v. BNSF Railway Co.*, 447 F. Supp. 3d 1239, 1244 (W.D. Okla. 2020) ("Plaintiffs' dispute of the accuracy of [the expert's] conclusion is a matter for cross-examination rather than for exclusion under Rule 702 and *Daubert*.")

*Daubert* provides that the scientific method "is based on generating hypotheses and testing them to see if they can be falsified." *Daubert*, 509 U.S. at 593. NFPA 921 likewise provides that the scientific method requires, *inter alia*, developing and testing a hypothesis. *See* NFPA 921 § 4.3.5-4.3.6. NFPA 921 further provides that a fire investigator should collect and analyze the data prior to forming and testing any hypothesis. *See id*. § 4.3.3-

4.3.4. An investigator can then test his or her hypothesis either "physically by conducting experiments [or] analytically by applying accepted scientific principles or by referring to scientific research." *Id.* § 4.3.6. In applying this methodology, fire investigators should first determine and establish the origin of the fire and then investigate the cause. *Id.* § 4.1. These standards, as set forth in NFPA 921, are highly relevant here because *Daubert's* gatekeeping requirement is intended to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

As Mr. Oliveaux repeatedly testified, he did appropriately follow the scientific method as set forth in *Daubert* and NFPA 921. *See* Report at 11-18; Oliveaux Dep. at 86:1-9. In fact, in stark contrast with Plaintiffs' cause and origin expert Mr. Mark Howell, Mr. Oliveaux devotes a large portion of his Report to explaining the scientific method and identifying how he went about applying that method in forming his opinions. *See* Report at 16-28, 33-36. Specifically, Mr. Oliveaux first collected and observed the data by conducting an examination of the Shop and all of the contents within and around the Shop. *See id.* at 17-28. Based on that data, he then formed multiple hypotheses as to the potential origin of the fire. *See id.* at 35-36 (documenting the various hypothesis he formed and considered); *see also* Oliveaux Dep. at 108:18-22. One such hypothesis was that the fire originated outside of the Shop at the northeast wall adjacent to the electrical service entrance. Report at 36; *see also* Oliveaux Dep. at 106:12-21.

Mr. Oliveaux then tested his hypotheses by analyzing various factors that are indicative of fire origin, pursuant to accepted scientific principles. *See* Report at 36.

Amongst the testing he performed, Mr. Oliveaux looked for the presence of electrical arcing on the interior and exterior of the Shop. *Id.* at 26, 35-36. As set forth in NFPA 921 § 18.4.5, arc mapping is a technique that investigators use "to aid in determining the area of fire origin." Indeed, arc mapping can be useful in "testing hypotheses." *Id*. § 18.4.5.5. Moreover, "[f]ull-scale, single-compartment testing has indicated that arcs may be more prevalent in the area of origin." *Id*. § 9.11.7.5; *see also id*. § 9.11.7.4.1 ("If arc mapping is being done for the purpose of origin determination, then it is likely that the physical location of the arc in the building and its relationship to potential ignition sources and fuels is important."). On the other hand, "[t]he absence of arcs can be important evidence and should be noted so that it is clear that the particular area was examined but that no arcs were found." *Id.* at § 9.11.7.4.8. Based on his testing, Mr. Oliveaux found no evidence of electrical arcing on the interior of the Shop, including on the interior wall directly adjacent to Plaintiffs' RV; rather, electrical arcing was found only on the exterior wall of the Shop. Report at 36. Pursuant to accepted scientific principles, the absence of evidence of electrical arcing within the Shop and its presence on the outside of the Shop supported his hypothesis that the fire indeed originated outside of the Shop. *Id.*

To further test his hypothesis, Mr. Oliveaux also considered the fire patterns— which is the type of data an investigator should collect and examine "to test hypotheses as to the origin and cause of the fire." NFPA 921 § 6.1.1. As Mr. Oliveaux explains, when properly interpreted and analyzed, fire patterns can clearly identify the area of fire origin. Report at 19. In conducting this analysis, Mr. Oliveaux found a lack of damage to the southwest and northwest roll-up doors, which is not consistent with the fire originating in

the RV. *Id*. at 10. On the other hand, he found severe damage to the northeast roll-up door along with spalling of the concrete in that area, which is consistent with the fire originating at the electrical service entrance just outside the door. *Id*. at 11; Oliveaux Dep. at 108:6-16, 104:20-25, 141:6-14. Furthermore, based on his review of photographs taken by the Edmond Fire Department, he found that there was a lumber pile located just outside the Shop and adjacent to the electrical service entrance that had burned outside of the Shop. Report at 36. The photographs also showed that the roll-up door located closest to the service entrance was closed at the time of the Fire, eliminating the possibility that the lumber had been thrown from inside the building during the fire suppression. *Id*. Further, there was no wooden structure above that area that could have fallen to the ground during the fire and so the lumber pile "was there during the fire." Oliveaux Dep. at 120:8-11.

Given the above, it is clear that Mr. Oliveaux appropriately utilized and applied the scientific method in his case. He (a) focused first on the origin rather than the cause of the Fire, (b) collected and analyzed the data bearing on the Fire origin, (c) formed various hypotheses as to the origin of the Fire, and then (d) tested those hypotheses by analyzing the available data and applying accepted scientific principles. Based on his analysis of the fire spread patterns, the electrical activity, and the photographs from the Edmond Fire Department, and applying accepted scientific principles, Mr. Oliveaux appropriately concluded that the fire originated on the north end of the exterior of the Shop, specifically in the lumber pile stored outside the electrical service entrance.[5] As Mr. Oliveaux notes in

---

[5] Moreover, after Mr. Oliveaux issued his Report, Plaintiffs produced a video of the fire. Mr. Oliveaux promptly reviewed the video, which confirmed that there was fire burning in

his Report, this "is the only area where all fire spread patterns and electrical activity can support the origin of the fire." *Id.* This is important because, according to NFPA 921 § 18.6.1, a "technically valid origin determination is one that is uniquely consistent with the available data." Because the methodology that Mr. Oliveaux employed is consistent with *Daubert* and the standards used by experts in the field, Plaintiffs have no basis for moving to exclude his origin opinion.

### B. Mr. Oliveaux's Inability to Further Test the Lumber Pile Does Not Render His Origin Opinion Unreliable

Although Mr. Oliveaux appropriately concluded that the Fire *originated* outside the Shop at the lumber pile, he expressly disclaimed any opinion as to what *caused* the fire. *Id.* He did so because the lumber pile had been removed and spoliated prior to him completing his inspection. *Id.* As such, Mr. Oliveaux did not have an opportunity to further test it to reliably determine what caused it to ignite. Oliveaux Dep. at 84:10-17.

Despite this spoliation, Plaintiffs suggest that Mr. Oliveaux cannot reliably opine that the fire even *originated* at the lumber pile unless he can also determine (1) exactly how and when the fire started within the lumber pile, (2) how long the lumber pile burned, and (3) the exact mechanism by which the fire travelled inside the Shop. *See* Motion at 5. Tellingly, though, Plaintiffs do not cite any authority for these so-called prerequisites to Mr. Oliveaux's origin opinion. They do not because no such authority exists. In fact, by claiming that Mr. Oliveaux can only determine the origin of the Fire if he can also

---

the area where the lumber pile was located and that, in fact, the lumber pile itself was on fire. Oliveaux Dep. at 106:8-11, 126:19-127:5, 128:18-20, 129:22-130:1.

determine "how the fire started" (*i.e.*, the cause of the Fire), Plaintiffs are plainly conflating origin and cause—two very separate and distinct concepts. Mot. at 5.

Of note, NFPA 921 has two separate chapters on origin and cause—with Chapter 18 discussing the appropriate methods for determining origin and Chapter 19 discussing the appropriate methods for determining cause. Chapter 18 of NFPA 921 does not state or even suggest that an investigator can only determine fire origin if he or she can also determine how the fire started, how long it lasted or the mechanism by which it traveled. Instead, Chapter 19—which addresses the determination of cause—discusses those issues. *See* § 19.4.4.2.1 (stating that a causation determination should involve determining how and sequentially when the fire started and what the fire spread mechanisms was). That is likely why Plaintiffs did not even bother to cite NFPA 921 in their Motion. Plaintiffs' attempt to unilaterally impose various methodological requirements on Mr. Oliveaux— requirements that are at odds with industry standards—certainly does not give rise to a legitimate basis for excluding his opinions.

Plaintiffs also fault Mr. Oliveaux for failing to physically examine and test the lumber pile. Yet, as Mr. Oliveaux explained, the totality of the evidence establishes that the fire could have only started outside the Shop—he did not need to (nor could he) personally examine and test the lumber pile to make that determination. Oliveaux Dep. at 191:5-192:1. Indeed, "[n]either *Daubert* not *Kumho Tire* requires physical examination where informed and reasonable empirical inferences can be made from photographic evidence and the reliable testimony of others." *Lesser ex rel. Lesser v. Camp Wildwood*, 282 F. Supp. 2d 139, 144 (S.D.N.Y. 2003) (holding that an expert's opinion about a tree's

pathology was empirically substantiated by photographs and other available evidence despite lack of physical testing).

Importantly, Mr. Oliveaux's inability to personally examine the lumber pile was not of his own making. Rather, it was solely and exclusively due to the spoilation of the scene following the first inspection. Report at 36. As Mr. Oliveaux testified, "I can't take a picture of something that is not there." Oliveaux Dep. at 107:8-10. Plaintiffs argue that the existence of spoilation is "demonstrably wrong," claiming that nothing precluded Mr. Oliveaux from documenting and testing the lumber pile during the first inspection. Mot. at 6. In so doing, however, Plaintiffs egregiously mislead the Court about the relevant events. Specifically, on June 15, 2018, an initial inspection took place that lasted most of the day. *See* Oliveaux Dep. at 142:10-14. The inspection proceeded with frequent interruptions as Plaintiff Kevin Hoog arrived in the middle of the day and the parties were directed to various parts of the Shop for evaluation. *Id*. at 87:4-22, 136:23-137:12, 139:20-142:9. Upon realizing that he could not complete his inspection in a single day, Mr. Oliveaux advised both Plaintiffs' counsel and Plaintiffs' cause and origin expert that he would need to come back to the site for a second day to complete his inspection. *Id*. at 143:8-12. Thus, something did in fact preclude Mr. Oliveaux from examining and testing the lumber pile during the first inspection: the frequent interruptions and the lack of sufficient time.

Of course, in light of that, Mr. Oliveaux reasonably expected that the scene would be preserved exactly the way it was and that there would be no disruption or spoilation so

14

that he could complete his inspection.[6] But that is not what happened. Instead, upon returning to the site on the second day of inspection, the lumber pile was gone. Oliveaux Dep. at 104:11-16. Mr. Oliveaux learned that someone had cleaned up the site and removed the lumber pile, thereby preventing him from being able to personally document the area. *Id*. Plaintiffs cannot plausibly discredit Mr. Oliveaux's origin conclusion—much less his methodology—based on the fact that the scene was spoliated and Mr. Oliveaux was thereby prevented from physically examining everything he intended to examine during the second inspection. *See Lesser ex rel. Lesser*, 282 F. Supp. 2d at 144 (rejecting argument that a tree pathologist's opinion should be excluded due to the expert's failure to test the relevant tree because, "by destroying the tree, the defendants have made it impossible" for the expert to test the tree); *see also Farm Bureau Prop. & Cas. Ins. Co. v. CNH Indus. Am. LLC*, 2018 WL 2077727, at *11 (N.D. Iowa Feb. 5, 2018) ("Different types of testing may be sufficient in the absence of physical testing, especially where, as here, that testing would be … impractical.").[7]

### III.   <u>Mr. Oliveaux's Other Opinions Are Also Reliable and Admissible</u>

---

[6] *See* NFPA 921 § 8.6 ("Care should be taken to preserve all evidence" and "[t]he loss or alteration of an item may have a significant consequence on the investigation and any litigation that may ensue."); *see also* Oliveaux Dep. at 143:8-144:2 (testifying that he advised Plaintiffs' counsel and their cause and origin expert that he needed to come back to the scene and was not finished and, therefore, "it should have been preserved.").

[7] Plaintiffs' argument in this regard also underscores just how prejudicial (if not intentional) the spoliation was in this matter. While Mr. Oliveaux did not need to conduct a physical examination of the lumber pile to reliably opine on the origin of the Fire, he did need to do so to form a reliable causation opinion. Yet, because of Plaintiffs' spoliation, Mr. Oliveaux was precluded from reliably determining what caused the lumber pile to ignite. That Plaintiffs attempt to fault Mr. Oliveaux for failing to perform testing they themselves made impossible demonstrates the contrived and disingenuous nature of their position.

In addition to his opinion about the fire originating at the lumber pile, Mr. Oliveaux submits several other opinions regarding the cause and origin of the fire. These include, *inter alia*, that the fire originated outside the Shop; that there is no evidence of electrical activity on the circuits routed along the north and west walls of the Shop; and that the damage caused by the fire is not consistent with the fire originating in the RV. *See* Report at 10-11. Plaintiffs appear to believe that if Mr. Oliveaux's opinion about the lumber pile is speculative or unreliable (it is not), then all of his other opinions must also be excluded. But that is not the law. Rather, so long as Mr. Oliveaux has a reliable basis for these other opinions, the inadmissibility of one opinion is not reason to exclude all of his other opinions. *See State Farm Fire & Cas. Co. v. Bell*, 30 F. Supp. 3d 1085, 1125 (D. Kan. 2014) (while part of an expert's opinion was deemed unreliable, the expert was nevertheless allowed to testify to his other opinions that had a reliable basis).

Mr. Oliveaux details in his Report how he formed each of his opinions, including how he utilized the proper methodology that is required for fire investigations in reaching each of these opinions. *See generally* Report. Plaintiffs do not argue that the methodology Mr. Oliveaux used to reach any of his other opinions was improper. Instead, they contend that his inability to test the lumber pile somehow requires that all his cause and origin opinions be excluded. Mot. at 7. Because that position is contrary to established authority, Plaintiffs have not proffered any basis for excluding Mr. Oliveaux's other opinions regarding the cause and origin of the fire. *See State Farm Fire & Cas. Co. v. Bell*, 30 F. Supp. 3d at 1085. As such, even if the Court takes issue with Mr. Oliveaux's opinion about

the lumber pile (it should not), the jury should still be permitted to consider all of Mr. Oliveaux's other opinions.

**<u>CONCLUSION</u>**

For the foregoing reasons, Dometic respectfully requests that the Court deny Plaintiffs' Motion to Exclude the Opinions of Walter Oliveaux in its entirety and allow Mr. Oliveaux to testify regarding his opinions of the cause and origin of the subject fire.

Respectfully submitted,

**DATED:** January 27, 2023

By:    /s/ Keith S. Yamaguchi

Keith S. Yamaguchi (admitted *pro hac*)
KMA ZUCKERT LLC
200 W. Madison Street, 16th Floor
Chicago, Illinois 60606
T: (312) 345-3000
F: (312) 345-3119
kyamaguchi@kmazuckert.com

Erica Rutner (Admitted *PHV*)
MOORE & LEE, LLP
110 SE 6th Street, Suite 1980
Fort Lauderdale, Florida 33301
T: (703) 506-2050
F: (703) 506-2051
e.rutner@mooreandlee.com

Michael Brewer (OBA #11769)
Jeffrey D. Scott (OBA #32115)
HILTGEN & BREWER
9505 North Kelley Avenue
Oklahoma City, OK 73131
T: (405) 605-9000
F: (405) 605-9010
mbrewer@hbokc.law

*Attorneys for Defendant Dometic Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 27, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Travis P. Brown, OBA #20636
Zachary J. Foster, OBA #30554
MAHAFFEY & GORE, P.C.
300 N.E. 1st Street
Oklahoma City, OK 73104
Telephone: (405) 236-0478
Facsimile: (405) 236-1840
tbrown@mahaffeygore.com
zfoster@mahaffeygore.com

Terrence A. Beard (Pro Hac Vice)
LAW OFFICES OF TERRENCE A. BEARD
P.O. Box 1599
Sutter Creek, CA 95685
Telephone: (925) 778-1060
TBeard1053@aol.com

/s/ Keith S. Yamaguchi
Keith S. Yamaguchi