# EXHIBIT 3



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

KEVIN W. HOOG and REBECCA HOOG,

      Plaintiffs,

vs.              Case No.  CIV-20-00272-JD

DOMETIC CORPORATION, a DELAWARE
CORPORATION,

      Defendant.

_____

**VIDEOCONFERENCE DEPOSITION OF**

**WALTER OLIVEAUX**

**TAKEN ON**
**FRIDAY, SEPTEMBER 16, 2022**
**9:05 A.M.**

**201 LAFAYETTE STREET**
**BATON ROUGE, LOUISIANA 70801**

26

1 worked numerous cases with those. I have greater
2 knowledge, I think, than most people about how they
3 work, how -- what happens to them when various
4 outside forces are applied to them. So, do I have a
5 better knowledge than most? Yes, I do, which would
6 make an expert in those particular boilers.
7     Q. So you're talking about you -- you would
8 consider yourself an expert in -- in RV
9 refrigerator, gas absorption refrigerator, boiler
10 failure?
11     A. I understand the various mechanisms that
12 we see on a regular basis that occur related to
13 those refrigerator cooling units. Yes.
14     Q. Well, in regard to seeing boiler failures
15 in RV refrigerators, other than that -- for example,
16 you understand that Mr. Keifer at AEGI has a
17 background in boiler design through the Naval
18 Academy?
19     A. Yes.
20     Q. And that he's a professional engineer?
21     A. Yes.
22     Q. And he has a extensive hands-on experience
23 in all aspects of boiler design failure through
24 working, serving on warships in the Navy?
25     MR. YAMAGUCHI: Object to the form.

27

1 BY MR. BEARD:
2     Q. You're aware of that?
3     A. What's that?
4     Q. You're aware of that?
5     A. I'm aware of Mr. Keifer's background.
6 Yes.
7     Q. Okay. And -- and you would consider Mr.
8 Keifer because of that training and education and
9 experience to be an expert in boiler design, boiler
10 failure, correct?
11     A. I believe Mr. Keifer has a book of
12 knowledge that makes him an expert in boilers,
13 including the refrigerators.
14     Q. Do you have any kind of similar training,
15 education as Mr. Keifer in the issue of boilers --
16 boiler design, boiler failure?
17     A. No.
18     Q. Are you planning on offering any opinions
19 in this case in the area of boiler design?
20     A. No.
21     Q. Are you planning on offering any opinions
22 in this case on the -- on the issue of boiler
23 failure?
24     A. I have -- I don't know that I have a -- an
25 opinion about -- any -- any opinion about the

28

1 refrigerator's failure or non-failure. It would be
2 for Dr. Baron. He's the one that's doing that part
3 of this.
4     Q. Okay. So you are not -- well, you're not
5 holding yourself out in this case as an expert in
6 boilers or boiler failure, correct?
7     A. My expertise is in the modality that
8 would've caused the things that Mr. Keifer and Dr.
9 Baron would be discussing. In other words, I'm
10 explaining the process of how it got to that point
11 in some regards, as to the environment that it was
12 in, what its effect was on the refrigerator.
13     Q. Okay. Well, I'm just trying to understand
14 the parameters of your expert opinions in this case.
15 Are you offering opinions as an expert on the issue
16 of boiler failure in this case?
17     MR. YAMAGUCHI: I'm going to object to the
18 form. Failure is vague and ambiguous.
19     You can answer.
20 BY MR. BEARD:
21     Q. Mr. Oliveaux, do you understand what I
22 mean?
23     A. Will you repeat your question?
24     Q. Sure. Are you offering -- are you holding
25 yourself out as an expert in this case and offering

29

1 opinions on the issue of boiler failure?
2     MR. YAMAGUCHI: Same objection.
3     THE DEPONENT: I believe that some of the
4 opinions that I have are related to the causation of
5 a -- a breach being created, which is the crux of
6 the -- of -- of your claim is that it failed. But
7 my opinions are related to the environmental
8 conditions that would cause those failures.
9 BY MR. BEARD:
10     Q. And what experience, training, or
11 expertise do you have to support those opinions on
12 the conditions for boiler failure?
13     A. One, my --
14     Q. What are you relying on?
15     A. One, my work experience. I've completed
16 numerous examinations of these and worked numerous
17 fires where they were in the -- the focus of the
18 investigation, whether warranted or not. So I
19 believe that I have a greater knowledge as to the
20 effects that the fire has than Mr. Keifer may have.
21     But in terms of what that failure was, or
22 type of failure, that's Mr. Keifer's and -- and Dr.
23 Baron's realm. But the information that I give --
24 that I can give to the - - the other experts working
25 for me, that is part of the process. So, yes, I

NAEGELI
DEPOSITION & trial   CELEBRATING 40 YEARS IN BUSINESS   (800) 528-3335
NAEGELIUSA.COM

30

1  believe that I am an expert in that aspect of it.
2      Q.   So the aspect that -- that you are talking
3  about is -- is the effect of fire on a -- well, on a
4  gas absorption refrigerator cooling unit?
5      A.   Not just fire, is the environment that
6  that refrigerator is subjected to.  It's the human
7  factors.  It is the environment.  It's the location
8  where you use it.  It's whether you follow directions
9  on how you're supposed to set your RV up.
10          There's a -- there's a whole group of
11  things that will cause failures in a refrigerator
12  that are all driven by human factors and their use
13  of that device.
14      Q.   Okay.  But what I'm -- I'm trying to
15  understand is are you -- are you offering opinions
16  in this case on the actual failure modality of the
17  boiler itself?
18          MR. YAMAGUCHI:  Objection to the form.
19          THE DEPONENT:  I've already answered that,
20  counsel, that that's Dr. Baron's part of this
21  investigation.
22  BY MR. BEARD:
23      Q.   Okay.  So you're not going to offer any
24  opinions yourself on that issue?
25      A.   No.

31

1      Q.   There we go.  Now, I'm getting the hang of
2  it.  All right.  Mr. Oliveaux, do you see the screen?
3      A.   I do.
4      Q.   All right.  And I put a document on the
5  screen, which for the record is SOS Investigations'
6  investigation report prepared for Keith Yamaguchi,
7  plaintiffs Kevin Hoog and Rebecca Hoog.  Do you
8  recognize this document?
9      A.   Yes.
10      Q.   We'll mark it as Exhibit 3.
11          (Whereupon, Exhibit 3 was marked for
12  identification.)
13  BY MR. BEARD:
14      Q.   I'll scroll down here so that we can see
15  that it's the complete document.  Well, I ask you to
16  confirm that this is the complete report.  58 pages.
17      A.   There -- that is the -- that is the
18  written report.  And then those attachments that are
19  the last thing that you have on there should be also
20  in PowerPoint presentations that go with it or
21  attachments that go with it.
22      Q.   Okay.  Now, does this report include all
23  the opinions in this case that you have?
24      A.   I believe so.
25      Q.   And does it include all the basis for the

32

1  opinions that you have in the case?
2      A.   I believe so.
3      Q.   All right.  Now, this is not the first
4  fire inspection -- the -- the Hoog case is not the
5  first fire inspection that you've conducted for
6  Dometic.  Is that correct?
7      A.   That's correct.
8      Q.   How many fire cases have you investigated
9  for Dometic involving their gas absorption
10  refrigerators?
11      A.   I'm not sure of an exact number.
12      Q.   When did you first start investigating --
13  well, strike that.  When were you first retained by
14  Dometic to investigate a fire, potentially,
15  involving a Dometic-branded gas absorption
16  refrigerator?
17      A.   Sometime in the mid-2000s.  Like somewhere
18  around '06 or a little -- a little after that.  I
19  don't remember the exact date.  I did a couple early
20  on.  And then later on they started giving me more
21  of them.
22      Q.   Okay.  Do you see the screen?
23      A.   Yes.
24      Q.   All right.  I want to show you what has
25  been produced in this case as a access spreadsheet

33

1  and for identification it's Dometic_Hoog 007619.
2  And it's also Exhibit 90 on plaintiffs' exhibit list
3  in this case.
4          And in prior depositions, I've asked you
5  whether or not you've ever seen Dometic's fire log
6  involving their gas absorption refrigerators,
7  correct?
8      A.   You've asked me that before.  Yes.
9      Q.   And in -- in fire testimony you've stated
10  that you've never seen the document, is that
11  correct?
12      A.   Yes.
13      Q.   And so between the last deposition that we
14  had and now, have you ever seen the -- the access
15  database from Dometic?
16      A.   I've never seen the access database.
17      Q.   Have you ever asked Dometic to -- during
18  the entire time that you've been doing these
19  investigations, have you ever asked Dometic to see
20  their log of fire claims involving their gas
21  absorption refrigerators?
22      A.   No.
23      Q.   Would it have been important to you as a
24  fire origin and cause investigator to know whether
25  these refrigerators, you know, were catching on fire



34

1 all the time, sometime? Would that be important to
2 you all?
3    A.   Each event is unique. So we handle each
4 event as a unique event. History can help you with
5 some things, but it doesn't necessarily mean that it
6 is accurate to the event that you are currently
7 working on.
8    Q.   But it's a data point that would inform
9 your opinions or inform your -- at least your
10 investigation, wouldn't it?
11    A.   Repeat that.
12    Q.   The history of a particular report, in
13 this case the Dometic gas absorption refrigerator,
14 would be a data point that would help inform your
15 investigation as a fire investigator, wouldn't it?
16        MR. YAMAGUCHI: Objection to the form.
17        THE DEPONENT: Every fire that I work is
18 -- provides data to me about different events and
19 things like that. So every one of the fires that
20 I've done for Dometic or whoever is data that's
21 stored in this thing.
22        And it's -- the -- the fact that they have
23 a list of claims that -- of events doesn't mean that
24 every one of those was causal as to the refrigerator
25 or it doesn't identify whether the -- you know, I've

35

1 never seen it.
2        I don't know what else in it, but if I go
3 back and use that document, then there could be a
4 bias created there. So I avoid those kind of
5 things. I've -- I've done probably 300 Ford cruise
6 control deactivation switches.
7        They -- they were great for business.
8 Ford blower motors, great for business for a period
9 of time. If I use that and I go to a Ford case and
10 I use that, "Okay, well, I've worked 299 of these,
11 so this third -- this 300th one it's got to be the
12 same thing." That's a bias just like looking up
13 recalls before you go.
14        You shouldn't look up a recall before you
15 go. You got to be a blank slate. You got to go look
16 at each one of these events, individually, and
17 uniquely, because that's what they are. None of
18 them burn the same.
19        None of -- you know, none of those cruise
20 control switches were the same. None of the
21 refrigerator cases are the same. They're all unique
22 because you have human factors in there. And you
23 have to figure out the human factors and then what
24 their impact is on the device that you're looking at
25 or considering that failed.

36

1        And if that turned out to be the
2 refrigerator or turned out to be that cruise control
3 switch or whatever, you still had to find the human
4 factors that are involved.
5 BY MR. BEARD:
6    Q.   Okay. I'd like to just walk through this
7 spreadsheet.
8        MR. YAMAGUCHI: I'm going to just object.
9 I'm not going to allow the witness to answer any
10 questions on this line of questioning regarding the
11 spreadsheet. He has not seen it. He's neither
12 relied on it or considered it for his report. So
13 this line of questioning is completely outside of
14 the purpose of his deposition today.
15        MR. BEARD: Okay. Well, I'm going to
16 proceed anyway.
17 BY MR. BEARD:
18    Q.   With regard to the -- the document, I just
19 want to walk through here. We'll go to the BC
20 partners June 2005 and there is a list of 1,188 fire
21 claims. Do you see that, Mr. Oliveaux?
22    A.   I see the number down at the bottom, yes.
23    Q.   Okay. And then in -- in all the work that
24 you've done with Dometic, you're familiar with how
25 they code various products that they -- that they

37

1 manufacture as far as keeping track of claims?
2        MR. YAMAGUCHI: Objection to the form.
3        And to the extent you're asking him about
4 coding with this document, I'm going to instruct him
5 not to answer the question.
6        MR. BEARD: Okay.
7        MR. YAMAGUCHI: Is that your question,
8 counsel?
9        MR. BEARD: Well, I'm just asking whether
10 he's familiar with the way Dometic codes these --
11 codes their various products.
12        MR. YAMAGUCHI: You can answer that
13 question separate and apart from whatever document
14 is on the screen.
15        THE DEPONENT: I have no information about
16 how they code that, how they create that document
17 that you have on the screen. It's not my purview.
18 BY MR. BEARD:
19    Q.   Well, I'll represent to you that -- that
20 Dometic codes their refrigerators as a D. So in
21 this spreadsheet, if you select for D you get 1,026
22 entries in the spreadsheet.
23        And then if you go over here in the
24 spreadsheet to -- goes on for a while. Inspection
25 firm, do you see that field?



38

1    A.  Yes.
2    Q.  And underneath inspection firm, there's a
3  number of organizations.  Do you recognize those
4  organizations?
5    A.  I do.
6    Q.  And Pyrtech that's Mr. Coggins, for
7  example?
8    A.  No.
9    Q.  Well, Mr. Coggins used to work for
10  Pyrtech, correct?
11    A.  Correct.  It was Keith, I can't remember
12  his last name now.
13    Q.  Richards.
14    A.  No.  Like -- no, it was something else,
15  Keith --
16    MR. YAMAGUCHI:  Just wait for a question.
17    THE DEPONENT:  Doesn't matter.  Yeah.
18  BY MR. BEARD:
19    Q.  And CJB Fire Consultant that's Mr. Bloom?
20    A.  Yes.
21    Q.  And Tri-Fire Consultants, Inc. that's Mr.
22  May?
23    A.  Yes.
24    Q.  And these are all fire investigators that
25  are routinely hired by Dometic?

39

1    A.  At some point in time, yes.
2    Q.  Okay.  And then if we look on the list,
3  there's SOS Investigations as well.
4    A.  Yes.
5    Q.  And if we select SOS Investigations, what
6  we end up with is 190 separate fire claim
7  investigations conducted by SOS Investigations.  Do
8  you see that?
9    A.  Yes.
10    Q.  Does that -- does that sound about right?
11  Well, this chart runs from October of '08 through
12  August of '18. So does that sound about right that
13  you've done 190 different fire investigations for
14  Dometic, hired by Dometic?
15    MR. YAMAGUCHI:  I object to the form of
16  the question.  To the extent you want to ask him
17  questions about what he's worked for with Dometic
18  without referring to this document, I'll allow him
19  to answer those questions.
20    But to the extent you're asking him to
21  answer questions and using this document to form the
22  basis or to help him recall his recollection, I'm
23  going to object and instruct him not to answer
24  because he's never seen this document.
25    And he doesn't know if you are

40

1  characterizing the information on this document
2  accurately.  And so if you want to ask him questions
3  without referring to this document, that's fine, but
4  I'm not going to allow him to answer questions that
5  are based on this document for the reasons I've
6  stated before.
7  BY MR. BEARD:
8    Q.  Well, Mr. Oliveaux, you previously stated
9  that you -- in regard to the number of fire
10  investigations done for Dometic that you didn't have
11  any firm fix.  So does this -- looking at this
12  document and the 190 entries on this document, does
13  that refresh your recollection that as to the number
14  of fire investigations you've done for Dometic
15  between 2008 and 2018?
16    A.  Does it -- I -- I see what the document
17  says.  I didn't prepare the document.  I don't know
18  what the document entails, whether that is every
19  fire that's just refrigerator fires, I don't know
20  that.  So the -- does it help me remember any
21  specific one?  No, it does not.
22    Q.  In regard to the work that you've done for
23  Dometic, the fire investigations you've done for
24  Dometic, do you bill Dometic hourly?
25    A.  Yes.

41

1    Q.  And you keep records and notes and files
2  on -- on each one of those inspections for Dometic?
3    A.  I have records of -- I -- I keep them for
4  five years unless I'm told to close it.  And if --
5  and it's gone away, if I'm told that, then we may
6  purge it just to save space.
7    Q.  Okay.  But with regard -- and with regard
8  to -- to each fire investigation that you've done
9  that, actually, where there was a claim filed that
10  was being pursued, in each one of those cases did
11  you do a formal report?
12    A.  No.
13    Q.  Did you do some kind of -- some kind of
14  report formal or otherwise where a claim was being
15  pursued by somebody claiming that a Dometic gas
16  absorption refrigerator caused a fire and caused
17  damages?
18    A.  I did not always prepare a written report.
19  On occasions, I provided verbal reports, mostly on
20  -- almost on every one of them.  A verbal report was
21  provided and then it was a discussion on whether or
22  not a written report was needed.
23    Q.  And in regard to the verbal report that
24  was -- was that a procedure or a protocol that was
25  established by Dometic?



42

1    A.  That is my standard procedure on any fire
2  when I'm working for a client that at the end of the
3  day, I call and give them a report as to the status
4  of the investigation.  And if we have either a
5  working hypothesis or hypotheses, if we have other
6  things that need to be done and we need to involve
7  other experts, so I have that conversation with
8  whether it's an adjuster or a lawyer or whoever I'm
9  working for.  That's the normal initial report is
10  verbal.
11    Q.  All right.  And -- and then you prepare a
12  written report if requested by Dometic?  I'm talking
13  about in your work for Dometic.
14    A.  It -- it is the same with everybody.  I
15  will prepare a written report if they ask for a
16  written report. If they take -- if they say they
17  don't want one, then I make a note that they didn't
18  ask for a report.
19       I don't always put the note in, but if
20  they -- I have a little way of keeping up with what
21  I've got to write.  And if they don't go on the
22  list, they don't get a report unless they call and
23  ask for one.
24    Q.  Okay.  And with regard to all the reports
25  that you have prepared for Dometic, to the extent

43

1  they haven't been purged already, you have
2  possession custody and control of those reports and
3  -- and -- and supporting material at your business,
4  correct?
5    A.  They're -- if they haven't been -- like I
6  said, if they tell me that it's closed, it's gone
7  away, and there's no action going to be taken on it,
8  we do not keep those at all.
9       Because like some of them we find out that
10  the RV's been discarded.  There's no more evidence.
11  That happens on a regular basis.  Or we go to a
12  claim and it's not a Dometic refrigerator, it's a
13  Norcold refrigerator. So that one -- you know,
14  there's -- it's just closed.
15       And sometimes I forget to delete it but it
16  -- you know, if it's -- if there's no action taken
17  in it other than call and set it up or showing up
18  and it's somebody else's product, there's really not
19  much done with that. And I usually get rid of it.
20    Q.  Okay.
21    MR. YAMAGUCHI:  Counsel, we've been going
22  about an hour.  Would you be okay with a five-minute
23  break?
24    MR. BEARD:  Sure.  Hold on a second, let
25  me --

44

1    MR. YAMAGUCHI:  Before we --
2    MR. BEARD:  There we go.  Oh, by the way,
3  I -- if I didn't -- if I didn't say, I'm going to
4  mark the access spreadsheet as Exhibit 4 to the
5  deposition.
6       (Whereupon, Exhibit 4 was marked for
7  identification.)
8    THE REPORTER:  Okay.
9    MR. YAMAGUCHI:  But before we go forward,
10  just for the record, so the record's clear about
11  what you've marked as Exhibit 4, the access
12  database.  Counsel, you are aware that is designated
13  as confidential, correct?
14    MR. BEARD:  Counsel, every document I
15  think you've provided in this case has been
16  designated confidential.
17    MR. YAMAGUCHI:  Is the answer to my
18  question you're aware that Exhibit 4 is designated
19  confidential, correct?
20    MR. BEARD:  Sure.  You marked it
21  confidential.
22    MR. YAMAGUCHI:  Okay.  So, for the record,
23  that exhibit is designated confidential subject to
24  protective order, as well as any testimony regarding
25  that document during the deposition today.

45

1       And in addition, before we break, and also
2  I just want to make sure it's clear on the record
3  that on -- on August 30th, 10:15 P.M. Chicago time
4  we did send you Mr. Oliveaux's file -- expert file.
5       It was provided to you in two links.  And
6  so I -- I would ask that you take a look at that
7  because all the information regarding his report and
8  his expert file were provided on that date.
9    MR. BEARD:  Okay.
10    MR. YAMAGUCHI:  Okay.  We can take a
11  break.
12    THE VIDEOGRAPHER:  Okay.  All right.
13  Please stand by.  The time is 10:03 A.M. and we are
14  off the record.
15       (Whereupon, a recess was taken.)
16    THE VIDEOGRAPHER:  We're on the record.
17  The time is 10:12 A.M.
18       You may now proceed.
19    MR. BEARD:  Thank you.
20  BY MR. BEARD:
21    Q.  All right, Mr. Oliveaux, did you ever ask
22  to see the -- the Dometic access database of fire
23  claims?
24    MR. YAMAGUCHI:  Object to the form.  Asked
25  and answered.

78

1    Q.   In regard to the pressure test, did the
2  refrigerator show a leak?
3    A.   I don't recall.
4    Q.   And what lab were you in?
5    A.   I don't recall where we were at.
6    Q.   Was it AEGI?
7    A.   No.
8    Q.   Was it Ms. Buck's lab in Michigan?
9    A.   No.  It wasn't a materials lab.  We were
10  just in somebody's back room that they called a lab.
11  I don't remember where it was at.
12    Q.   Okay.  And approximately when did that
13  happen?
14    A.   Mid to late 2021.
15    Q.   Any other instances where you worked with
16  Ms. Buck on a refrigerator fire investigation?
17    A.   I don't see her very often, so I can't
18  give you a number.  I know those two is the ones
19  that stick in my head, but I mean, I've been around
20  Dr. Buck multiple times, but some of those were like
21  events or things like that.
22    Q.   Okay.  Okay.  Hold on a second.  I
23  apologize. Bear with me.  I'm --
24    A.   I use the term technically challenged when
25  it happens to me.

79

1    Q.   No kidding.  It's the downside of doing
2  this by Zoom.
3    A.   Yup.
4    Q.   All right, let me try again.  How about
5  that? Did that work?
6    A.   All we see is your list of documents.
7    Q.   Okay.
8    A.   Depo exhibits.
9    Q.   Okay.
10      MR. YAMAGUCHI:  Terry, it's been another
11  hour. Do you want to just take five so you can kind
12  of figure out --
13      MR. BEARD:  How about that?
14      MR. YAMAGUCHI:  Okay.  We got it.
15      MR. BEARD:  There you go.  All right.  I
16  keep forgetting how to do it.
17  BY MR. BEARD:
18    Q.   Anyway, going back to your report that's
19  been marked as Exhibit 3, I'd like to switch gears
20  here a little bit and talk about your investigation
21  of the Hoog fire.
22      Now, when did you first get contacted with
23  regard -- well, let me back up.
24      How did you first become aware of the Hoog
25  fire?

80

1    A.   I received an assignment from -- I'd have
2  to look -- I think it was Ben White.  It's in the
3  report, I believe.  It may have been somebody, one
4  of the other people that was handling claims, but I
5  -- best recollection it's Ben White.
6    Q.   And what did Mr. White -- well, is that
7  the normal way that you get assignments from
8  Dometic?
9      MR. YAMAGUCHI:  Objection to the form.
10      THE DEPONENT:  I get either e-mails or
11  telephone calls or a combination of the two
12  depending on a few things, I guess, on their end on
13  whether they just call and ask or if they just send
14  it.  Yeah, that's the normal process.
15  BY MR. BEARD:
16    Q.   And what, if anything, did Mr. White tell
17  you about the -- about the claim?
18    A.   It's basically a summary of what --
19  whoever put Dometic on notice.  It would be that
20  typed out in e-mail or something like that.
21      And they would provide me with normally
22  product information as to what Dometic product is
23  present or is -- or being accused of causing an
24  event.  I get information on the RV, the location of
25  the loss, the owner's names, anything like that.

81

1      So, I want to know where I'm going.
2  Sometimes I get the other investigators' names,
3  we'll coordinate exams that way.
4    Q.   Okay.  And so as you went on to do,
5  whatever, the scene exam, I think the initial scene
6  exam was June 15th, 2018?
7    A.   If you scroll up on the report, it'll tell
8  us, but yeah, I think you're right, somewhere up in
9  there.
10    Q.   Okay.  And then there were two further
11  exams that you conducted with Mr. Perryman on the
12  24th and 25th of July 2018?
13    A.   Yes.
14    Q.   All right.
15    A.   There -- there was more than just me and
16  Mr. Perryman, but yes, we had another exam.
17    Q.   Okay.  I'd like to turn to -- just to sort
18  of get into the -- the report, I'd like to turn to
19  page 36.  Okay.  Your perception on determination of
20  area of fire origin.  Do you see that?
21    A.   Yes.
22    Q.   And I'll just read this into the record,
23  "The examination of the building, the electrical
24  system of the building, and the contents of the
25  building all indicated the fire originated on the

82

1  north end of the building in lumber being stored on
2  the concrete next to the electrical service entrance
3  just east of the east rollup door.
4       The fire then spread into the building via
5  the path of the electrical conductors.  The fire
6  then involved the insulation on the electrical
7  wiring and the electrical distribution panel before
8  exiting the panel to involve other fuel loads
9  associated with the contents of and components of
10 the building."  Did I read that correctly?
11    A.  Yes.
12    Q.  So your overall opinion as to the area of
13 fire origin was that the fire started outside the
14 Hoog shop rather than inside the Hoog shop, is that
15 correct?
16    A.  Yes.
17    Q.  All right.  Now, and I hate to do this,
18 but I'm going to try another share screen.  Do you
19 see the screen?
20    A.  Yes.
21    Q.  And do you recognize what's on the screen?
22    A.  It's a drawing of the building with
23 dimensions and items located approximately where
24 they were found in the building and indicating the
25 area of fire origin.

83

1     Q.  Is this a drawing that you prepared?
2     A.  Yes.
3     Q.  All right.  I'll mark this as --
4        THE REPORTER:  Exhibit 7.
5        MR. BEARD:  Correct.  Exhibit 7.  Thank
6  you.
7        (Whereupon, Exhibit 7 was marked for
8  identification.)
9  BY MR. BEARD:
10    Q.  And I'd like to ask you just a couple of
11 questions about this diagram.  Now, the -- the
12 diagram is not the scale, correct?
13    A.  Correct.
14    Q.  And any reason why you didn't draw a -- a
15 scale diagram?
16    A.  This diagram was prepared at the scene and
17 shared with everybody else.  And I'm including Mr.
18 Howell.  Matter of fact, every investigator was
19 there was provided that. It's not perfect to scale,
20 but I tried to draw it -- that would take more time
21 than I had at the scene.  So this is the diagram I
22 started with.  So it's the diagram that I kept.
23    Q.  Did you ever, subsequent to the initial
24 scene exam, do a different diagram that was to
25 scale?

84

1     A.  No.
2     Q.  Now, you have the area of fire origin on
3  the outside of the building in the red square, is
4  that correct?
5     A.  Yes.
6     Q.  And it's your opinion that the fire
7  started in a pile of lumber out in front of the
8  north end of the shop?
9     A.  Yes.
10    Q.  With regard to that pile of lumber and the
11 fire starting at that location, what ignited the
12 pile of lumber?
13    A.  I'm not sure what ignited the pile of
14 lumber and the reason for that is that it had been
15 cleaned up prior to our arrival at the scene.  It
16 was not -- all of that had been cleaned up prior to
17 the first exam.
18       So there was no information really left
19 there other than the spalling of the concrete to
20 show what happened.  We found the fire department
21 pictures is how we came to that area.
22    Q.  Okay.  Is that part of -- are the fire
23 department pictures you're talking about part of
24 your photolog that went along with your report?
25    A.  Yes.  The -- those descriptions are mine,

85

1  not the fire department, but they're the fire
2  department's photographs.
3     Q.  Okay.  Can you see the screen, Mr.
4  Oliveaux?
5     A.  Yes.
6     Q.  And is -- can you tell me what the screen
7  shows? What this document is?
8     A.  That is a PowerPoint presentation where I
9  create slides and turn into a PDF that show the
10 various views of the building and of the items that
11 document and support my opinions.
12    Q.  Okay.
13    A.  It also --
14    Q.  I'm sorry.
15    A.  -- documents things that were considered
16 like the vehicles, the apartment, all of those
17 things, they're all covered.  If -- if we considered
18 it in any way, we documented it and those pictures
19 are -- a sampling of those pictures are included in
20 that PowerPoint.
21    Q.  Okay.  That -- that -- that raises a point
22 I -- I wanted to cover with you.  In the fire origin
23 investigation business, is it accurate to say that
24 there are -- there is a methodology, a system
25 commonly used to document a fire scene?

86

1    A.   There are steps that you follow in the
2  scientific process and, you know, based on
3  scientific method of how we gather the data.  Yes.
4  How we process --
5    Q.   One of those -- I'm sorry.
6    A.   How we -- how we process the scene.  There
7  is a -- there is a -- everybody has little things
8  that they might vary to, but for the most part,
9  everybody follows the same process.
10    Q.   Okay.  And one of those processes is to
11  photograph the scene?
12    A.   Yes.
13    Q.   And prepare a -- a -- a photolog?
14    A.   Yes.
15    Q.   And the photolog -- the idea of the
16  photolog is that as you examine the scene and take
17  pictures of the scene, the photolog will document
18  what you are seeing, what order it is that you're
19  seeing so you could follow along in the photos and
20  see exactly what the inspector was seeing at the
21  time they did the inspection?
22    A.   Yes.
23    Q.   And -- and that is something that is part
24  of the normal, accepted methodology in the fire
25  origin and cause investigative field, correct?

87

1    A.   Yeah.  Yes.
2    Q.   And -- and you did that as well in
3  investigating the Hoog fire?
4    A.   The answer, Mr. Beard, is yes, with some
5  interruptions.  There were numerous times where I
6  was in the process going around the exterior of the
7  building, or going through parts of the building
8  where somebody called me to come look at something
9  that they had discovered or uncovered or whatever or
10  needed help with something.
11         Like on the first day, I was doing the --
12  I -- I was doing my outside pictures and all of a
13  sudden there's somebody trying to collect the
14  refrigerator.  So I stopped taking photos outside
15  and documenting the process like I normally would.
16  And I went to where they were at to document what
17  they were doing.
18         So that -- that occurred numerous times on
19  this.  So there are some things that would be out of
20  order of how I would normally do it.  But when you
21  have that many people there, you have to react to
22  what's going on.
23    Q.   Okay.  But the idea of it is that your
24  photolog, even with the interruptions or deviations,
25  your photolog basically shows what you were looking

88

1  at in the sequence that you were looking at it?
2    A.   More or less, yes.
3    Q.   All right.  And -- and -- and that -- and
4  the purpose of -- of having a photolog like that is
5  -- is so that you can -- you can look back at the
6  photolog and see what -- what the items were that
7  you looked at, what you considered, correct?
8    A.   Yes.  Yes.
9    Q.   Okay.  Now, this PowerPoint is not a
10  complete copy of the photolog that you prepared,
11  correct?
12         MR. YAMAGUCHI:  Objection, misstates his
13  prior testimony.
14         THE DEPONENT:  It is the photograph that
15  -- this is the photographs and the logs for those
16  particular pictures that showed what -- what we were
17  looking at.  But if there were redundant
18  photographs, which there often is, those were
19  provided in the file share with all the other
20  pictures.
21  BY MR. BEARD:
22    Q.   Okay.  These are the ones you selected out
23  as particularly significant to you for purposes of
24  your report?
25    A.   That and that document was getting huge.

89

1  Exactly.
2    Q.   Okay.  So we were talking about the area
3  of origin that you had identified on the north side
4  of the shop, correct?
5    A.   Yes.
6    Q.   And you had stated that there were some
7  pictures in this document, Exhibit 8, that showed
8  that area.  Am I correct?
9    A.   Yes.
10    Q.   And do you know which document that is or
11  which -- which photograph that is?
12    A.   Keep going.  I want to -- right, that's
13  part of it right there.  Those are.
14    Q.   Okay.  So go down to photo 6 in -- in this
15  exhibit, that shows the north end of building,
16  correct?
17    A.   Yes.
18    Q.   And, well, does Exhibit 6 show the area of
19  fire origin that you have identified?
20    A.   It's in the distance, yes, but that's a
21  wider view of the area.
22    Q.   Okay.  How about photo 7?
23    A.   Another wider view of the area.
24    Q.   Okay.  Does this identify the area of
25  origin that you have on your diagram?

98

1  you guys were looking at, correct?
2      A.  He did not go up the ladder as many times
3  as we did.  Like, if you go to the left of this
4  picture, that's where we started.  That's where I
5  started labeling the wires, going all the way back
6  to the north wall.
7          And Mr. Howell did not get up on the
8  ladder every time I -- I went up the ladder.  He --
9  he later on just -- I've known the man for years.
10  He is not one to just sit back.  He wanted to go get
11  involved but, you know, he -- when it -- when there
12  was something up there that he needed to see or --
13  or I had a question about -- if I questioned an
14  area, I told Mark where it was.
15          Mark would decide whether he was going up
16  the ladder to take the picture or did I take the
17  picture for him.  That happened a few times but, you
18  know, did it -- was -- did he have some limitations?
19  We all get that way at some point, you know?
20          So, but in terms of his mental
21  capabilities, he - - he's spot on.  That was Mark
22  every day.  But, you know, he'd had a -- he'd had an
23  event that had some limitations and we helped him as
24  much as we could.
25      Q.  Okay.  Let's get back to the area of fire

99

1  origin.
2      A.  Okay.
3      Q.  Let's see.  Which way are we going to get
4  to it?  Down or up?
5      A.  I'm trying to remember if we were going --
6  I think you need to be going down in the numbers.
7      Q.  This way?
8      A.  I'm going to say we're going the wrong
9  direction.  Go up.
10      Q.  Okay.
11      A.  My fault.
12      Q.  We're getting warmer?
13      A.  Not quite.  You're getting -- all right.
14  Stop and go back a few.  Well, that one got thrown
15  in for some other reason.  Go back.  It's a couple
16  of pictures.  Nope.  The other way.
17      Q.  The other way?
18      A.  Right -- right there.  So this picture
19  right here has a fire damage pattern showing the
20  fire spreading away from the wall over there.  We
21  went --
22      Q.  Okay.  I admit, Mr. Oliveaux, I want to --
23  I -- I -- we'll get there, eventually.  What I want
24  to focus on is a picture that shows the area of fire
25  origin that you identified outside the building on

100

1  the north end of the shop.  That's what I'm looking
2  for.  Now, is there -- do we have a picture -- a
3  closeup picture of that -- that area?
4      A.  What you need to find is a picture of the
5  service entrance, which you know what it looks like,
6  the one with the arc on it.  If you can find those
7  pictures.  I think you're going down.
8      Q.  Yeah.  Okay.  So --
9      A.  Let me get the PowerPoint to see if I can
10  help you there.
11      Q.  Yeah.  If you could -- if you can look at
12  the -- do you have the PowerPoint available to you?
13      A.  I do.
14      Q.  All right.  If you can tell me what page
15  it is that we're talking about.
16      A.  Okay.
17          MR. BEARD:  And tell you what, while we're
18  looking at that, why don't we take just a -- a -- a
19  quick five-minute break and then we could come back.
20          THE DEPONENT:  Okay.
21          MR. YAMAGUCHI:  That's fine.
22          THE VIDEOGRAPHER:  Okay.  Okay.  Please
23  stand by.  The time is 11:37 A.M. and we're off the
24  record.
25          (Whereupon, a recess was taken.)

101

1          THE VIDEOGRAPHER:  We are on the record.
2  The time is 11:46 A.M.
3          You may now proceed.
4  BY MR. BEARD:
5      Q.  All right, Mr. Oliveaux, before the break
6  we were talking about finding a picture in your
7  photolog, Exhibit 8, depicting the area of fire
8  origin that you identified outside the north end of
9  the Hoog shop.  Did you find the picture?
10      A.  I found some, yes.  If you scroll down to
11  the one that's labeled photo 7 and photo 8, it's
12  very top.  You'll go all the way to the top of it
13  and then come down a few pictures.  All right.
14          That one shows you the area where the fire
15  originates.  You'd have to zoom into it some, but it
16  shows you the next photograph, 8, is another view of
17  that area.
18          And you can see the box and remains of the
19  rollup door underneath there.  And the fire's just
20  in front of that.  When you go to slide 64 --
21      Q.  I got --
22      A.  Not to picture 64, slide 64.
23      Q.  Oh, you mean page 64?
24      A.  Yeah.
25      Q.  Okay.



102

1    A.  All right.  I -- so in 64 you have two
2  pictures then in the next picture I have stitched
3  together with the software I have.  And you will see
4  -- if you look across the -- if you look down at the
5  wall next -- between the tree or right there to the
6  left of the tree, you see the fire damage to that
7  exterior wall.
8        And then back behind that would be the
9  pictures of -- or the pictures that you saw earlier.
10  Then you go to -- the slide 66 and 67.  That shows
11  you the spalling on the concrete right there, the
12  arc hit.
13        Then if you go to 67, just another picture
14  of the arc hit, but you can see the spalling of the
15  concrete and in -- go up one -- go back one slide,
16  please.  Go -- 66. Go to 66.  You can see the
17  discoloration of the bricks where fire is attacking
18  the outside of this wall.
19        And the spalling is showing that there is
20  something out there burning.  Our issue was that had
21  been cleaned up.  So when we get there, we're trying
22  to figure out what's causing that.  We didn't get to
23  that point until we got the fire department
24  pictures, which show better.
25    Q.  Okay.  Are the fire department pictures

103

1  part of your -- this photo presentation?
2    A.  Not this one.  It's an individual
3  presentation.
4    Q.  All right.  So the fire department
5  pictures would -- would -- would show the area of
6  origin -- fire origin that you've identified better
7  than these pictures?
8    A.  They show that the area of origin with the
9  items actually still on fire.
10    Q.  All right.  What I -- what I'm interested
11  in, Mr. Oliveaux, and again, we'll go through the
12  various steps here.  But I would like to start at
13  the -- what you have identified as the area of fire
14  origin.  And I would like to have a -- what you
15  consider to be the best picture of what the area of
16  fire origin is.
17        Now, you've identified certain pictures in
18  your photolog, but as I understand it, your area of
19  fire origin is a pile of wood that is outside the --
20  that -- that is somewhere away from the north side
21  of the building.  So do we have a picture of that
22  pile of wood in the photolog?
23    A.  We have that in the fire department
24  pictures.
25    Q.  Okay.  Do you have it in your photolog in

104

1  -- that we're looking at right now?
2    A.  The area where the spalling is and, you
3  know, that -- that shows where the fire was
4  attacking that wall from the exterior.
5    Q.  What I'm asking about is the pile of wood
6  that you say ignited and was the -- was the
7  beginning of the fire.
8    A.  And as --
9    Q.  Am I -- am I -- am I misstating that in
10  any way?
11    A.  That's what the fire department photos
12  shows, but as I testified earlier, somebody had
13  cleaned up that area.  There was no pile of wood
14  left.  But in the fire department photos taken that
15  night and the next morning it showed that material
16  present.
17    Q.  Well, what I'm asking about is -- is there
18  a -- I'm just trying to get what you consider to be
19  a picture of the area of origin of the fire.
20    A.  There are wider pictures.  These are
21  closer pictures right here that you're looking at in
22  66 that shows the -- the damage to the bricks and
23  the staining of the bricks and the spalling of the
24  concrete and the arc hit that indicate that that was
25  attacked as the fire moved toward the building.

105

1    Q.  Okay.  But -- but is there a picture in
2  your photolog, Exhibit 8, that shows the actual area
3  of -- of -- of fire origin, the pile of wood, or the
4  area the pile of wood was sitting?
5        MR. YAMAGUCHI:  Objection to the form as
6  he testified, previously, that it was cleaned up.
7        But you can answer again.
8        MR. BEARD:  The question I'm asking,
9  counsel, and please let me, you know, just ask the
10  question.
11        And, Mr. Oliveaux, we've been through this
12  a number of times, you know how the game is played.
13  Just answer the question.
14  BY MR. BEARD:
15    Q.  What I'm asking for is, is there a picture
16  in your photolog, Exhibit 8, that shows the area
17  where the pile of wood was sitting that you say is
18  the place where this fire started?  Is it in your --
19  is it in this photolog or not?
20    A.  No, it's not in the photolog because it
21  was not there when we got there.  Somebody had
22  cleaned up the area.
23    Q.  All right.  And with regard to the place
24  where the -- where the lumber was sitting, is there
25  a picture in your photolog of that part of the

---

106

1 concrete driveway out in front of the north side of
2 the shop?
3     A.   There is a -- a wider view of the area
4 showing the fire patterns on the outside the
5 building.  Yes.  Is -- is it close or up to just
6 showing the ground there?  No.  At that point, we see
7 this damage, we don't know what causes it.
8         And then we didn't know that until we
9 obtained the fire department pictures.  And then
10 later on we -- you -- you provided videos that show
11 the fire burning in that area.
12    Q.   Okay.  Well, let me -- let me back up.
13 This notion that the area of fire origin was outside
14 the building in this pile of wood, was that a
15 hypothesis that you formed during the first
16 inspection of the property in June of 2018?
17    A.   In June of 2018, our conversation or our -
18 - yes, it was one of the things that the fire
19 started outside the building.  Our issue was there
20 was nothing there to explain why the heat was being
21 imparted onto the electrical service entrance cover.
22         And like I said, we didn't know that
23 things were removed.  Nobody told us that efforts
24 had been made to start cleaning up the property and
25 shouldn't have been made.  So, technically, that's a

---

107

1 spoliation issue but the fire department pictures
2 show that there were items there.
3         The videos that you supplied, I think,
4 yesterday or day before yesterday, show stuff
5 burning outside.  And the fire department pictures
6 show things on the ground burning.  And then the
7 next day, the pictures show the remains of those
8 items in the area of fire origin.  I can't take a
9 picture of something that is not there.  So, I do
10 not have a picture --
11    Q.   What -- what I'm asking --
12    A.   -- of the wood.
13    Q.   -- what I'm asking, Mr. Oliveaux, if I
14 understand your testimony, is that when you first
15 went out to the fire scene in June of 2018, you
16 formed a hypothesis that the fire started outside
17 the building.  Am I hearing that correctly?
18    A.   There was a hypothesis that the fire
19 started in the building in the electrical panel.
20 There was a hypothesis that it could have started in
21 the EXT.  There was a hypothesis that the fire
22 started outside the building and spread inward.
23         Based on the initial exam, that's pretty
24 much where I was at, in this -- in this area, either
25 inside the building or outside the building.

---

108

1     Q.   Did you form a hypothesis on that first
2 day that the Dometic refrigerator might be a
3 potential cause of the fire?
4     A.   Didn't have that opportunity.  The
5 refrigerator was collected almost immediately.
6     Q.   Well, when -- when you were forming these
7 hypotheses about the various -- about the XLT and
8 about the fire burning outside the building, and the
9 -- the scene according to you was cleaned up, what
10 caused you to -- to believe that the fire started
11 outside the building?
12    A.   I have spalling of concrete and fire
13 attacking the exterior of the building over there in
14 an arc hit on a feeder that arcs to the outside of
15 the panel and then has other arcing activity and
16 electrical damage inside that service entrance.
17    Q.   Okay.  So my question is when you came out
18 that first day and inspected the scene and formed
19 one of your hypotheses was that the -- there was a
20 fire out front of the building, why didn't you take
21 a picture -- I -- I realize you say that everything
22 was cleaned up, but why didn't you take a picture of
23 the area where you suspected the fire to have
24 started?
25    A.   I have a picture of the area where I

---

109

1 believe the fire entered the building.  And at the
2 point where -- at -- at that point, Mr. Beard, there
3 was nothing to take a picture of other than the
4 ground.  We took some wider photographs.
5         Mr. Perryman took more photographs over
6 there as he was working that area.  The -- I believe
7 that somewhere in this process, like I told you
8 earlier, was -- there was really multiple things
9 going on at one time.
10         Instead of it being, "Okay, we're all
11 going to go take our outside pictures and -- and do
12 that," other people were doing other things.  And
13 all of a sudden, you know, something pops up and you
14 have to go to there.  It was not -- there was
15 nobody, I guess, per se, running the show and/or
16 coordinating what was going on.
17         So it kind of resembled a little bit of --
18 of a Chinese fire drill because all of a sudden
19 somebody's taking a piece of evidence and they're
20 moving it before we have an opportunity to look at
21 it.
22         And so -- but, you know, that -- that lack
23 of a plan, I guess, of, you know -- or somebody
24 coordinating the removal of evidence and saying,
25 "Okay, we're fixing to do these things."  It wasn't,

---

110

1 "Hey, we're fixing, go take them." It was, "They
2 were taking them."
3        And somebody said, "Hey, they're over
4 there picking up the refrigerator." Nobody had told
5 me that they were even going to touch the
6 refrigerator at that point.
7    Q. Now, Mr. Oliveaux, I'd like to get back to
8 the question that I asked. Now, we previously
9 talked about the fact that everybody in the fire
10 origin and cause business takes a photolog and
11 documents things that they find significant during
12 their inspection.
13       And -- and what I'm asking is if you
14 formed a hypothesis that a fire started outside the
15 building at that first inspection, did you -- where
16 -- where is the picture that shows the area where
17 the fire supposedly started? Do you have a picture
18 or not?
19    A. It's -- it's in the photograph that you
20 have in -- that's open in the PowerPoint right now.
21 That is the area where the fire starts in the
22 building.
23    Q. Okay. But I'm talking about the area of
24 fire origin that you identified outside the
25 building.

---

111

1    A. And like I told you, those are shown in
2 the fire department photographs.
3    Q. Okay. They're not in this exhibit?
4    A. They're not in that exhibit. I made that
5 clear already.
6    Q. Well, I'm glad you cleared that up because
7 it wasn't clear to me. Okay. So it's not in --
8 well, let me ask you this question. In your
9 photolog here, Exhibit 8, that includes photos that
10 you thought were significant to your opinion. My
11 question is why doesn't this photolog include a
12 picture of where you say the fire started?
13    A. I think I just testified, Mr. Beard, that
14 that picture that you have up right there is where
15 the fire enters the building. Okay? We know that
16 there's a heat source outside. We don't know what
17 it was because it was - - the scene was spoliated.
18       And that comes back to you and your
19 client, not us. We didn't take the stuff away.
20 Somebody that was controlling the property had
21 something cleaned up. I would assume that you
22 would've given them advice to leave it alone. That
23 was not the case.
24       They cleaned up the fire scene. They
25 removed items that were pertinent to the

---

112

1 examination.
2    Q. So, okay, we don't have a picture in your
3 photolog of where you say the fire started. This is
4 where -- this picture that we're looking at in page
5 66 is where you claim the fire entered the building,
6 correct?
7    A. That's where the -- the first components
8 of the building become involved is in this -- this
9 location right here. That door and that electrical
10 service entrance is where the fire entered the
11 building.
12    Q. All right. So, let's -- bear with me for
13 just one second here. Okay, Mr. Oliveaux, I have up
14 on the screen what's been identified as Exhibit 35
15 in the plaintiffs' exhibit list, which also are
16 Bates stamped Hoog supplemental document production
17 100 -- okay, hold on a second.
18       All right, there we go. Okay. Hoog
19 supplemental document production 100539 through
20 00718. And represent to you that these are the fire
21 photographs or photographs from the fire department,
22 the Edmond Fire Department. Can you see those on
23 your screen?
24    A. I can.
25    Q. Okay. And do you recognize these pictures

---

113

1 as the photographs from the Edmond Fire Department?
2    A. That's what they look like.
3    Q. And now it's your testimony that the area
4 of fire origin that you've identified is seen in
5 this picture -- in these pictures?
6    A. No. It's not seen in that picture.
7 That's the south side of the building.
8    Q. No, I know. Not in -- in -- in this
9 picture that's on the screen, but in this collection
10 of photographs?
11    A. Yes.
12    Q. Okay. And if we go through these
13 photographs -- well, let me go back. All right.
14 The first photograph is the south side of the
15 building?
16    A. Yes. No. Yes. South side of the
17 building.
18    Q. Okay. South side of the shop?
19    A. And, actually, yeah, that -- that's the
20 first one. Okay. Yes. South side of the shop and
21 showing the firemen on the east side of the building
22 applying water.
23    Q. Okay. So as we click through these
24 pictures, we are going around the shop in a
25 clockwise motion until we get to page 9, photograph

114

1  9, which shows the north side of the building,
2  correct?
3      A.  Yeah, that's the Northwest corner.
4      Q.  Okay.  And then as we click on --
5      A.  Well, if you -- if you go back just a
6  minute.  Go one more back.
7      Q.  Okay.  Page 10 of the exhibit.
8      A.  What you're seeing there is the door in
9  front of the RV still intact and down.  And you see
10 that the door to -- that's underneath the canopy
11 area has been breached and there's fire inside that
12 part of the door.
13     Q.  Okay.  And as we continue to walk around
14 the building, there's -- when we get to --
15     A.  We passed up the door again, but --
16     Q.  Okay.  We're going back to the door on the
17 north --
18     A.  Right.  So --
19     Q.  Picture or page 15 of this exhibit and
20 we'll mark -- we'll mark this as -- we'll mark this
21 collection of photographs as Exhibit 9 to your
22 deposition.
23         (Whereupon, Exhibit 9 was marked for
24 identification.)
25 BY MR. BEARD:

115

1      Q.  Page 15 of this exhibit that shows the --
2  the north side of the building.
3      A.  Shows the -- that shows the piece of wall
4  between the two rollup doors on the north side of
5  the building.
6      Q.  Okay.  And then as we continue to click
7  through the pages of this exhibit.
8      A.  You're going a little fast there, Mr.
9  Beard.
10     Q.  Oh, okay.
11     A.  Can you go back a little ways?
12     Q.  I'm looking for the --
13     A.  I am too.
14     Q.  -- the photographs of the north side of
15 the building, which is where you say the fire
16 started.
17     A.  Okay.  So we're back to the south side is
18 where we're at.  So now you're -- you're in daylight
19 --
20     Q.  That's page 36 of the exhibit.
21     A.  Yeah.  So now you're -- you're doing the
22 daylight hours.  So you can keep going down in these
23 -- to the next ones.  Now, slow down.  All right.
24 You need to go slow through these.  You see the fire
25 damage attacking the panel, you see the panel, you

116

1  see the wires that are damaged?
2      Q.  Right.  What we're looking for is the area
3  of fire origin that you have identified out front of
4  the north side of the building.
5      A.  We're getting there.
6      Q.  Okay.  Did we miss it?
7      A.  You're not finished.  I don't think.
8      Q.  That's all 180 pages.  Are you sitting in
9  front of your computer?
10     A.  I'm sitting in front of my computer.  So
11 --
12     Q.  So, do you have the Edmond Fire Department
13 pictures on your computer?
14     A.  I do.
15     Q.  And --
16     A.  All right, if you find Edmonton (sic) Fire
17 Department 15.
18     Q.  Okay.
19     A.  Okay.  You can see in the bottom left of
20 that photograph, the wood.  And then --
21     Q.  Are we looking at the same picture?
22     A.  It's -- it's fire department photograph
23 15.  There's a firefighter on the right side barely
24 in the picture and a -- and a hose string going into
25 the door toward the side of the -- west side of the

117

1  apartment.
2      Q.  Okay.  And is that the same picture that's
3  on the screen?
4      A.  Well, it's in my -- it's in the PowerPoint
5  that I did.  Yes.  It's just that I think that
6  picture is cropping out something.  I think that --
7  that I -- that is not a true representation of that
8  photograph.
9      Q.  Okay.
10     A.  If you go to the fire department pictures
11 that I put in the PowerPoint, you'll see the full
12 photograph.
13     Q.  Okay.
14     A.  And I -- that's slide number 16 is where
15 --
16     Q.  Okay.  Okay.  So we're back to your
17 PowerPoint. And which -- which photograph are you
18 referring to?
19     A.  Go to 45, slide 45, slide 47.  And you can
20 see some of it in 49.
21     Q.  Okay.  We're -- are you talking about page
22 45?
23     A.  Yes.  The slide number is 40 -- the -- the
24 -- the numbers should track pretty close, but there
25 was a couple that the pictures didn't come out that

118

1  mark or something.
2      Q.   Are you --
3      A.   Look at 40 -- slide 47.  That's probably
4  the best one.  You can --
5      Q.   Wait a minute, Mr. Oliveaux, just so that
6  the record is clear.  We're looking at your
7  PowerPoint presentation, correct?
8      A.   Yes.
9      Q.   That is --
10     A.   Of -- of the fire department photographs.
11     Q.   That is -- that is -- is Exhibit 8?
12         MR. YAMAGUCHI:  Fire department's Exhibit
13  9.  Are we looking at Exhibit 8?
14  BY MR. BEARD:
15     Q.   Yeah.  Are we looking at Exhibit 8 or --
16  which is your PowerPoint presentation that went
17  along with your report?
18     A.   It's the -- it's the PowerPoint
19  presentation of the fire department pictures.
20     Q.   Ah, okay.  Not Exhibit 8.  Okay.  So, now,
21  can you see my screen, Mr. Oliveaux?
22     A.   Well, let me shrink mine.  Now, I
23  can see your screen.
24     Q.   Okay.  And is -- on my screen, is that the
25  PowerPoint presentation that you prepared in this

119

1  case involving the fire department photographs of --
2  of the fire scene?
3      A.   Yes.
4      Q.   Okay.  So is that the -- are we on the
5  same document now?
6      A.   We are.
7      Q.   All right.  So we'll mark this PowerPoint
8  as Exhibit 10.
9         (Whereupon, Exhibit 10 was marked for
10  identification.)
11  BY MR. BEARD:
12     Q.   And -- and which picture you -- are you
13  referring to?  And, again, what -- all I'm trying to
14  do is get a picture from you that you are -- claim
15  is a picture of the area of origin of the fire
16  outside the building.
17     A.   Photo -- if you go down to, I think, it's
18  slide 47 or it's -- and -- but I think it's
19  photograph 45.
20     Q.   Well, we can -- just so -- just so that I
21  get things more screwed up, can we go by page
22  number?
23     A.   47.  Go to 47.  You can actually go --
24  stop right there.  In this picture 45, go to 40 --
25  go back one to 45.

120

1      Q.   Okay.
2      A.   You can see in that photograph the remains
3  of the wood and other things over -- charred, not
4  completely consumed outside that door.  And then if
5  you go to I think two slides ahead, you go down two
6  more, to 47, there you see, again, the wood and
7  other materials that have fallen.
8         But you have a pile of wood on the ground
9  there. And there was no wooden structure above this
10  to fall on the ground.  So that wood was there
11  during the fire.
12     Q.   Okay.  So, 47 is a photograph that -- it's
13  your testimony that the -- the -- the wood pile
14  that's in the bottom left-hand corner of this
15  photograph is the area of origin of the Hoog fire?
16     A.   Yes.
17     Q.   Are there any other pictures in here that
18  you claim are -- show this area better than this?
19     A.   I think you can go down a couple -- go
20  down one each and there's more views of that area.
21  All right.  Back up.  Back up.  Go back again.  Some
22  more.  Some more.  All right, stop right there.
23  Well, let's -- wait, I take that back.  Go back one
24  more.  Let me make sure that we're in the right
25  spot.  All right.  Go -- you can go forward and

121

1  stop.
2      Q.   Okay.  So we are at page 100 of Exhibit
3  10.  And this picture depicts the outside main
4  electrical panel?
5      A.   Electrical service entrance.  Yes.
6      Q.   Okay.  And then some distance away or some
7  -- some rubble and is that the wood pile that you're
8  talking about down on the bottom left-hand corner of
9  the photo?
10     A.   Yeah.  You saw it in a previous picture
11  now you're seeing just a closer view of that area,
12  but you'll - - as you progress, you'll see, one,
13  you've got fire patterns that are showing fire
14  coming up from the ground here and going across that
15  panel box and across that wall.
16         And you've got staining on those bricks,
17  which again, these other items weren't there.  So
18  you can go one more -- go another picture down.  You
19  see the PVC conduit attacked at floor level or
20  ground level, and the panel being attacked as
21  something's burning upward from the bottom.
22     Q.   Well, that's -- that's your interpretation
23  to this photograph?
24     A.   That's my interpretation of a combination
25  of all of these photographs.

122

1    Q.  By the way, that conduit that is or the --
2    the -- can you see my cursor?
3    A.  Yes.
4    Q.  The -- the conduit that is coming out of
5    the bottom of the electrical box, is that insulation
6    wrapped around the -- wrapped around the conduit?
7    A.  It appears to be the PVC being attacked
8    from -- from the fire.  When we looked at it, it --
9    it had a PVC piece between where the wire turned up
10   and taking the wire into the bottom of the service
11   entrance.
12   Q.  Okay.  And is there -- is there any better
13   picture of the area of fire origin in this
14   collection of photographs that -- that you're
15   relying on?
16   A.  I think there's -- I think there's --
17   understand, I didn't take these.  So they were taken
18   by the -- by the fire investigator.  And if you go
19   down, I think there might be a couple more, but I
20   haven't looked at these in the last week or so.
21   Q.  Okay.
22   A.  I put them in the order that he shot them.
23   Q.  Okay.
24   A.  There -- see, there was a -- go back.  Go
25   back, one more, maybe another one.  Right there.

123

1    See that, he went back to and took a picture of the
2    inside of that cover.
3    Q.  Okay.
4    A.  So you can keep going.  There's -- I think
5    there was another couple of pictures later -- oh,
6    wait, go back.  You're going to see where the
7    electrical service panel inside, it's on the ground
8    there, right there.  And the door's on top of it.
9    Q.  Okay.  Well, again, Mr. Oliveaux, I don't
10   -- I'm not -- we're not there yet.  We're still out
11   front.
12   A.  Okay.
13   Q.  What I -- all I'm asking about are
14   photographs of where you say the area of origin of
15   fire.
16   A.  Okay.
17   Q.  So we just click on through here.
18   MR. YAMAGUCHI:  And, counsel, while you're
19   doing that, I just wanted to clarify on the record.
20   I think you referred to this as Exhibit 10 and I
21   think it's Exhibit 8.  I mean, Exhibit 9, sorry.
22   MR. BEARD:  No, the fire -- the fire
23   department photos were Exhibit 9.  This is Mr.
24   Oliveaux's fire department PowerPoint, which is
25   Exhibit 10.

124

1    BY MR. BEARD:
2    Q.  Okay.  I do not see any more photographs
3    of --
4    A.  I didn't either.
5    Q.  -- north.  Okay.  So what we're talking
6    about here is 46 and 100.
7    A.  And you have one before that that shows
8    the side view of -- with more of the wood visible.
9    Go up some more.  There's one.
10   Q.  47.
11   A.  47.  And I think there's actually another
12   one before that, 46 or 45.  45, I think.  You can go
13   up one and go up -- all right.  Yeah.  45.  You can
14   see --
15   Q.  46.
16   A.  That's photo 44, slide 45.
17   Q.  Page 45.
18   A.  Yeah.  Page 45.
19   Q.  Okay.
20   A.  And you can -- you can see the item on the
21   ground in front of and their proximity to the
22   service entrance, electrical service entrance.
23   Q.  Okay.  And I just want to confirm that
24   when you came out to the site on June 15th, 2018,
25   you did not take any photographs of the area on the

125

1    ground where this pile of lumber is sitting in photo
2    -- in -- on page 45 of this exhibit, is that
3    correct?
4    A.  I took some wider views of it, but
5    understand there was nothing there to take a picture
6    of other than the door.  We did get pictures of the
7    door later on, but -- or the general area, but there
8    was nothing there because it had been spoliated.  It
9    had been cleaned up.
10   Q.  What's your estimate -- looking at page 45
11   of Exhibit 10, what's your estimate of the distance
12   between the wood pile and the outside electrical
13   panel for the shop?
14   A.  You'd have to go to the other picture, go
15   back to 47, I think.  I would say it's within three
16   feet.
17   Q.  Okay.
18   A.  But it also has some proximity to that
19   rollup door, which also is a fuel package that the
20   fire can attack and spread into the building.
21   Q.  Well, you indicated that there was --
22   well, strike that.  Well, the series of videos that
23   recently surfaced of the fire, are you aware of
24   them?
25   A.  Yeah.



126

1    Q.   And you've had a chance to review those?
2    A.   Yes.
3    Q.   Want to -- hold on a second.  Can you see
4  my screen?
5    A.   Yes.
6        MR. BEARD:  And this is, for the record,
7  one of the videos.  There's five video clips.  This
8  one is titled image 0858, which is the first in
9  series of these five clips.
10 BY MR. BEARD:
11   Q.   And you've had a chance to review this?
12   A.   Yes.
13   Q.   All right.  And is it your understanding
14 that these are videos of the fire showing the north
15 end of the Hoog shop taken by one of the neighbors
16 to the Hoog --
17   A.   It appears as he's walking from
18 north to south toward the building.
19   Q.   Okay.  And go ahead and play this.  Let me
20 just stop here.  With regard to this video, is it
21 fair to say that the interior of the building is
22 fully engulfed in fire -- in fire?
23   A.   Actually, I'm not sure that that's the
24 case, because remember there's a door there that
25 could be just the door on fire because of the panels

127

1  on the inside of the door.  And --
2    Q.   Do you see the wood -- the wood pile that
3  you referenced on fire in this picture?
4    A.   I see fire on the ground, outside the
5  building.  Yes.
6    Q.   Okay.
7    A.   And as you get to the next ones, they --
8  they get closer.
9    Q.   Well, in this picture here, you've also
10 got fire coming out of the windows on the west side
11 of the building?
12   A.   Yes.
13   Q.   And that's the RV side of the building?
14   A.   Yes.  Those are coming out near the roof
15 or near the eave line of the building.
16   Q.   Well, it's coming out of the windows on
17 that side.
18   A.   Yes, it's a window that's just below the
19 eave line.
20   Q.   Okay.  Can you see my screen, Mr.
21 Oliveaux?
22   A.   I can.
23   Q.   Okay.  The next video clip in order, 0859.
24 Again, this shows the north end of the building?
25   A.   Yes.

128

1    Q.   And the fire department is --
2    A.   A little closer, I think.
3    Q.   The fire department is already on scene?
4    A.   There's one -- there's one unit that's
5  visible, yes.
6    Q.   Okay.  I --
7    A.   Between the pond and the -- and the
8  building.
9    Q.   Now, it'd be fair to say that this video
10 clip shows fire coming out from the interior of the
11 building?
12   A.   There's some fire coming outside the
13 interior of the building and there's some fire
14 outside the building.
15   Q.   Okay.  The next video clip 0860.  Can you
16 see my screen, Mr. Oliveaux?
17   A.   I can.
18   Q.   Now, let me just stop it early on.  Now,
19 this -- it'd be fair to say that this video shows
20 this wood pile on fire?
21   A.   Yes.
22   Q.   And it shows behind the wood pile there's
23 the door to the shop?
24   A.   Yes.
25   Q.   And inside the shop it's fully engulfed in

129

1  flame?
2    A.   That's what the picture shows.  Yes.  Fire
3  is well-advanced.
4    Q.   And the flame from the inside of the shop
5  is going through the building?
6    A.   Above the area of the electrical
7  distribution, yes.
8    Q.   I'm talking about the area at the roof.
9    A.   Right there.
10   Q.   Okay.
11   A.   That's -- that area is right above the
12 electrical distribution equipment.
13   Q.   Okay.  Well, that -- well, okay.  And you
14 can also see fire going behind the other rollup door
15 that is still down, correct?  To the right?
16   A.   Yes.
17   Q.   All right.  And -- and it's your testimony
18 or your opinion that the fire that is burning on
19 this pile of wood in front where the cursor is that
20 that's what started the entire fire?
21   A.   Yes.
22   Q.   Okay.  Let me stop here.  In -- at -- at
23 -- in this video clip, stopped it at 18 seconds.
24 Could you see the fire or could you see the fire in
25 the wood pile?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

130

1    A.  Yes.
2    Q.  Can you see the electrical box?
3    A.  Yes.
4    Q.  And is the fire anywhere near the
5  electrical box?
6    A.  The fire is within three feet of the
7  electrical box and it is burning vigorously.
8    Q.  Okay.
9    A.  And, actually, they're starting to
10  suppress it. So it's been burning for a while.
11    Q.  Well, the fire department is not paying
12  any attention to the wood pile burning, correct?
13    A.  They -- they put water on it in other
14  pictures and they're putting water on it now. You
15  can see the steam coming off of it.
16    Q.  Well, they're -- they're putting fire on
17  the -- on the inside of the building, correct?
18    A.  No.  Right there, they're spraying water
19  on that pile of wood.
20    Q.  That's your interpretation of that?
21    A.  I can see where the steam is being
22  produced. Yes.  And that right there is what is
23  causing the spalling of the concrete because now
24  that you have heated it and you cool it real quick,
25  it'll spall.

131

1    Q.  Okay.  Actually, I think that's the last
2  video clip that shows actual fire on the outside of
3  the building.
4    A.  Which one was the last one that you
5  played?
6    Q.  860.
7    A.  Let's look at -61.  I think --
8    Q.  Okay.
9    A.  There's -- the two at the end are them
10  cutting doors.  Cutting the doors on the north end
11  of the building, I think.  Or maybe it was -- I'm
12  sorry -- the south end of the building, I think, is
13  what -- was what those two last ones were.
14    Q.  Tell you what, why don't we look at them
15  just to make sure?
16    A.  Yup.
17    Q.  Okay.  We're looking at -- do you see the
18  screen, Mr. Oliveaux?
19    A.  Yeah, I do.  And that looks like one of
20  them cutting the door.
21    Q.  Okay.  That short one?
22    A.  Yeah.  Is it -- is there -- if there's
23  only one more, the last one was also them cutting
24  the door.
25    Q.  Well, let's just --

132

1    THE DEPONENT:  Can I ask that those all be
2  attached?
3    MR. YAMAGUCHI:  Sure.
4  BY MR. BEARD:
5    Q.  Do you see the screen, Mr. Oliveaux?
6    A.  Yes.
7    Q.  Okay.  And --
8    A.  That's them cutting the door again.
9    Q.  Right.
10    A.  I'm not as clear on which door they're
11  cutting on this one, but I think it's probably the
12  one on the -- in front of the RV.
13    Q.  Correct.  And this could've been --
14  doesn't -- is after the -- well, the fire is still
15  burning inside, but there's no fire on the outside,
16  right?
17    A.  Yes.  They've suppressed that.
18    Q.  Okay.  What I'll do is mark the video clip
19  0858 as 11, 859 as 12, 860 as 13, 861 as 14, 862 as
20  15.
21    (Whereupon, Exhibit 11, Exhibit 12,
22  Exhibit 13, Exhibit 14, and Exhibit 15 were marked
23  for identification.)
24    MR. BEARD:  All right.  What time is it in
25  -- in -- in your area of the woods, Mr. Oliveaux?

133

1    THE DEPONENT:  Quarter to one.
2    MR. BEARD:  Okay.  Tell you what, why
3  don't we take a -- why don't we take a lunch break
4  'till 1:30 and then hit it again.
5    THE DEPONENT:  Okay.
6    MR. BEARD:  All right.
7    THE VIDEOGRAPHER:  Off the record.
8    (Whereupon, a luncheon recess was taken.)
9    THE VIDEOGRAPHER:  We are on the record.
10  The time is 1:34 P.M.
11  You may now proceed.
12    MR. BEARD:  Thank you.
13  BY MR. BEARD:
14    Q.  Mr. Oliveaux, I'd like to go back to your
15  report for a second.  Do you have it in front of
16  you?
17    A.  I can get it.
18    Q.  Might be quicker than me trying to share
19  the screen.
20    A.  You're good.  I can do it.  Oh, let me
21  see. Okay.  I've got it.
22    Q.  Okay.  I'd like to refer you to page 14 of
23  your report under qualifications.
24    A.  Okay.
25    Q.  And in a sentence --

134

1    A.  Hang on just a minute.  Let me get to
2  where you're at.  You said 14, right?
3    Q.  14, correct.
4    A.  9, 11.  All right.
5    Q.  Okay.  Draw your attention to the second
6  sentence of the first paragraph under
7  qualifications.  "My experience with SOS
8  Investigations includes investigating over 1,000
9  recreational vehicle fires, where gas absorption
10  refrigeration was present and other fire losses
11  across the broad spectrum of vehicles, vessels,
12  buildings, industrial facilities, and
13  construction/forestry equipment."  Did I read that
14  correctly?
15    A.  Yes.
16    Q.  All right.  I'm -- the -- the way the
17  sentence is -- is phrased, I just wanted to make
18  clear or clarify, are you saying that you have
19  investigated over a thousand recreational vehicle
20  fires where gas absorption refrigeration was
21  present, period, in addition to other things?
22    A.  To be honest with you, I don't know that
23  I've -- that paragraph is probably underestimating
24  because I've done more than a thousand fires.  But
25  it was more -- it -- it's a combination of

135

1  everything in there, not just --
2    Q.  Okay.  That's what I wanted to clarify.
3  You're -- you're not -- you're not saying in this
4  paragraph that -- by this sentence that you've done
5  a thousand investigations of refrigerator fire
6  cases?
7    A.  No.
8    Q.  Okay.
9    A.  It's not --
10    Q.  You're talking about a thousand
11  investigations total since -- I guess since SOS was
12  formed in 1994?
13    A.  Yeah.  And it's probably -- like I say,
14  it's more than that now, but like I say, it's -- it
15  says over.  So it's grammatically correct.  It's
16  just not an exact number.
17    Q.  Okay.  And looking at that, could you
18  estimate how many of the thousand or so fires were
19  investigate or investigations -- were investigations
20  of recreational vehicle fires where gas absorption
21  refrigerators were present?
22    A.  I can't give you a -- a good estimate.  I
23  can just tell you that recreational vehicle fires
24  make up a lot of what I've done over the years.
25        Progressive sent me quite a few of them

136

1  and then component manufacturers, RV manufacturers,
2  you know, there -- there's -- there's more of them
3  in there, plus two refrigerator manufacturers.
4    Q.  Okay.  So let's get back to what we were
5  talking about before the break, which was the -- the
6  area of origin in front of the north side of the
7  Hoog shop where you placed the area of origin of the
8  fire in this case.
9        Now, you had said several times during
10  your deposition so far that it was impossible for
11  you to have examined the wood pile, the area of
12  origin because by the time you got out there, the
13  wood pile had already been cleaned up.  Is that
14  correct?
15        MR. YAMAGUCHI:  Objection, misstates prior
16  testimony.
17  BY MR. BEARD:
18    Q.  Well, is that a misstatement of your prior
19  testimony, Mr. Oliveaux?
20        MR. YAMAGUCHI:  I don't recall him using
21  the word impossible.
22  BY MR. BEARD:
23    Q.  Okay.  Let me back up.  Let me phrase it
24  -- rephrase the question.  Let me just ask a
25  different question.  Why didn't you investigate the

137

1  area of origin that you identified when you came out
2  to the shop to do the scene inspection?
3    A.  When we arrived there, the first thing we
4  did was we started taking our pictures, going around
5  it.  Then Mr. Hoog arrived and we started the
6  interview process, which you were part of.  And I
7  had made it to the north side of the building and
8  there was nothing there.
9        And then when we started back to the
10  interview, somebody asked about something else and
11  we went to that location.  And then later on, I went
12  back to that end of the building.
13    Q.  Okay.  And -- and is it your testimony,
14  under oath, that when you examined the scene on June
15  15th, 2018, there was no evidence of the wood pile
16  on the back -- on the north side of the building?
17    A.  I don't -- no.  There was no evidence of
18  the wood pile.  There was evidence of falling of the
19  concrete, damage to the door and damage to the
20  service entrance and the conduit and the bricks
21  around the service entrance and up the wall.
22    Q.  Was -- at the initial scene inspection,
23  was Mr. Howell also documenting the fire scene along
24  with everybody else?
25    A.  I don't remember specifically, but if that



138

1 was his first time there, I'm sure Mark was taking
2 pictures.
3     Q.  All right.  Doing the same kind of photo
4 documentation as everybody else?
5     A.  Yes.
6     Q.  Okay.  And by the way you have seen Mr.
7 Howell's expert file, haven't you?
8     A.  Yes.
9     Q.  And you reviewed the material that he
10 provided?
11     A.  The way it came in, I have -- it -- it
12 came in in multiple files and, I mean, it's -- I've
13 looked through, I'm going to say, most of it.  But
14 the way it came in, it was like court filings and
15 then something, court's filings and then some -- you
16 know, it's mixed in.
17         And it took me a couple of times to get
18 that downloaded with the internet that I have at my
19 -- at my office.
20     Q.  And did you have a chance to review Mr.
21 Howell's photolog of his initial inspection of the
22 fire scene?
23     A.  The answer is I have reviewed -- I
24 reviewed his notes and I went through the pictures.
25 But once we got the fire department pictures, I

139

1 don't know that I finished going through all of his
2 photographs.  But if you give me a second, I'm
3 looking at that now because I remember reading
4 through his report and --
5     Q.  Fair enough.
6     A.  -- yeah, I do remember looking at -- at
7 his pictures because he had the red arrow that was
8 pointing to the -- to where the pile was.
9     Q.  What pile are you talking about?
10     A.  Outside the north door.  Outside where --
11 that stuff right there.
12     Q.  Okay.  So can you see my screen?
13     A.  Yes.
14     Q.  All right.  Now, this is a photograph from
15 Mr. Howell's photolog, number 8285.  And we'll mark
16 this as Exhibit 16.
17         (Whereupon, Exhibit 16 was marked for
18 identification.)
19 BY MR. BEARD:
20     Q.  And is it accurate to say, Mr. Oliveaux,
21 that this photograph depicts the wood pile out in
22 front of the 14 foot door on the north side of the
23 Hoog shop?
24     A.  Yes.
25     Q.  As it existed at the time of the initial

140

1 inspection in June of 2018?
2     A.  Yes.
3     Q.  So, your prior testimony that this area
4 had all been cleaned and there was nothing left is
5 not accurate, correct?
6     A.  Correct.  It was -- it was cleaned between
7 this inspection and the next inspection.
8     Q.  Okay.  So let's get back to the question
9 that I was asking this morning.  When you saw this
10 wood pile and its relationship to the electrical
11 panel on the date of the first inspection, did you
12 do anything to investigate the wood pile?
13     A.  We were inside with Mr. Hoog and then it
14 was refrigerator collection and documenting inside
15 of the building.  Evidently, in that process I
16 missed photographing that area.
17     Q.  Okay.  So you didn't -- so you -- you
18 concede now that this is an accurate depiction of
19 what the north side of the building looked like on
20 the day of the first inspection, correct?
21     A.  Yes.
22     Q.  And you were there for the entire
23 inspection that day?
24     A.  Yes.
25     Q.  And you had the ability to document and

141

1 photograph and excavate and examine this wood pile,
2 correct?
3     A.  Yes.
4     Q.  And you didn't do it?
5     A.  No, I didn't.
6     Q.  And you testified earlier on this morning
7 that you formed at least one of your hypotheses was
8 that the fire originated outside the building,
9 correct?
10     A.  Yes.
11     Q.  And that you based that on the -- on the
12 spalling of the concrete that was out in front of
13 the door right where this wood pile sat?
14     A.  Yes.
15     Q.  But even though that was one of your
16 hypotheses, you did nothing to investigate the wood
17 pile itself, correct?
18     A.  I didn't photograph it.  I don't remember
19 -- I know I went around that end of the building.
20 But like I told you earlier, the -- the process
21 there was we were taking pictures and then Mr. Hoog
22 came.  We went to listen to Mr. Hoog and then we
23 start back up.
24         And then after we've interviewed Mr. Hoog,
25 25 minutes or so later, Mr. Hoog comes back and



142

1  gives us a different story.  So we kind of got
2  sidetracked there.  So I may have just -- didn't go
3  back to that area.
4        But we -- at that point, we started --
5  they were wanting to collect the refrigerator and
6  that's what we went and did.  We wrapped it, you
7  were there, we put it in -- on the -- you know, in
8  Mark's truck.  And we had already determined that we
9  were going to have to come back to this location.
10  Q.  And what I -- that -- it is true -- well,
11  let me back up.  How long did that initial exam last
12  on June 15th, 2018?  All day?
13  A.  Most of the day.  The portion of the day.
14  I don't remember exactly what time we left.
15  Q.  So you had every opportunity to look at
16  whatever you wanted to look at, correct?
17  A.  Yes.  But the other thing was -- is that
18  we were looking at a whole bunch of stuff there.
19  You had an RV that you were -- we were trying to
20  document.  We were -- you know, y'all went and took
21  the refrigerator.
22        So we worked to document that and other
23  things related to it.  And then we had vehicles, one
24  had just been driven that day.  So we ran out of
25  time, which we asked to come back.  We made that

143

1  statement very -- before we left that we needed to
2  come back.
3  Q.  So now that you've seen this photograph
4  documenting the conditions at the north side of the
5  building, do you withdraw your prior testimony about
6  the scene being spoliated so that you could not
7  examine the wood pile?
8  A.  Not completely because here's the thing,
9  we'd already advised you and Mr. Howell that we
10  needed to come back to this, that we were not
11  finished.  And, therefore, it should have been
12  preserved.
13  Q.  What I'm asking, Mr. Oliveaux, is that you
14  made allegations in your report and during your
15  testimony this morning that at the first scene
16  inspection, this area had been cleaned and had been
17  spoliated because none of this was present.
18        And now that you are changing your
19  testimony that, yes, this was present, are you
20  withdrawing your claims that the scene was spoliated
21  as far as this wood pile goes?
22  A.  It wasn't that way when we came back.  So,
23  yes.
24  Q.  Yes, you are withdrawing it?
25  A.  No, I'm not withdrawing it.  It was not

144

1  there on the second visit and the fire scene was not
2  supposed to be changed.
3  Q.  When you came back for the second visit
4  and -- and saw that the wood pile had been cleaned
5  up, is that when you formed your hypothesis that the
6  fire must have started on the outside of the
7  building?
8  A.  When I formed the hypothesis that the fire
9  started on the outside of the building was during
10  the first exam, because the arc hit is on the
11  outside of the building.
12  Q.  Okay.  But having formed that hypothesis
13  and the fact that this wood pile was in existence at
14  the time and could have been examined by you, you
15  did nothing to do that, correct?
16  A.  I did not examine the pile on that day.
17  Q.  Okay.  Now, looking again at this
18  photograph, Exhibit 16, this gives a better look, I
19  think, of the distance between the wood pile and the
20  electrical panel?
21  A.  To some extent, yes.
22  Q.  And would you -- now that you've seen this
23  picture, would you estimate that the electrical
24  panel was more than three feet away from the wood
25  pile?

145

1  A.  No.
2  Q.  Now, in regard to the -- your theory of
3  fire origin, you don't have any idea what ignited
4  the wood pile, correct?
5  A.  I do not.
6  Q.  You don't have any idea of when in the --
7  well, strike that.  Your -- your opinion is that the
8  wood pile caught on fire for some unknown reason and
9  that the fire traveled or the heat from the fire
10  traveled over to the electrical panel, the outside
11  electrical panel, and heated up the outside
12  electrical panel, correct?
13  A.  Yes.
14        MR. YAMAGUCHI:  Objection -- objection to
15  the form.
16  BY MR. BEARD:
17  Q.  Okay.  And --
18        THE REPORTER:  Sorry, what was that
19  objection?
20        MR. BEARD:  It was an objection?
21        MR. YAMAGUCHI:  Objection to the form.
22        MR. BEARD:  I'm sorry, Keith, I didn't
23  mean to cut you off.  Was there an objection?
24        MR. YAMAGUCHI:  Yeah, I was just objecting
25  to the form, the use of the word -- saying that Mr.

146

1  Oliveaux had talked about the fire travelling.
2      MR. BEARD:  Okay.
3  BY MR. BEARD:
4      Q.  And, Mr. Oliveaux, did you do any testing
5  to determine what amount of heat would be generated
6  in a pile of lumber, the size that we would be depicted
7  in Exhibit 16?
8      A.  None.  Did not.
9      Q.  With regard to the electrical panel, the
10  -- that we're looking at in -- in photo 16 or
11  Exhibit 16, the panel at the time of the fire was on
12  the -- on the -- the front cover was on the box,
13  correct?
14      A.  Yes.  It's turned around.  It should be
15  180 degrees of where it's at now.
16      Q.  Okay.
17      A.  It's based -- so that's the inside of the
18  panel, the cover that you see.
19      Q.  Okay.  So the outside electrical panel was
20  enclosed at the time of the fire?
21      A.  Yes.
22      Q.  And have you done any testing or analysis
23  to determine how hot the electrical box, the outside
24  panel would have to get in order to compromise the
25  insulation around the feed wires inside the box?

147

1      A.  The melting temperature of that
2  conductor's insulation is a little north of 380
3  degrees.  So you have to get to north of 380
4  degrees.  And now there's a little variable in there
5  based on the wire size, because the -- the wire size
6  is going to affect the thickness on those
7  conductors.
8          That's 350 cable.  So, have to go back to
9  the book, but I want to say it's around an eighth or
10  a little better thick, but I -- that's top of my
11  head.  I'm not going to swear to that number.
12          But there -- there's -- there's a standard
13  for what the insulation should be and that
14  insulation softens and flows at north of 300
15  degrees, 380 degrees, I think it is.
16      Q.  And what reference are you relying on for
17  that?
18      A.  That is listed in the ignition handbook
19  somewhere.  That is listed in 921, I believe.  But
20  the -- the insulation is a polyvinyl chloride
21  insulation and it's got a, like I say, melting
22  temperature.  The only thing that varies on it is
23  the thickness of the -- of the insulation based on
24  the size of the wire.
25      Q.  So have you done any analysis about this

148

1  particular -- how hot this particular panel would
2  have to get in order to compromise the insulation in
3  this particular case?
4      A.  Well, with the damage to the insulation on
5  the wiring and the -- and the arc, you know that it
6  has to have exceeded the melting temperature of the
7  insulation on the conductor.
8      Q.  But do you know how -- what that
9  temperature would be?
10      A.  I've told you twice now I think it's north
11  of 380 degrees.
12      Q.  And how hot would the -- the heat from the
13  fire and the wood pile have to get to travel through
14  air and heat up the electrical panel to the point
15  where it would compromise the insulation on the
16  inside?  Have you done any workup on that?
17      MR. YAMAGUCHI:  Object to the form and
18  lack of foundation.
19      THE DEPONENT:  You want to repeat your
20  question?
21  BY MR. BEARD:
22      Q.  Sure.  Have you done any analysis or
23  calculation of how hot the fire would have to be
24  from the wood pile in order to convey heat across
25  the three foot air gap and heat up the panel of the

149

1  outside electrical service to the point where it
2  compromised the insulation on the inside?
3      MR. YAMAGUCHI:  Same objection.
4      THE DEPONENT:  The --
5  BY MR. BEARD:
6      Q.  Mr. Oliveaux, the question is just, have
7  you done any kind of calculation or analysis?  Yes
8  or no?
9      A.  I did -- I did an analysis of what I could
10  see in the first set of pictures when I saw it from
11  the fire department pictures of what I believe the
12  amount of material was in that location.
13          After that, it's more of a thought process
14  test in terms of we estimate how many BTUs you get
15  from each of those dimensional pieces of lumber and
16  their proximity to each other to get some kind of
17  estimate of BTU output.
18          This would not be a huge pile based on the
19  way it looked stacked.  When I saw the picture from
20  the fire department, it was not tightly together, so
21  it would have some space and it would lose some
22  heat.
23          The question is also going to be, as I
24  don't remember off the top of my head the wind
25  direction that day.  I've got the weather report,

190

1 last sentence of the determination of fire -- can we
2 put it back?  The determination of fire cause.
3 BY MR. BEARD:
4     Q.   Okay.
5     A.   I'm sorry, origin.  That the fire -- the
6 fire then involved the insulation on the electrical
7 wiring in the electrical distribution panel before
8 exiting the panel to involve other fuel loads
9 associated with the contents and components of the
10 building.
11         That is a metal building, which means that
12 it's going to absorb heat.  It's going to transfer
13 heat through conduction to other things, including
14 the internal panel, the door, the insulation on the
15 backside of the rollup door.
16         All of those things are going to be heated
17 through heat transfer from conduction and radiated
18 heat. The radiated heat's going to come from the
19 pile burning outside.  It's going to impart heat
20 onto that metal.
21         And it's going to spread to fuels inside
22 that are combustible, like the framing around the --
23 the electrical panel, the -- the insulating panels
24 on the inside of the door.  And then it's just going
25 to go from there, burning more and more fuel.

191

1     Q.   Well, all of that scenario that you just
2 discussed, you've not done any testing to determine
3 whether that in fact happened in the Hoog case,
4 correct?
5     A.   I tested my hypothesis as to origin and
6 the spread.  And the totality of the evidence says
7 that that fire can only start outside the building.
8 That testing cannot -- you cannot have the
9 electrical events that -- you know, we don't have
10 any electrical events except for one.
11         And we know that the interior finish in
12 this area is combustible.  And we know that because
13 we have pictures of Mr. Hoog's building before it
14 burned.  So the transfer of heat is a simple thing.
15         You don't have to -- if -- if you have a -
16 - if you've got wood burning within three feet of
17 that door, or that metal building, you're going to
18 have heat flux on that metal component.  And that
19 metal component is going to get warm.
20         And that metal component is going to start
21 spreading that heat throughout its whole area.  And
22 it's going to continue to rise as long as you've got
23 stuff burning outside in the videos.  And the
24 photographs from the fire department show that it
25 burned for a period of time.  And it spread from

192

1 there to other areas.
2     Q.   Well, in regard to the idea of the -- the
3 -- the arc happening and then heat being transmitted
4 from the exterior panel to the interior panel due to
5 the smoldering of the insulation, how long would
6 that have taken to transmit a significant amount of
7 heat to the interior panel?
8         MR. YAMAGUCHI:  Objection to the form.
9         THE DEPONENT:  So you -- you're saying
10 that the only heat source I'm supposed to be
11 considering now is the smoldering of the insulation
12 or am I considering all of the heat sources present?
13 BY MR. BEARD:
14     Q.   Now, Mr. Oliveaux, all the heat sources
15 present, how long would it have taken for a
16 significant amount of heat to be transmitted to the
17 interior electrical panel?
18     A.   It depends on which of the -- which fuel
19 ignited first.  If you ignite the panels on the
20 inside of the door, you are going to then involve
21 the items on the west wall of the building.  And
22 you're also going to involve the wood structure
23 around the electrical panel.
24     Q.   All right.  I'm not talking about --
25     A.   So, I'm -- I'm --

193

1     Q.   -- I'm not talking about the alternate --
2 the -- the alternate idea of -- of the door catching
3 on fire.  I just want to limit it to the fire path
4 that you have described in your report, which is the
5 heat going from the exterior electrical box to the
6 interior electrical box.
7         How long would that have taken for a
8 significant amount of heat to end up in the interior
9 electrical box?
10     A.   And --
11         MR. YAMAGUCHI:  Objection to the form.
12         THE DEPONENT:  -- you also misstated my
13 opinion because you keep taking out the components
14 of the building, which are metal, which transfer
15 heat readily.  When you put heat in it, it's going
16 to transfer the heat.  That's called conduction.
17         The radiant heat from the fire is going to
18 -- from the fire burning outside is going to heat
19 that metal. So, you keep trying to take parts of my
20 opinion and throw them out, and you cannot because
21 they are congruent with each other.
22         They are tied to each other.  Because all
23 of those panels, those electrical panels that you're
24 talking about or that we've been talking about,
25 that's got the arc on it that we know it had to get

194

1  that hot to melt the insulation and all of that
2  continued to be heated by the external fire.
3        And it's going to spread into the other
4  components of the building that it is in contact
5  with. And it's going to still have radiant heat
6  being applied to those spaces that are now getting
7  heat from down low and from this fire burning
8  against that -- up against that building.
9  BY MR. BEARD:
10     Q.  Have you done any testing --
11     A.  That is -- that is illustrated by the
12  patterns above the panel box. It goes up -- fire
13  spreading up from the ground over by and across that
14  panel.
15     Q.  Have you done any testing to determine how
16  long it would take?  Well, let me back up. Once the
17  heat gets into the electrical panel on the inside of
18  the shop, how did the heat spread outside of that
19  distribution panel?
20     A.  You've got holes in the top of it where
21  the conduit or where the conductors go out. And
22  inside that panel, you have a different type of
23  insulation that will burn on those smaller
24  conductors.
25        So when you get the heat in there and you

195

1  ignite those circuits, you now have a vertical fuel
2  source where with that vertical fuel source, you now
3  have a -- a heat source below it.
4        So it is going to not only burn the
5  bottom, but the bottom is going to continue to
6  generate heat. And you're going to basically have
7  fire going up that panel, inside that panel.
8     Q.  How much heat is necessary to ignite the
9  wires inside the distribution panel inside the Hoog
10  shop?
11     A.  They -- the -- the ones in that size would
12  be about 300 degrees is when that material starts to
13  melt and flow. And if you continue to heat it it'll
14  start to off- gas and then it will ignite. The
15  exact temperature is not something that I have
16  stored in my head. I know what the melting is and
17  it's like 280 something. So I just used the number
18  300.
19     Q.  What's the fuel load inside the
20  distribution panel?
21     A.  Fuel load inside the distribution panel is
22  the combined amount of PVC or polyvinyl chloride
23  insulation on the wiring, and to some extent, some
24  components of the breakers. Because they will heat
25  and produce a little bit of -- once they get hot,

196

1  they will -- they -- they degrade and they produce a
2  little bit of heat, but they're not the biggest fuel
3  load.
4     Q.  And how much -- how hot would -- assuming
5  that -- that the wires on the insulation on the
6  inside of the distribution panel melted, what kind
7  -- how hot would the fire be that was -- that was --
8  that was generated by that fact?
9     A.  To melt copper you have to have 1,982
10  degrees for a sustained period of at least a minute.
11     Q.  Well, the copper didn't burn. The
12  insulation burned, right?
13     A.  Correct.
14     Q.  Okay. So the insulation, how hot would
15  the copper be --
16     A.  But you asked something about melting the
17  copper -- you said melting the copper. That's what
18  I just -- that's what I answered.
19     Q.  No, I -- I didn't say melting the copper.
20  I said melting the insulation. We know the -- your
21  -- your scenario is that sufficient heat got into
22  the electrical box distribution panel inside the
23  shop to cause the insulation around the wires inside
24  the distribution box to degrade and catch on fire,
25  correct?

197

1     A.  That's -- that's one of the fire spreads.
2  Yes.
3     Q.  Okay. And what I'm asking is what -- how
4  hot would that fire be and how big would that fire
5  be considering the number of wires that were in the
6  Hoog box? Have you done any analysis or testing to
7  determine what that would be?
8     A.  Your -- the heat required is going to be
9  percent -- some percentage greater than the melting
10  temperature of the material on which -- the PVC
11  material. Once you get it soft and it starts to
12  off-gas, which is what every solid does, it off-
13  gases, that's what is ignited.
14        The -- the solid does not burn, the gas
15  off of it burns. The liquid does not burn, the gas
16  off of the liquid burns as it is heated and -- and
17  you get a phase change.
18        So that's what's burning. And you have a
19  heat source of a fire burning outside, and you have
20  a heat source of the building that is absorbing that
21  heat and that's transferring into the panel.
22        So what does the temperature have to be?
23  I don't know exactly because I don't know the total
24  amount of weight that you have in insulation.
25     Q.  Okay. And you haven't done any kind of

246

1  is a sealed system that is pressurized because
2  without the water, there's nothing there.
3       You -- you cannot take the liquid ammonia
4  and just the -- the little bit of hydrogen gas
5  that's in there. You -- you cannot build that
6  pressure with that limited amount of material or of
7  gas.
8     Q.  And how do you know that?
9     A.  That's been discussed -- I mean, you --
10  you have a volume there that it cannot -- it's
11  already a gas. So if you -- if you've got something
12  left, if the water's gone out, you -- the only thing
13  for you to expand is the water. The liquid ammonia
14  is -- is in there, but it's going out with the water
15  if you have a breach.
16      And if you have that breach and you've
17  lost all the water, you're not going to create that
18  fish-mouth rupture.
19    Q.  Is it your testimony that it is impossible
20  to have a boiler tube leak and a overpressure
21  situation at the same time?
22      MR. YAMAGUCHI:  Objection to the form.
23      THE DEPONENT:  You have to have a very
24  small leak.  And in this case, we tested the cooling
25  unit at AEGI to 100 PSI and it lost 5 PSI over an

247

1  hour. So that is a minuscule leak. And you're --
2  you're not losing that kind of pressure out of there
3  or you're not -- I mean, it's -- this refrigerator's
4  -- and that's after the fire that you find this
5  small leak.
6       So question is, is which one came first?
7  And you've got to figure out that scenario because
8  we know it's an intact cooling unit if Mr. Hoog says
9  he's been using it. He never reported that it wasn't
10  cooling. So he had an intact cooling unit.
11      Now, you have a popped dimple and you have
12  a fish-mouth rupture and you have a very small hole
13  in the bottom of that refrigerator. So which one
14  comes first?
15  BY MR. BEARD:
16    Q.  Well, do you have any experience,
17  training, or expertise to make that call yourself?
18    A.  It's not a call that just -- you know, I
19  mean, this is in consultation with other experts.
20    Q.  Well, I'm asking about -- about you and
21  your report, Mr. Oliveaux. Now, you've made a
22  series of declarative statements in this section
23  about how the cooling units work, how overpressure
24  works, how you -- you have to have a -- a leak of a
25  certain size.

248

1       All of these declarative, factual-sounding
2  statements. And we've established that you don't
3  have the experience and expertise and training to --
4  to -- to opine on that. So I want to know where
5  this information is coming from.
6     A.  Are -- are you saying that I don't have
7  the training, education, and experience to testify
8  that you have to have something to expand to
9  generate pressure?
10    Q.  No, I'm talking about the -- the
11  particular opinions that you have -- the particular
12  -- particular statements that you're making in this
13  section about how the gas absorption refrigerator
14  cooling unit operates and -- and how it fails.
15      And under what circumstances you get an
16  overpressure rupture, and whether you could have an
17  overpressure rupture and a boiler tube leak at the
18  same time. You make a number of declarative
19  statements of fact in this section and I would want
20  to know where those come from.
21      MR. YAMAGUCHI:  I'm going to object --
22  BY MR. BEARD:
23    Q.  Are they just -- are -- are they -- they
24  based on just general -- general background and
25  experience that -- that you have in investigating

249

1  fires involving Dometic gas absorption
2  refrigerators?
3       MR. YAMAGUCHI:  Objection to the form.
4  And -- and I would request rather than this broad
5  brush stroke, since there -- there's a full page of
6  information here, if you have specific questions
7  about the background from which he's referring to
8  certain statements, you should just break it down.
9       MR. BEARD:  Okay.
10  BY MR. BEARD:
11    Q.  Let's go to page 32 of your report. Oh.
12  Hold on a second. I forget I went blank here.
13      Let's go to page 32, the first full
14  paragraph.
15      Well, up above, the last sentence,
16  "Between 1,000 and 1,200 degrees Fahrenheit, the
17  steel loses approximately 50 percent of its
18  strength. This increased heat also continues to
19  increase the pressure inside the vessel." Where did
20  that come from?
21    A.  Came from one of the experts in -- that's
22  been retained in prior cases.
23    Q.  Who?
24    A.  Ms. Gayliss, and I believe that Mr. Baron
25  has -- in his reports in the past that I've read

250

1  indicate the softening of steel.  This is something
2  that's known commodity.  I mean, it -- it -- you
3  have to raise the temperature of the steel to cause
4  it to lose its strength.
5      Q.  So this is a regurgitation of what
6  somebody else has said?
7      MR. YAMAGUCHI:  Objection to the form.
8      THE DEPONENT:  It is statements given to
9  me by experts in the field that state that these
10  parameters are correct.
11  BY MR. BEARD:
12      Q.  Okay.  But you don't know -- you don't
13  have the experience or training or education to
14  opine or make these statements yourself, correct?
15  These are statements coming from other people?
16      A.  These are statements of other experts that
17  are work -- that have -- that are working with me.
18  So --
19      Q.  Why -- why is this section in your report
20  if these are just statements from other experts?
21      A.  It is -- it is to explain what has to
22  happen for an overpressure rupture or ignition to
23  occur.  And when it comes to the ignition part, yes,
24  I'm very qualified to make those statements.  And
25  when it comes to the refrigerators, you've been

251

1  there many times to watch those, and I've taken part
2  in those and discussed these details with people who
3  are more than qualified.  And I just told you who
4  they are.
5      Q.  Okay.  But the opinion -- well, let me
6  back up.
7      A.  So it's a statement --
8      Q.  If this -- is -- is this section included
9  in your report to support opinions about whether or
10  not there was a leak in the Hoog refrigerator boiler
11  tube?
12      A.  Is it to support that there was a hole or
13  not a hole?
14      Q.  That -- that -- let me -- let me back up.
15  Let me ask it a different way.  Do you agree that
16  there was a boiler tube leak in the Hoog
17  refrigerator?
18      A.  We lost five PSI, so yes, it's losing some
19  -- it is losing that we checked -- I mean, when we
20  do those tests, we leak test every connection and
21  all of that, and we found a -- a loss of five PSI in
22  an hour.
23      Q.  All right.  And you agree your -- your
24  understanding of the way that the system works, the
25  refrigerator under normal operating conditions

252

1  operates in 400, 450 degrees at the boiler tube?
2      A.  As long as it's in a level condition, yes.
3      Q.  All right.  And the -- well, is there any
4  question that the inside of the Hoog shop was
5  leveled?
6      A.  No, there's -- there's no question about
7  them.  I'm just saying that you -- you made a
8  statement that it operates in that -- that
9  temperature range.  And my answer was as long as
10  it's level, it's -- it should operate in that
11  temperature.
12      Q.  Okay.  And it also operates at 350, 400
13  PSI under normal operation, correct?
14      A.  Yeah.
15      MR. YAMAGUCHI:  Counsel, I'm just going to
16  interject, 15 minutes and then we're finished.
17  BY MR. BEARD:
18      Q.  And with regard to the -- with regard to
19  the -- with regard to the -- let me see.
20      MR. BEARD:  Keith, you made me lose my
21  train of thought.
22      MR. YAMAGUCHI:  Well, apologies.  I just
23  didn't want to give you a late notice.  We're
24  approaching 5:00 P.M.
25      MR. BEARD:  Well, Mr. Court Reporter, what

253

1  are we on time -- elapsed time?
2      THE REPORTER:  Almost six and a half
3  hours.
4      MR. BEARD:  Okay.
5  BY MR. BEARD:
6      Q.  With regard to the -- you had an opinion
7  as to whether or not the -- the -- the leak in the
8  Hoog boiler tube was sufficient to cause a fire.
9      A.  I would -- I would refer you to Mr. Baron
10  or Dr. Baron's for those things.  He's the one that
11  analyzed and states his findings related to
12  metallurgical issues.
13      Q.  Okay.  So you don't have an opinion on
14  that?
15      A.  It's -- that -- that's his part of this
16  investigation.
17      Q.  In regard to the idea of a boiler tube
18  fire -- fire, a -- a -- a refrigerator having a
19  boiler tube fire that causes a high rupture at the
20  condenser, you've seen that in the past, correct?
21      A.  Yes.
22      Q.  And that's not -- that's not in fact an
23  uncommon thing to have a boiler tube fire and a high
24  rupture at the same time.  Correct?
25      A.  It is not -- no, that -- that's not

254

1 uncommon. We -- we find the blowouts up in the top
2 part of the cooling unit when it's clear that
3 they've been attacked, but you still will find a
4 small rupture, occasionally, in the boiler area.
5      We've -- we've cut them out and they wound
6 up at Pete's on a regular basis after finding a
7 pressurized blowout. And one of those -- the -- the
8 big thing you have to remember is that the pressure
9 inside that refrigerator is equal throughout the
10 cooling unit.
11      So if you have enough pressure to blow it
12 out at the top and enough heat, why would you not
13 have the possibility of having things fail within a
14 certain pressure range of each other? So the --
15 that though is for Dr. Baron to discuss. You asked
16 me a question, I -- I have seen it. I've seen it
17 multiple times.
18      Matter of fact, I saw it last week. We
19 have a pressurized blowout in the rectifier area.
20 And then we have a crack in the area going outside
21 of the absorption -- or outside of the absorber
22 vessel that feeds the -- the perk tube.
23      And then we found a small leak between the
24 heater pockets on that model refrigerator. That was
25 -- that was at Norcold but --

255

1      Q.   Okay.
2      A.   -- we found multiple holes. So it's not
3 uncommon that we do find that when they have been
4 exposed to a fire and had not vented. And in this
5 case, this one did not vent, so it blew out and it's
6 attacked by a high fire.
7      Q.   Well, it's your opinion that -- that the
8 damage to -- or the -- the higher rupture was a
9 result of an attacking fire from somewhere other
10 than the boiler tube in the refrigerator?
11      A.   Yes. It's coming from that thermal layer
12 that is coming down onto the bus and descending
13 toward the floor. And you -- you start involving the
14 bus around it once you've already got the thermal
15 layers going.
16      You're -- you're imparting no telling how
17 much heat on this thing, because think -- I mean,
18 you've now involved the bus and you already have
19 this great thermal layer above you that is imparting
20 all kind of radiant heat. And you're starting to
21 drop that level when you start burning other fuels.
22      Q.   What is your explanation for the presence
23 of corrosion on the inside of the boiler tube of the
24 refrigerator, the crack in the -- inside out crack
25 in the boiler tube --

256

1      MR. YAMAGUCHI:  Objection to the form.
2 Lack of foundation.
3 BY MR. BEARD:
4      Q.   -- if you have one?
5      A.   I would refer you to Dr. Baron for that.
6      Q.   Okay. And the -- as a fire investigator,
7 fire origin and cause investigator, what's your
8 explanation for the fact that there is a crack in
9 the Hoog boiler tube -- a rupture above the boiler
10 tube and yet the fuse plug on the other side of the
11 cooling unit did not deploy?
12      MR. YAMAGUCHI:  Object to the form, lack
13 of foundation.
14      THE DEPONENT:  The thermal layer of the
15 building and the fire attacking the top of the RV
16 and then burning downward, you're heating the top of
17 the cooling unit. So, therefore, you are also
18 imparting heat where the -- onto that cooling unit,
19 which now spreads throughout it through conduction.
20      So when you start heating the cooling
21 unit, the pressure's going to go up because it's
22 gasifying the water. That's the reason why you get
23 the overpressure in this condition.
24 BY MR. BEARD:
25      Q.   But how is it that you could have this

257

1 fire banging down from the roof and setting the RV
2 on fire and the only damage to the cooling unit is
3 on the boiler side, not the fuse plug side?
4      A.   Because the refrigerator, the fuse plug
5 goes into the absorber tank and until you get the
6 heat inside there, you're not going to melt it out.
7 And once it vents, once you get that overpressure
8 rupture, you no longer have the force behind that.
9 You're -- you're now at zero. Once you dump the --
10 the condenser area when -- when it ruptures, you
11 drop the pressure.
12      Because what you're doing to get that
13 thing to come out is you're softening that solder
14 plug and you have to soften it all the way through
15 to get and allow the pressure to blow it out.
16      And in this case, all it did was it had
17 some melting on the outside, but you -- you still
18 don't have the pressure to force it out.
19      Q.   So the fuse plug, is it not the case the
20 fuse plug blows out at around 270 degrees
21 Fahrenheit?
22      A.   It -- it --
23      MR. YAMAGUCHI:  Objection to the form.
24      THE DEPONENT:  The -- it's somewhere
25 between 270 and 300. Yes. And -- but that is --