## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

KEVIN W. HOOG and )
REBECCA HOOG, )
            )
          Plaintiffs, )
            )
v. )     Case No. CIV-20-00272-JD
            )
DOMETIC CORPORATION, )
a Delaware corporation, )
            )
         Defendant. )

## ORDER

Before the Court is Plaintiffs' Motion to Exclude the Opinions of Walter Oliveaux ("Motion") [Doc. No. 102].[1] Defendant Dometic Corporation filed a response in opposition [Doc. No. 112], and Plaintiffs filed a reply [Doc. No. 122]. For the reasons stated below, the Court denies the Motion.[2]

---

[1] The Court also reviewed Terrence Beard's Declaration [Doc. No. 103] in support of the Motion, which included attached excerpts of Walter Oliveaux's September 16, 2022 deposition testimony and Exhibit No. 16 from that deposition. [Doc. Nos. 103-1, 103-2].

[2] Based on the evidence in the record before it, the Court finds a formal hearing is not necessary. A formal hearing is not required to adjudicate a *Daubert* motion, and the Court has considerable latitude in deciding whether to hold a formal hearing. *See United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999); *see also Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 664 (10th Cir. 2013) (unpublished) (concluding that the district court properly exercised its discretion in issuing a *Daubert* ruling without a formal hearing where the district court had before it several expert reports, deposition transcripts, and other evidence that accompanied the parties' arguments).

I.    **BACKGROUND**

This action arises from property damage sustained by Plaintiffs after a fire

destroyed their custom-built shop on their property in Arcadia, Oklahoma, on March 30,

2018. Also destroyed in the fire were Plaintiffs' two vehicles and their RV, which were

all inside the shop. The cause and origin of the fire are disputed with experts from both

sides offering conflicting opinions as to both.[3] Plaintiffs have proffered David Mark

Howell, a certified fire investigator, as their origin and cause expert. [Doc. Nos. 71-1 at 3,

104-2 (expert report), 104-3 (deposition transcript), & 104-4 (rebuttal expert report)].[4]

Dometic has moved to exclude Mr. Howell's proposed testimony under Federal Rule of

Evidence 702 and *Daubert*. [Doc. No. 104]. That motion will be addressed by separate

order. Dometic has proffered Walter L. Oliveaux, also a certified fire and explosion

investigator, as its origin and cause expert. *See* [Doc. No. 112-2 at 6]. His proposed

testimony is the basis of the Motion at issue in this Order.

Mr. Howell and Mr. Oliveaux physically inspected and examined the scene of the

fire loss on June 15, 2018. Also present during their investigation were Plaintiff Kevin

---

[3] Additionally, the Court notes that Edmond Fire Department Assistant Chief Mike Fitzgerald completed his investigation after his department extinguished the fire in the early morning hours of March 31, 2018. Due to the extreme fire damage sustained by the structure, Mr. Fitzgerald advised he was unable to determine an origin or cause of the fire, and the official cause of the fire was listed as "undetermined." [Doc. No. 104-2 at 3, 30–34]. However, he did indicate based on physical evidence and witness statements that in his opinion the area of origin was near or in the motor home or along the north wall by the electrical panel. *See id.* at 34.

[4] The Court uses CM/ECF page numbering from the top of filings in this Order.

Hoog, who spoke to both investigators, and counsel for both parties. [Doc. Nos. 102-1 at 5, 103-1 at 16–17, & 104-2 at 3–4, 7]. Additional inspections of the scene by Howell and Oliveaux occurred on July 23 and July 24, 2018. [Doc. Nos. 103-1 at 11 & 104-4 at 2–3]. These latter inspections included removal of the interior wall panels of the shop and the documentation and collection of wiring and electrical components along the west and north walls of the shop. *See id.* The two vehicles were examined by Howell and Oliveaux on June 15, 2018, and again on November 30, 2021. [Doc. Nos. 102-1 at 11, 37 & 104-2 at 18].

Mr. Howell opines that the fire originated inside the Dometic-manufactured gas absorption refrigerator (the "Refrigerator") within Plaintiffs' RV. [Doc. No. 104-2 at 29]. In addition to examining the scene and collecting evidence and witness statements, Mr. Howell, in part, relies on the AEGI engineers' reports of their lab inspection of the Refrigerator. [Doc. No. 104-2 at 28]. According to Howell's report, AEGI engineers reported that the boiler assembly tubing on the Refrigerator sustained an internal failure and leaked flammable gas. *See id.* at 28–29. Mr. Howell opines that the flammable gas was ignited "by one of the many available ignition sources in the area of origin" and that this caused the fire. *See id.* at 29.

Mr. Oliveaux's expert report is at [Doc. No. 102-1].[5] Mr. Oliveaux considered and excluded several hypotheses of origin before opining that the fire originated outside the

_____

[5] Mr. Oliveaux indicates in his report that the photo attachments to his report "should be used when reading the report to provide a graphic understanding." [Doc. No. 102-1 at 5]. However, the photographs do not appear to be attached to the report in

north end of the shop in a pile of lumber ("lumber pile"), stored near the electrical service entrance of the building, just east of the roll-up garage door. [Doc. No. 102-1 at 7, 24, 37–38]. He derived this opinion after observing and examining concrete spalling, electrical arcing, discoloration of bricks, and evidence of burned combustible materials at the electrical service entrance during his various inspections of the scene and from photographs taken by the Edmond Fire Department. [Doc. Nos. 102-1 at 5, 24–25 & 103-1 at 9]. His report indicates that the photographs show the lumber pile was burned and had to be extinguished, and other photographs show firefighters working to extinguish the area east of the east roll-up garage door on the north side of the shop building. [Doc. No. 102-1 at 24–25, 38]. From his review of the fire damage, spread patterns, and electrical arc mapping, Mr. Oliveaux further opines that the fire spread from the electrical service entrance into the building "via the path of the electrical conductors" and that the "fire then involved the insulation on the electrical wiring in the electrical distribution panel before exiting the panel to involve other fuel loads associated with the contents and components of the building." *Id.* at 6, 38.

Although he concludes the fire originated outside the shop at the lumber pile, Mr. Oliveaux declines to opine as to what caused or ignited the fire because he asserts, he did not have the opportunity to examine and further test the lumber pile after the initial inspection of the scene on June 15, 2018. Rather, he asserts that the lumber pile was removed or spoliated, either intentionally or accidentally, prior to him completing his

---

Plaintiffs' briefing on the Motion or to Dometic's response, which also includes Mr. Oliveaux's report. *See* [Doc. Nos. 102-1 & 112-1].

inspection. [Doc. Nos. 102-1 at 38, 112-3 at 9, & 103-1 at 18]. "Spoliation" of the lumber pile is a contested issue between the parties and will be discussed in more detail below.

Plaintiffs seek to exclude Mr. Oliveaux's expert testimony based on the content of his expert report, his curriculum vitae, and his deposition testimony. *See* [Doc. Nos. 102-1, 112-2, & 103-1]. Plaintiffs assert that Mr. Oliveaux is not qualified to offer opinions regarding the design, operation, and cause of failure of Dometic-branded gas absorption refrigerators, and that his opinions and testimony on those issues should be excluded. [Doc. No. 102 at 4–5]. Further, Plaintiffs assert that Mr. Oliveaux's origin and cause opinions are based on speculation and false statements of fact, and as such, are not reliable and do not assist the trier of fact. *Id.* at 5–7. Specifically, Plaintiffs take issue with Mr. Oliveaux's claim that the lumber pile was "spoliated" or "cleaned up" before he could complete his investigation. *See id.*

In response, Dometic asserts that Mr. Oliveaux has extensive education, training, and experience in fire investigations and is qualified to testify about the cause and origin of the fire. [Doc. No. 112 at 6–8]. Additionally, Dometic asserts that Mr. Oliveaux has experience with gas absorption refrigerators and may rely on the expertise of others to inform his opinions. *See id.* at 8–11. Specifically, in response to the spoliation issue, Dometic asserts that Mr. Oliveaux used a reliable methodology in deriving his opinion on the origin of the fire, and his inability to test the lumber pile does not render his opinion as to origin unreliable. *Id.* at 11–19. Regardless, Dometic contends that Mr. Oliveaux's other opinions concerning the cause and origin of the fire—including that the fire originated outside of the shop and that the fire damage is inconsistent with the fire

originating in the RV—are reliable and should be admitted even if the Court excludes his opinion on the lumber pile. *Id.* at 19–21.

In reply, Plaintiffs assert that Mr. Oliveaux cannot rely on the opinions of others to satisfy his lack of qualifications under *Daubert*. [Doc. No. 122 at 1–3]. Additionally, Plaintiffs assert that it is impossible to separate Mr. Oliveaux's origin opinions from his opinions on causation because they are intertwined, and thus, both should be excluded. *See id.* at 3–4. Plaintiffs contend that Mr. Oliveaux used a "flawed and unreliable methodology" to support his opinions, and that his "[f]ailure to investigate a hypothesis [i.e., inspect the lumber pile] is a clear violation of the Scientific Method," which is incorporated into the 2017 National Fire Protection Association Guide for Fire and Explosion Investigations ("NFPA 921") [excerpts of the NFPA 921 at Doc. No. 112-4]. *Id.* at 5–6. Lastly, Plaintiffs assert that "Mr. Oliveaux is a creature of Dometic and . . . not an independent fire investigator," thereby his testimony and opinions are "sufficiently compromised by bias to justify their exclusion." *Id.* at 6–7.

## II.   <u>DISCUSSION</u>

### A.   **Applicable Legal Standards**

Courts have broad discretion in determining the admissibility of expert testimony. *Taylor v. Cooper Tire & Rubber Co.*, 130 F.3d 1395, 1397 (10th Cir. 1997). A district court also has broad discretion to decide "how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). The

admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the

Supreme Court's opinions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1993) and *Kumho Tire*. *See James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d

1207, 1215 n.1 (10th Cir. 2011) ("If expert testimony is not reliable under

*Daubert/Kumho*, it is not admissible under Rule 702.").

### *(1)    Amended Federal Rule of Evidence 702*

Rule 702 imposes upon the trial judge an important "gatekeeping" function

regarding the admissibility of expert opinions. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if
> the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the
>     trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and
>     methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 was amended in two ways on December 1, 2023. First, the rule was

amended to clarify and emphasize that the proponent of expert testimony must meet all of

Rule 702's substantive standards for admissibility by a preponderance of the evidence.

*See* Fed. R. Evid. 702 advisory committee's note to 2023 amendments. Second,

subsection (d) was replaced in its entirety "to emphasize that each expert opinion must

stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *See id.*

The 2023 amendments are intended to correct some courts' prior and inaccurate application of Rule 702. As reflected in the advisory committee's note, "many courts have [incorrectly] held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," which is an "incorrect application of Rules 702 and 104(a)." *See id.* As such, "[t]he Committee concluded that emphasizing the preponderance standard . . . was made necessary by the courts that have failed to apply correctly the reliability requirements of [Rule 702]." *Id.*

"Nothing in the amendment imposes any new, specific procedures." *Id.* It simply "clarifies that the preponderance standard [in Rule 104(a)] applies to the three reliability-based requirements." *Id.* Moreover, the "Rule 104(a) standard does not require perfection" or courts "to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support." *Id.* At the same time, the Rule 104(a) standard "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." *Id.*

### (2)    *Two-Step Analysis: Expert Qualification and Reliability*

In considering whether an expert opinion is admissible, the Court performs a two-step analysis. First, the Court determines "whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render [the] opinion." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (quoting Fed. R. Evid. 702). If so

qualified, the Court must then determine whether the expert's opinion is reliable under the principles set forth in *Daubert* and *Kumho Tire*, and relevant, in that it will assist the trier of fact. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc); *103 Investors I, L.P.*, 470 F.3d at 990; *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122–23 (10th Cir. 2006); *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

The Supreme Court in *Daubert* listed four non-exhaustive factors that a trial court may consider in making its reliability assessment: (1) whether the expert's technique or theory can be and has been tested; (2) whether the theory has been subjected to peer review or publication; (3) whether the technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory has been generally accepted in the relevant scientific community. *Kumho Tire*, 526 U.S. at 149–50 (citing *Daubert*, 509 U.S. at 592–94); *103 Investors I, L.P.*, 470 F.3d at 990 (same). "The *Daubert* factors are 'meant to be helpful, not definitive,' and not all of the factors will be pertinent in every case." *United States v. Baines*, 573 F.3d 979, 992 (10th Cir. 2009) (quoting *Kumho Tire*, 526 U.S. at 150–51). Thus, in some cases, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150 (internal quotation marks and citation omitted). The inquiry is always, and of necessity, highly fact-specific, and no one factor is outcome

determinative.[6] Finally, when the testimony of an expert is challenged, the proponent of the testimony bears the burden of establishing its admissibility. *Nacchio*, 555 F.3d at 1241.

**B.    Expert Qualification**

Plaintiffs do not appear to dispute Mr. Oliveaux's general qualifications in the field of fire cause and origin investigation.[7] Rather, they assert that Mr. Oliveaux is not qualified to specifically offer opinions regarding the design, operation, and cause of failure of Dometic-branded gas absorption refrigerators. Additionally, they assert that Mr. Oliveaux cannot rely on the opinions of others to satisfy a lack of qualifications. In response, Dometic asserts that Mr. Oliveaux has extensive education, training, and experience in fire investigations and is qualified to testify about the cause and origin of

---

[6] The Advisory Committee Notes to Rule 702 identify other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by a jury. These factors include: (1) whether the expert proposes to testify about matters growing naturally and directly out of his research, independent of the litigation, or whether he has developed his opinion expressly for the purpose of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

[7] "'When no objection is raised, district courts are not required to make explicit on-the-record rulings.'" *United States v. Avitia-Guillen*, 680 F.3d 1253, 1257 (10th Cir. 2012) (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 n.2 (10th Cir. 2000) and explaining that where a party objects only to an expert's qualifications, the party does not preserve an objection to the expert's methodology).

the fire. Additionally, Dometic asserts that Mr. Oliveaux has experience with gas absorption refrigerators and may rely on the expertise of others to inform his opinions.

In considering the issue of expert qualification, the Court is guided by *Ralston*, which turned entirely on the expert's qualifications. 275 F.3d at 969. The plaintiff asserted that the warnings accompanying an implanted orthopedic nail were inadequate. The Tenth Circuit affirmed the trial court's exclusion of the testimony of the plaintiff's expert, who was a board-certified orthopedic surgeon and an associate professor at the University of Kansas Medical School. *Id.* at 967, 969. The plaintiff's expert admitted that she was not an expert on intramedullary nailing and that she knew little about the subject. *Id.* at 969. Moreover, the plaintiff's expert testified that she had never drafted a warning for a surgical device. *Id.*

The expert's general credentials, although impressive, were insufficient. "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Id.* at 970. Her reliance "upon general orthopedic and surgical principles and concepts" was not sufficient. *Id.* at 969–70. Additionally, her proposed testimony about the adequacy of the warning was not within the "reasonable confines" of her expertise. *Id.* at 970. "As long as an expert stays within the reasonable confines of his subject area, . . . a lack of specialization does not affect the admissibility of the expert opinion, but only its weight." *Id.* (internal quotation marks, bracketing, and citation omitted).

*Ralston* demonstrates that a focused approach to determining an expert's qualifications is appropriate. The question before the trial court is "specific, not general."

11

*Kumho Tire*, 526 U.S. at 156. The trial court must decide "whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Id.* (internal quotation marks and citation omitted).

"'[T]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1092–93 (W.D. Okla. 2009) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). Simply put, "'[t]he real question is, what is he an expert about?'" *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1232 (N.D. Okla. 2007) (quoting *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001)). Under controlling case law, including *Ralston*, the qualifications of a proposed expert must be assessed only after the specific matters he proposes to address have been identified. *Graves*, 675 F. Supp. 2d at 1093; *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1232. "[T]he expert's qualifications must be both (i) adequate in a general, qualitative sense (*i.e.*, 'knowledge, skill, experience, training, or education' as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert." *Graves*, 675 F. Supp. 2d at 1093.

Plaintiffs contend that Mr. Oliveaux is not an expert in gas absorption technology or boiler design, operation, or failure, and that he offers opinions in his report—specifically at pages 31–35—"that he lacks any qualification to provide." [Doc. Nos. 102 at 4, 102-1 at 31–35]. Additionally, Plaintiffs maintain that this section of Mr. Oliveaux's report "is a collection of *ipse dixit* assertions untethered to any relevant qualifications

possessed by Mr. Oliveaux, or citations to any relevant authority." [Doc. No. 102 at 5].

Dometic counters that Mr. Oliveaux has conducted more than 1,000 cause and origin

investigations involving gas absorption refrigerators, and asserts that "experience, by

itself, is sufficient to qualify [Mr. Oliveaux] in cause and origin issues pertaining to gas

absorption refrigerators." [Doc. No. 112 at 9].

Mr. Oliveaux stated in his deposition that he was not offering any opinions in this

case in boiler design or boiler failure, but that Dr. Richard Baron will opine on the

Refrigerator's failure or non-failure in those areas. [Doc. No. 112-3 at 3, 4].[8] Rather, Mr.

Oliveaux clarified that his testimony would relate to the environmental conditions on the

Refrigerator that would cause such failures, and Dometic asserts in its response that

understanding the mechanics of the Refrigerator is relevant to Oliveaux's cause and

origin opinion and whether the Refrigerator was a valid ignition source for the fire. [Doc.

No. 103-1 at 8; Doc. No. 112 at 10]. Thus, this argument by Plaintiffs appears to be moot

since Oliveaux is not offering testimony on those subjects and is agreeing to stay within

the reasonable confines of his expertise.

Additionally, it is reasonable to expect that experts will rely on the opinions of

other experts in other fields as background material for arriving at an opinion. Rule 703

explicitly contemplates such a scenario. *See Vox Mktg. Grp., LLC v. Prodigy Promos*

*L.C.*, 521 F. Supp. 3d 1135, 1144–45 (D. Utah 2021) (citing *Gopalratnam v. Hewlett-*

*Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017)). Rule 703 provides that "[a]n expert

---

[8] Dr. Baron has submitted an expert report in this case, and Plaintiffs do not
challenge his qualifications or the reliability of his opinions.

may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. "Although '[a]n expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert,' the expert may rely upon another expert's opinion if 'the facts or data relied upon [are of] the kind that experts in the particular field would reasonably rely on . . . in forming an opinion on the subject.'" *Vox Mktg. Grp., LLC*, 521 F. Supp. 3d at 1144–45 (quoting *Gopalratnam*, 877 F.3d at 789 and Fed. R. Evid. 703).

In the field of fire cause and origin investigations, it is well established that reliance on the expertise of others is standard industry practice. *See, e.g.*, *United States v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000) (explaining that the fire cause and origin expert's "reliance on reports, photographs, and third-party observations . . . served as a reliable basis for his testimony because these materials are facts or data 'of a type reasonably relied upon by experts' in the field of fire cause and origin"); *Westfield Ins. Co. v. Harris*, 134 F.3d 608, 613 (4th Cir. 1998) (explaining that a state deputy fire marshal was permitted to rely on the insurance company's investigator's report in forming his opinion); *United States v. Durango & Silverton Narrow Gauge R.R. Co.*, 571 F. Supp. 3d 1203, 1207 (D. Colo. 2021) (noting that experts in the fire investigator's field regularly rely on the work of trained subordinates and such was reasonable in that case). The NFPA 921 specifically recognizes that when an "investigation involves a specialized industry [or] piece of equipment, . . . an expert in that field may be needed to fully understand the processes involved." NFPA 921 § 15.5.7 [Doc. No. 112-4 at 9].

14

The Court must decide whether Mr. Oliveaux has sufficient specialized knowledge to assist the factfinder in deciding the issues in this case. *Kumho Tire*, 526 U.S. at 156. Upon examination of Mr. Oliveaux's report and his deposition testimony, the Court concludes that his qualifications encompass those required to proffer the opinions offered here. Mr. Oliveaux is a certified fire and explosion investigator who physically inspected the scene of the fire loss on more than one occasion. He received an associate degree in fire science from Louisiana State University in 1999, and he has completed more than 200 hours of training at the Louisiana State University Fire & Emergency Training Institute. [Doc. No. 112-2 at 4]. Additionally, Mr. Oliveaux has completed 80 tested hours of fire and arson investigation training through the National Fire Academy and hundreds of hours of training in various fire investigation topics through the Public Agency Training Council and International Association of Arson Investigators. *See id.* at 4–5.

Mr. Oliveaux has been the Chief Investigator for SOS Investigations, Inc. for 30 years. *See id.* at 2. In that role, he has investigated more than 1,000 fires, including RV fires where gas absorption refrigerators were present. [Doc. No. 112-1 at 16; Doc. No. 122-5 at 5, 11]. He has provided expert consulting services in fire cause and origin investigations and accident reconstruction for three decades. [Doc. No. 112-1 at 16].

Additionally, Mr. Oliveaux has served in several different capacities on the West Feliciana Fire Protection District from 1988 to the present, including as a firefighter, instructor, investigator, chief, assistant chief, and interim fire chief. [Doc. No. 112-2 at 2–3]. As lead investigator for the department's fire investigations division, he led numerous

arson and fire related death investigations. [Doc. No. 112-1 at 16]. As such, the Court finds that his testimony will be helpful to the trier of fact, and he is qualified to proffer the opinions at issue.

**C.      Reliability**

Finding that Mr. Oliveaux is qualified, the analysis shifts to the reliability of his opinions. In conducting its *Daubert* review, the Court must focus on "principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Despite this focus, "an expert's conclusions are not immune from scrutiny." *Dodge*, 328 F.3d at 1222. "'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). The purpose of the *Daubert* analysis "is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 1222–23 (quoting *Kumho Tire*, 526 U.S. at 152).

A witness may acquire expertise on a subject based on experience in that field. *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014). However, "witnesses 'relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Id.* (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Whether other courts have

accepted the methodology is relevant in determining whether expert testimony is reliable. *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780–81 (10th Cir. 2009).

Plaintiffs assert that Mr. Oliveaux used a "flawed and unreliable methodology" to support his opinions and that his "[f]ailure to investigate a hypothesis [i.e., inspect the lumber pile] is a clear violation of the Scientific Method," under the NFPA 921. [Doc. No. 122 at 5–6]. Specifically, Plaintiffs take issue with Mr. Oliveaux's claim that the lumber pile was "spoliated" or "cleaned up" before he could complete his investigation. In response, Dometic asserts that Mr. Oliveaux used a reliable methodology in deriving his opinion on the origin of the fire, and his inability to test the lumber pile does not render his opinion as to origin unreliable.

A district court has broad discretion to decide "'how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability.'" *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1216 (10th Cir. 2016) (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 990 (10th Cir. 2003)). "As the Supreme Court said in *Kumho Tire*, '[t]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Id.* at 1216–17 (quoting *Kumho Tire*, 526 U.S. at 152).

To establish an expert's testimony as reliable, the proponent need not prove the expert is indisputably correct; rather, the party must show the method employed by the expert in reaching his conclusion is sound and the opinion is based on facts which

sufficiently satisfy Rule 702's reliability requirements. Mr. Oliveaux's analysis meets those requirements.

The parties here do not dispute that the NFPA 921 is the industry standard for fire and explosive investigations, and that the 2017 edition is applicable. [Doc. Nos. 104-3 at 45–46; 104-2 at 29; 112-1 at 18]; *see also Sipes v. Allstate Indem. Co.*, 949 F. Supp. 2d 1079, 1086 (D. Colo. 2013) (noting that the "NFPA 921 is a generally accepted peer reviewed fire investigation guide that is the industry standard for investigations of fires and explosives"). The NFPA 921 requires an investigator to collect data, analyze the data, develop hypotheses, and test the hypotheses before selecting a final hypothesis. NFPA 921 §§ 4.3.3, 4.3.4, 4.3.5, 4.3.6, 4.3.7 [Doc. No. 112-4 at 4]. It incorporates the scientific method, which requires the consideration of alternate hypotheses. *See id.* § 4.3.7.

Testing can take many forms, including physical experiments, relying on the scientific research of others, and applying accepted scientific principles. *See id.* § 4.3.6; *see also Mickelsen v. Aramark Sports & Ent. Servs.*, 536 F. Supp. 3d 1238, 1243 (D. Utah 2021) (noting that the fire cause and origin expert's lack of physical testing on his explosion hypothesis was expressly permitted by the NFPA 921). In applying this methodology, the NFPA 921 indicates that generally fire investigators should first determine and establish the origin of the fire and then investigate the cause. NFPA 921 § 4.1 [Doc. No. 112-4 at 3].

In reviewing Mr. Oliveaux's expert report and his deposition testimony, he asserts that physical testing of the lumber pile was not possible because it was "cleaned up" or "spoliated." However, as his expert report reflects, he followed the scientific method in

considering and excluding several hypotheses of origin before opining that the fire

originated in the lumber pile. His determination of the area of fire origin was based on

eyewitness accounts, video and photographic evidence, fire damage pattern analysis,

electrical arc mapping, and fire dynamics. [Doc. No. 102-1 at 20–22]. This is consistent

with the NFPA section 17.1.2, which provides that an investigator "must analyze witness

information, fire patterns, arc mapping . . ., and fire dynamics" to determine the origin of

the fire. *See Sipes*, 949 F. Supp. 2d at 1087 & n.12. Following an examination of the

exterior and interior of the property, collection of evidence, analysis of burn patterns, and

observation of the fire's trajectory, Mr. Oliveaux concluded that the fire originated

outside the shop in the lumber pile; however, he declined to opine as to what caused or

ignited the fire because he asserts, he did not have the opportunity to examine and further

test the lumber pile.

Plaintiffs contend that Mr. Oliveaux's spoliation claim "is demonstrably false,"

and that there was nothing to preclude him from documenting, examining, testing, and

preserving the lumber pile during his first inspection of the fire scene in June 2018. [Doc.

No. 102 at 6].[9] Mr. Oliveaux in his deposition testimony asserted that he and his team

"ran out of time" and "asked to come back." [Doc. No. 112-3 at 22]. He asserts that he

---

[9] Mr. Howell asserts in his rebuttal report that Mr. Oliveaux never requested that
the lumber pile be collected. [Doc. No. 104-4 at 6]. Incidentally, the Court notes that Mr.
Howell represents in his initial expert report that prior to his and Mr. Oliveaux's joint
inspection of the scene on June 15, 2018, investigators from the Edmond Fire Department
and at least two investigators from Mr. Hoog's insurance carriers had processed the
scene. [Doc. No. 104-2 at 23]. Mr. Howell also indicated the same in his deposition
testimony and that the "scene had been partially cleaned up." [Doc. No. 104-3 at 72].

told Mr. Howell and Plaintiffs' counsel they "were not finished," and he contends that the scene "should have been preserved." *See id.* His deposition testimony indicates that the first inspection proceeded with frequent interruptions, including Mr. Hoog arriving in the middle of the day, and the parties being directed to various parts of the shop for evaluation. *See id.* at 10, 20–22.

The NFPA 921 speaks directly to preservation of evidence. It provides that "[c]are should be taken to preserve all evidence . . . . The loss or alteration of an item may have a significant consequence on the investigation and any litigation that may ensue." NFPA 921 § 8.6 [Doc. No. 112-4 at 6]. The Court finds that spoliation is a contested issue with conflicting testimony on both sides, and it does not render Mr. Oliveaux's opinions unreliable. It raises a matter of weight and not admissibility and can be adequately challenged on cross-examination.[10]

### D.    Bias Objection

Plaintiffs raise a bias argument in their reply brief, asserting that "Mr. Oliveaux is a creature of Dometic and . . . not an independent fire investigator" and that his testimony and opinions are "sufficiently compromised by bias" and should be excluded. [Doc. No. 122 at 6–7]. They base this argument on Mr. Oliveaux's spoliation claim and the fact that

---

[10] "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence. It will often occur that experts come to different conclusions based on contested sets of facts. Where that is so, the Rule 104(a) standard does not necessarily require exclusion of either side's experts. Rather, by deciding the disputed facts, the jury can decide which side's experts to credit." *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

he has conducted at least 190 fire origin and cause investigations involving Dometic gas absorption refrigerators. *See id.* at 7–8.

It is not proper to raise a new argument in a reply brief. Regardless, however, evidence of bias is not a proper basis for exclusion of expert testimony. It is the jury's role to assess any potential bias and the impact of any bias on the weight to give Mr. Oliveaux's testimony. *See United States v. McCluskey*, 954 F. Supp. 2d 1224, 1240–41 (D.N.M. 2013) (citing *Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 613 F.3d 54, 59 (1st Cir. 2010)).

## III.   <u>CONCLUSION</u>

Based on the parties' briefing and presentations, the legal standards, and the Court's analysis, the Court DENIES Plaintiffs' Motion to Exclude the Opinions of Walter Oliveaux [Doc. No. 102].

IT IS SO ORDERED this 22nd day of March 2024.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE